**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| SHANE AYERS, individually<br>and on behalf of O.A., a minor, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 1:24-cv-00064 |
| | ) | |
| EPIC GAMES, INC.; | ) | JURY TRIAL DEMANDED |
| TAKE-TWO INTERACTIVE SOFTWARE, INC.; | ) | |
| ROCKSTAR GAMES, INC.; | ) | |
| ROCKSTAR SAN DIEGO, INC. f/k/a | ) | |
| ANGEL STUDIOS, INC.; | ) | |
| ROCKSTAR GAMES UK LIMITED f/k/a | ) | |
| ROCKSTAR NORTH LIMITED | ) | |
| AND DMA DESIGN LIMITED; | ) | |
| MICROSOFT CORPORATION; | ) | |
| MOJANG STUDIOS f/k/a MOJANG AB; | ) | |
| SONY INTERACTIVE ENTERTAINMENT LLC; | ) | |
| ROBLOX CORPORATION; | ) | |
| NINTENDO OF AMERICA, INC.; | ) | |
| GOOGLE, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

Plaintiffs Shane Ayers, individually and on behalf of O.A., a minor, hereby file their *Complaint* against the Defendants: Epic Games, Inc., Take-Two Interactive Software, Inc., Rockstar Games, Inc., Rockstar San Diego, Inc. f/k/a Angel Studios, Inc., Rockstar Games UK Limited f/k/a Rockstar North Limited and DMA Design Limited, Microsoft Corporation, Mojang Studios f/k/a Mojang AB, Sony Interactive Entertainment LLC, Roblox Corporation, Nintendo of America, Inc., and Google, LLC (collectively, the "Defendants") notifying each Defendant of Plaintiffs' claims for relief as available under Florida law. In support thereof, Plaintiffs allege and state:

## I.   <u>NATURE OF THE ACTION</u>

1.     Video game addiction, also called internet gaming disorder, is a condition characterized by severely reduced control over gaming habits and increasing priority given to gaming over other activities, resulting in negative consequences in many aspects of a person's life, including self-care, relationships, school, and work.

2.     Video game addiction has negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making. Those suffering stop interacting with friends and/or family, exhibit excessive rage, and no longer enjoy other hobbies or activities outside of their video games.

3.      Video game addiction causes rifts between minors and young adults with gaming-addiction and their loved ones—rifts beyond that normally experienced between children and their parents or other family members.

4.     Video game addiction and its harmful consequences are only expanding due to the advent of online gaming, cloud gaming, and streaming of games on any device at any time—giving minors unfettered access to "free" games that target those consumers to purchase products within the game to keep playing or for other game perks.

5.     Video game addiction is a world-wide epidemic harming our nation's youth and young adults.

6.     The rapid spread of video game addiction is a proximate result of Defendants' concerted effort to get consumers (*i.e.*, minor and young adult game players) addicted to the Defendants' video game products in order to maximize Defendants' profits.

7.     Defendants manufactured, published, marketed, and sold video games and gaming products, including those played by O.A., which Defendants had specifically developed and

designed to cause the addiction experienced by O.A. and other users.

8.      Defendants use traditional game tactics such as feedback loops and reward systems, along with patented designs containing addictive features and technology to ensure its users keep playing longer and spending more on "microtransactions" within the game.

9.      Defendants rely on microtransactions to increase their profits from individual games.

10.     Defendants design their games to keep consumers playing—and spending—by enlisting the help of behavioral psychologists and neuroscientists to conduct state-of-the-art research and to collect data that Defendants use to develop and design their games to be as addictive as possible—especially to minors, young adults, and neurodivergent individuals.

11.     Defendants make their games addictive, in part, by encouraging long-term, extended game play despite knowledge that such extended play causes physical harm to the human brain – and particularly to a minor's developing brain.

12.     Defendants' motive in developing, designing, manufacturing, publishing, and selling addictive video game products is their own bottom line.

13.     By making their games addictive, Defendants are able to maximize profits after the original purchase or free download. Within their games, Defendants offer significant opportunity to purchase downloadable game products and/or in-game transactions, known as "microtransactions," to allegedly give players an advantage in the game.

14.     "Microtransactions" often occur due to Defendants' use of patented technologies, algorithms, computer-generated "friends," targeted advertisements, or other deceptive tactics built into Defendants' video games. Thus, the more times a player comes back to play a game, the more times that player is subjected to Defendants' deceptive and harmful conduct and more likely to

spend more money within the game in order to keep playing, thereby increasing Defendants' bottom line.

15.    By keeping minors, young adults, and neurodivergent users playing longer—and spending more money during gameplay and product usage—Defendants are causing physical and mental harm to users while consistently increasing their revenue.

16.    By acquiring—and addicting—users when they are young, Defendants are securing their profit stream by ensuring future engagement and monetization as these product users age.

17.    Defendants are exploiting consumers, particularly minors, young adults, and neurodivergent users, through the use of unfair, unconscionable, and deceptive trade practices and conduct that prioritizes gamer engagement and spending over gamer safety.

18.    Video game addiction impacts thousands of product users and their families across the country, including in Florida.

19.    Plaintiffs are one of those families who have been negatively impacted by the addiction and harm caused by each of Defendants' video game products.

20.    Defendants' intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts proximately caused O.A.'s brain damage and gaming addiction, along with Plaintiffs' other damages as described herein.

21.    As a result of that gaming addiction and the harm caused by Defendants' products, O.A. specifically has experienced brain damage, severe emotional distress, diminished social interactions, loss of friends, poor hygiene, and withdrawal symptoms such as rage, anger, and physical outbursts.

22.    As a result of the gaming addiction and harm proximately caused by Defendants' misconduct, O.A. requires treatment, including out-patient counseling, private tutoring, and an

educational "504" plan at school. O.A. has also been diagnosed with depression and Attention Deficit Hyperactivity Disorder ("ADHD").

23.     As a result of O.A.'s gaming addiction and the harm proximately caused by Defendants' misconduct, Shane Ayers has personally witnessed and been affected by O.A.'s gamer's rage and withdrawal symptoms. Shane Ayers has personally experienced emotional distress, pain, suffering, mental anguish, and loss of money as a proximate result of Defendants' misconduct.

24.     Plaintiffs have been injured and harmed as a proximate result of Defendants' actions and misconduct; for that they are entitled to compensation and other damages under Florida law.

## II.     PARTIES

25.     O.A., a minor, is and at all times relevant to this action, was a citizen and resident of the State of Florida whose principal place of residence being in Dixie County, Florida.

26.     O.A. is 11 years old at the time of filing of this lawsuit.

27.     O.A. began playing video games at two (2) years old.

28.     O.A. has continued to play video games at an increasing and uncontrollable pace since that time.

29.     O.A. specifically played and/or plays Fortnite (began playing at approximately 5 years old), Red Dead (began playing at approximately nine years old), Minecraft (began playing at approximately 2 years old), and Roblox (began playing at approximately 3 years old).

30.     O.A. played and/or plays video games using multiple gaming devices and online gaming products, including: a personal computer, Xbox One, Xbox One X, Xbox 360, Nintendo Switch, Xbox Game Pass Ultimate, Xbox Game Pass Gold, and Google Play.

31.     O.A. has also purchased games from the Xbox Store and subscribed to Xbox Game Pass Ultimate, which provides access to all games identified herein as well as Xbox's online services.

32.     Plaintiff Shane Ayers is, and at all times relevant to this action was, a citizen and resident of the State of Florida whose principal place of residence is in Dixie County, Florida.

33.     Shane Ayers is the parent of O.A. and represents O.A.'s interests in this lawsuit.

34.     Shane Ayers also seeks redress on his own behalf for loss of society and companionship, as well as for economic injuries and losses sustained as a result of O.A.'s brain damage and gaming addiction proximately caused by each Defendant's intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, and for actual damages and injuries he personally sustained as a result of Defendants' deceptive, outrageous, fraudulent, and negligent acts.

35.     Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business at 620 Crossroads Blvd, Cary, North Carolina 27518.

36.     Epic Games is a video game and software developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Fortnite video game series and platform, either directly or indirectly, to members of the general public within the State of Florida, including to Plaintiffs.

37.     Defendant Take-Two Interactive Software, Inc. ("Take-Two") is a Delaware corporation with its principal place of business at 622 Broadway, New York, NY 10012.

38.     At all times material hereto, Take-Two designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied,

and/or sold the video gaming Red Dead series either directly or indirectly, to members of the general public within the State of Florida, including to Plaintiffs.

39.     Defendant Rockstar Games, Inc. ("Rockstar Games") is a Delaware corporation with its principal place of business at principal place of business at 622 Broadway, New York, NY 10012.

40.     At all times material hereto, Rockstar Games designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Red Dead series either directly or indirectly, to members of the general public within the State of Florida, including to Plaintiffs.

41.     Defendant Rockstar Games San Diego, Inc. f/k/a Angel Studios, Inc. ("Rockstar San Diego") is a Virginia corporation with its principal place of business at 2200 Faraday Avenue, Suite 200, Carlsbad, CA 92008.

42.     At all times material hereto, Rockstar San Diego designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Red Dead series either directly or indirectly, to members of the general public within the State of Florida,  including to Plaintiffs.

43.     Defendant Rockstar Games UK Limited f/k/a Rockstar North Limited and DMA Design Limited ("Rockstar North") is a British company with its principal place of business in Edinburgh, Scotland.

44.     At all times material hereto, Rockstar North designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Red Dead series either directly or indirectly, to members of the general public within the State of Florida, including to Plaintiffs.

45.     Rockstar Games is a video game publisher and a wholly owned subsidiary of Defendant Take-Two.

46.     Rockstar San Diego is a wholly owned subsidiary of and video game development studio operated by Defendant Rockstar Games, whose parent company is Defendant Take-Two.

47.     Rockstar North is a wholly owned subsidiary of and video game development studio operated by Defendant Rockstar Games, whose parent company is Defendant Take-Two Interactive Software, Inc.

48.     Take-Two is the parent company of Defendant Rockstar Games.

49.     Take-Two is the parent company of Defendant Rockstar San Diego.

50.     Take-Two is the parent company of Defendant Rockstar North.

51.     As parent company of Rockstar Games, Rockstar San Diego, and Rockstar North, Defendant Take-Two is responsible for any damages that may be assessed against Rockstar Games, Rockstar San Diego, and Rockstar North in connection with the video gaming Red Dead series.

52.     Defendants Take-Two, Rockstar Games, Rockstar San Diego, and Rockstar North (collectively, "Red Dead Defendants") acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming Red Dead series with all the addictive features and technologies contained therein.

53.     Defendant Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business at 1 Microsoft Way, Redmond, WA, 98052.

54.     At all times material hereto, Microsoft developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold

the Minecraft video game series, either directly or indirectly, to members of the general public within the State of Florida, including to Plaintiffs.

55.     At all times material hereto,  Microsoft, in conjunction with its subsidiary video game design and development studio division, Xbox Game Studios, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series, either directly or indirectly, to members of the general public within the State of Florida, including Plaintiffs.

56.     Defendant Mojang Studios f/k/a Mojang AB ("Mojang Studios") is Swedish Company with its principal place of business in Stockholm, Sweden.

57.     At all times material hereto, Mojang Studios designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video series, either directly or indirectly, to members of the general public within the State of Florida, including to Plaintiffs.

58.     Mojang Studios is a wholly owned subsidiary of Microsoft, who acquired Mojang Studios and the Minecraft intellectual property for $2.5 billion in September 2014, and Microsoft is responsible for any damages that may be assessed based on Mojang Studios' wrongdoing in connection with its Minecraft video game product.

59.     Defendant Sony Interactive Entertainment LLC ("Sony") is a California company with its principal place of business at 2207 Bridgepointe Pkwy., San Mateo, CA 94404.

60.     Sony is a wholly owned subsidiary of Sony Group Corporation, a Japanese company with its principal place of business in Tokyo, Japan. Sony Group Corporation is, upon information and belief, the sole member of Sony.

61.     At all times material hereto, Sony developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Minecraft series, either directly or indirectly, to members of the general public within the State of Florida, including to Plaintiffs.

62.     Microsoft, Mojang Studios, and Sony (hereinafter, "the Minecraft Defendants") acted in concert in designing, developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, supplying, and/or selling the Minecraft video game series with addictive features and technologies contained therein.

63.     The Minecraft Defendants together with video game design studios, Xbox Game Studios, acted in concert in designing, developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, supplying, and/or selling the Minecraft video game series with addictive features and technologies contained therein.

64.     At all times material hereto, Microsoft designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Xbox video game consoles, including Xbox One X, Xbox One and Xbox 360, either directly or indirectly, to members of the general public within the State of Florida, including to Plaintiffs.

65.     At all times material hereto, Microsoft designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied the Xbox Network (formerly known as Xbox Live) and Xbox Cloud Gaming, which are available product features designed for use with the Xbox gaming console system, including to members of the general public within the State of Florida, including to Plaintiffs.

66.     At all times material hereto, Microsoft developed, tested, patented, assembled,

manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Xbox Game Pass to members of the general public within the State of Florida, including to Plaintiffs.

67.     Microsoft acted in concert with Epic Games, Take-Two, Rockstar Games, Rockstar San Diego, Rockstar North, Mojang Studios, Sony and Roblox to distribute, market, supply, and/or sell the Fortnite, Red Dead, Minecraft, and Roblox video games and all in-game downloadable content and in-game purchases contained therein in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

68.     Defendant Roblox Corporation ("Roblox Corp.") is a Delaware corporation with its principal place of business at 910 Park Pl., San Mateo, CA 94403.

69.     Roblox Corp. is a video game developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold its video game, Roblox, either directly or indirectly, to members of the general public within the State of Florida,  including to Plaintiffs.

70.     Defendant Nintendo of America, Inc. ("Nintendo") is a Washington corporation with its principal place of business located at 4600 150th Avenue NE, Redmond, WA 98052-5113.

71.     Nintendo is a wholly owned subsidiary of Nintendo Co. Ltd., a Japanese company with its principal place of business in Kyoto, Japan.

72.     At all times material hereto, Nintendo designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Nintendo Switch console and the Nintendo eShop, either directly or indirectly, to members of the general public within the State of Florida, including Plaintiffs.

73. Nintendo acted in concert with all herein named Defendants to distribute, market, supply, and/or sell the Fortnite, Red Dead, Minecraft, and Roblox video games and all in-game downloadable products and in-game purchases contained therein to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

74. Defendant Google LLC ("Google") is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Pkwy., Mountain View, CA 94043. The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business at 1600 Amphitheatre Pkwy., Mountain View, CA 94043, and is a wholly owned subsidiary of the publicly traded company Alphabet Inc. Google LLC is the primary operating subsidiary of Alphabet Inc.

75. At all times material hereto, Google designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, and/or supplied the Google Play app, either directly or indirectly, to members of the public within the State of Florida, including to Plaintiffs.

76. Google acted in concert with the Minecraft Defendants and Roblox Corp. to distribute, market, supply, and/or sell the Minecraft and Roblox video games and all in-game downloadable products and in-game purchases contained therein to increase Google's revenue at the expense of Florida consumers, including to Plaintiffs.

77. Upon information and belief, each Defendant was aware—or should have been aware—that video game product manufacturers, designers, developers, and publishers, including the other Defendants named herein, were engaging in the unlawful, deceptive, negligent, outrageous, immoral, and reckless behavior identified herein.

78. Upon information and belief, Epic Games, Take-Two, Rockstar Games, Rockstar San Diego, Rockstar North, Microsoft, Mojang Studios, Sony, Roblox Corp., Nintendo, and Google acted in concert and entered into licensing agreements to utilize the same patents to keep users, including minors like O.A., playing longer and dependent on (i.e., addicted) to Defendants' products.

79. At all times material hereto, each Defendant targeted consumers/purchasers, including minors, young adults, and neurodivergent individuals, to (1) purchase and/or play its video games and (2) to purchase in-game items or perks in exchange for real money through in-game advertising and "fake" avatar friends.

80. Each Defendant—with knowledge of O.A.'s age and Florida residency—targeted O.A. and induced O.A. to enter into microtransactions.

81. Upon information and belief, each Defendant—with knowledge of O.A.'s age and Florida residency, allowed third parties to target O.A. and induce O.A. into microtransactions within Defendants' products.

### III.    JURISDICTION AND VENUE

82. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of the *Complaint*.

83. This *Complaint* brings forth claims for relief arising under the laws of the State of Florida, including but not limited to allegations that as a direct and proximate result of Defendants placing the defective gaming products into the stream of commerce, Plaintiffs have suffered and continue to suffer both injuries and damages, as described herein, within the State of Florida that exceed the sum or value of $75,000, exclusive of interest and costs.

84.    This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states.

85.    This Court has personal jurisdiction over each Defendant because each routinely conducts business in Florida and has sufficient minimum contacts in Florida to have intentionally availed itself to this jurisdiction by marketing video game products and transacting business in the State of Florida.

86.    At all relevant times, each Defendant was present and transacted, solicited, and substantially conducted business in the State of Florida through their employees, agents and/or sales representatives, and derived substantial revenue from such business.

87.    Defendants are conclusively presumed to have been doing business in this State and are subject to Florida's long arm jurisdiction.

88.    At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within Florida and throughout the United States.

89.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things: (a) Plaintiffs are all residents of this District and citizens of this State; (b) each Defendant directed its activities at residents in this District; (c) each Defendant conducted substantial business in this District; (d) each Defendant directed its activities and services at residents in this District; and (e) many of the acts and omissions that give rise to this action took place in this District.

## IV.    GENERAL ALLEGATIONS

### A.  The Rise of Video Games

90.    A "game" is a closed, formal system that engages players in structured conflict and resolves its uncertainty in unequal outcome.

91.    Video games are closed in the fact that once engaged in the game, the player sets

aside their rules for daily life and accepts the rules of the game as the status quo.

92.     A "video game" specifically is an object or device that stores recorded data or instructions generated by a person who uses it, and by processing the data or instructions creates an interactive game capable of being played, viewed, or experienced on or through a computer, gaming system, game console, or other technology.

93.     Unlike traditional arcade-style games, online video games require active, lengthy participation, during which players are exposed to psychological techniques designed to control, manipulate, and exploit minors' developing brains to increase game playing time and encourage in-game purchases.

94.     Such manipulation and exploitation are possible—and common—because video games have little regulation beyond the Entertainment Software Ratings Board.

95.     The first video games were sold in the 1970s, and by the mid-1980s, many video game franchises were released that are still in production today.

96.     The industry is yet young, and in a short period of time has rapidly evolved from gaming machines to games on virtual and augmented reality gaming consoles.

97.     Early video game companies would create games and sell them mostly through physical cartridges or discs and the costs of developing the game, and profits, were realized through the sale of their games over a period of time which resulted in a long and slow method of earning profits.

98.     A new revenue model based on in-game purchases was created that would allow the publishing companies to earn more profits over a very short period of time. This model is driven by increasing a minor's game play time and keeping them engaged to assure addiction and increase in-game purchases.

99.     Today's technology enables video games on a scale unimaginable 20 years ago. From open-world games with hundreds of square miles to explore to role playing games that can take hundreds of hours to beat, there is a staggering amount of gameplay available to users in modern video games.

100.    The video gaming market grew slowly, taking more than 35 years to reach $35 billion; however, between 2007 and 2018, the industry has grown by more than $100 billion to $137.9 billion.

101.    The global video game industry occupies a special place in the entertainment and media market, now being one of the fastest-growing segments.

102.    In 2023, the video game industry's revenue was $365.6 billion globally.

103.    With the advent of in-game purchasing systems, video games as a consumer product have thrived from in-game purchases.

104.    Most in-game purchases have been made by minors and young adults, including O.A.

105.    The explosive growth of the video game industry has been fueled by patented "monetization schemes" that target minors and young adults who are induced to make several in-game purchases, or "microtransactions," of downloadable products.

106.    Often, there is no meaningful disclosure of the inclusion of microtransactions in the game at the time of download or of the use of psychological mechanisms employed within the games for consumers or parents to make informed decisions about the safety of games.

107.    In order to entice minors and young adults to make such in-game purchases, video game product manufacturers, developers, and publishers, like Defendants, rely on minors and young adults becoming addicted to their video games so they play for more hours and spend more

money on microtransactions.

## B. Microtransactions

108.    Instances where players are able to spend real money for in-game items or perks are known as "microtransactions" (sometimes abbreviated "mtx").

109.    The gaming industry calls such purchases "microtransactions" because a single virtual item is often relatively low in price, but often they are bundled together in "value" packs, or games require players to purchase them repeatedly in order to meaningfully advance the game.

110.    Some games allow players to purchase items that can be acquired through normal means; players may opt to make such purchases if they lack the skill or available time to earn the items through regular game play.

111.    Some games, however, heighten exclusivity by including items that can only be obtained through microtransactions.

112.    Microtransactions are often used in free-to-play games to provide a revenue source for the developers and publishers. Such free-to-play games that include a microtransaction model are sometimes referred to as a "freemium."

113.    While microtransactions are a staple of mobile app games, they are also seen on PC software and console gaming.

114.    Microtransactions first appeared in 2006 but did not prove to be a good profit-making model for developers and publishers until smartphones started to get more powerful and more players started switching to mobile gaming.

115.    In 2012, there was a huge rise of microtransactions mostly because of mobile gaming titles, and they became the normal model across the video gaming industry by 2014.

116.    Microtransactions are most commonly provided through a custom store interface

placed inside the app or game for which the items are being sold.

117.    Developers and publishers can also use microtransactions to lock potentially significant product upgrades and "easter eggs" designed to extend gameplay and increase a player's dopamine levels behind paywalls.

118.    Unlike patches or updates, which are essential to remove bugs and enhance in-game experiences, microtransactions are non-essential components of the game and are planned in advance by companies.

119.    The market strategy for the game developers and publishers is that in the long term, the revenue from a microtransaction system will outweigh the revenue from a one-time-purchase game.

120.    This is because microtransaction spending can easily—and quickly—add up to hundreds, or even thousands, of dollars.

121.    This new model heavily relies on patented algorithms built into the game, yet concealed from users, to ensure revenues earned by a video game are recurring for as long as the game is available and players are playing it.

122.    Microtransactions were designed to use operant conditioning to ensure the impulsive behavior of players and the gaming environment and peer pressure to drive purchases.

123.    For instance, placing a time limitation on a microtransaction offer may push a user to impulsively buy a particular item. Similarly, a player's desire to be the first among a group of friends to buy an in-game premium item or achieve a higher-ranking will drive a player to make microtransaction purchases.

124.    Today, microtransactions make up 30% of the total gaming revenue earned across the industry.

125.   Microtransactions are not only benefiting the gaming industry publishers and developers; the console manufacturers and suppliers-owners of online video game stores that allow the microtransactions in video games made available to consumers take a cut of the revenue from each purchase—typically about 30% depending on the size of the app developer. For example, Google, Apple, and Steam all receive revenue for in-game purchases made on games downloaded through their products.

126.   While these corporate industries are benefiting from the microtransaction model, the most vulnerable to these manipulative monetization schemes are America's youth and young adults.

127.   Each Defendant knows this, or should be aware of this, because they have purposefully designed their video games to be addictive and rely on microtransactions to make money from this vulnerable population.

## C. The Monetization Schemes Built into Video Games

128.   Predatory monetization schemes in video games are essentially purchasing systems within the games that disguise or withhold the long-term cost of an activity until players are already committed, both psychologically and financially.

129.   The schemes use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated play and increased spending among users, especially among vulnerable populations like minors.

130.   Specifically, such tactics may involve, either singularly or in combination: limited disclosure of the product, intrusive and unavoidable solicitations, and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.

131.   Game developers and publishers utilize many strategies to enhance the predatory

monetization tactics in their games. Such strategies include:

    a.   The "near miss": convincing players via exciting animation, for instance, that they were very close to winning;

    b.   "Chasing": encouraging players to keep playing to get back any money they just lost;

    c.   "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window;

    d.   "Exclusivity": suggesting that only a small number of a special prize are available so it must be obtained immediately;

    e.   "Entrapment": convincing players they are about to win, or they have invested enough to win, but if they stop playing they will miss out on the win; or

    f.   The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

132.    The psychological tactics described in the foregoing paragraph are only one part of the predatory monetization schemes.

133.    Some games also permit a player limited or temporary possession of a certain item to encourage urgent use and/or additional purchasing. Others give only limited disclosure or misrepresentation of important conditions of the purchase, including the long-term value or utility of a purchased item.

134.    Another noteworthy aspect of predatory monetization is the collection and use of individual player data to manipulate the nature and presentation of purchasing offers in ways that maximize the likelihood of the player spending money. Specifically, the games are capable of tracking various player metrics and adjusting their design in automated ways to elicit in-game

purchasing.

135.    Such schemes exploit an information asymmetry between purchaser and provider, in that the game system knows more about the player than the player can know about the game. This allows the gaming industry to use its knowledge of the player's game-related preferences, available funds, and/or playing and spending habits to present offers predetermined to maximize the likelihood of eliciting player spending.

136.    Games and video game products linked to a game player's social network pages also gather information about players and Defendants use this information to target products and microtransactions to users based on that player's unique interests and preferences.

137.    As the game system gathers more data on how various types of players behave under certain conditions, the game becomes better equipped to present in-game events and purchasing situations that will elicit the desired behavioral outcome (*i.e.,* spending or playing longer).

138.    The prices of in-game items may be determined by factors that are not disclosed to the player because the algorithm considers the player's available funds and cost sensitivity to certain items. This allows the game to incentivize continuous spending, while offering limited or no guarantees or protections.

139.    As the playing population as a collective invest more and more time in the game, the game system may become more adept at "knowing" each player, both individually and as part of its group.

140.    Such systems that dynamically adjust in-game item prices and value based on individual player analytics, which were primarily implemented by developers to serve monetary goals and which lack basic transparency to the player, may have the potential to exploit certain

types of vulnerable players under certain conditions.

141.     These continued schemes with little to no restriction on the amount of spending in the payment interface also makes it easy for children to stop understanding the value of the actual money being spent and continue spending more and more.

142.     A few specific examples of predatory monetization schemes include Defendants' sale of loot boxes, rubber-banding, and pay-to-win models.

**i.   Loot Boxes**

143.     A "loot box" is an in-game reward system that can be purchased repeatedly—with real money—to obtain a random selection of virtual items. Loot boxes could contain items that give players an advantage in the game, or cosmetic items that can be used to customize characters or weapons.

144.     Through purchasing a loot box, the player acquires a seemingly random assortment of items.

145.     The low probability of obtaining a desired item in a loot box means that the player will have to purchase an indeterminate number of loot boxes to obtain the item.

146.     Loot boxes require no player skill and have a randomly determined outcome (*i.e.,* prize).

147.     Loot boxes are essentially a lottery that provide a way for gaming developers, publishers, suppliers, and even console manufacturers to increase revenue through underage gambling.

148.     It is common knowledge that gambling addiction is a severe issue and a big risk when playing lottery-style games, so combining these aspects with the psychologically addictive traits of video games is highly dangerous for players.

149.     After being compared to gambling, many games started adding probability to earn respective items in their loot boxes. However, the odds are still extremely against the players; rare items have incredibly low probabilities such as 0.08%.

150.     Loot boxes still have the same designs, opening of animations, and more features to release dopamine leading to players purchasing more microtransactions—much like the tactics used in gambling.

151.     Loot boxes are also ultimately controlled by the gaming developers and publishers, meaning that the "prizes" obtained from such boxes are likely to be determined by algorithms and other factors considered in the game design.

152.     Loot boxes result in high revenues for the gaming developers and publishers, like Defendants, because instead of a one-time purchase for the desired item, users may have to buy multiple boxes.

**ii. Rubber-Banding**

153.     Another example of a monetization scheme is "rubber-banding."

154.     Games have long employed rubber-banding to ensure dynamic difficulty, or a consistently challenging experience, irrespective of the player's skill level. For instance, matching computer opponents to a player's skill level.

155.     Game developers and publishers also use this same principle of rubber-banding with microtransactions to ensure that the game's financial requirements are adjusted to match the player's desire and capacity to pay.

156.     In this sense, the "difficulty" of a monetized game may be considered analogous to the player's cost sensitivity or the willingness of the player to make continued in-game purchases.

157.     If an item costs too much, then the players of monetized games cannot strategize to

win, but instead must decide between making in-game purchases or not playing at all, or potentially playing without paying, but doing so with significantly diminished in-game capability that generate regular feelings of frustration.

158.    Such technical sophistication in these purchasing systems aims to reduce the player's uncertainty or reluctance regarding purchasing decisions.

### iii. Pay-To-Win

159.    Some games operate on a "pay-to-win" model, a type of predatory monetization scheme that incentives players who pay more.

160.    Players who are willing to shell out more money get a disproportionate advantage over other players, particularly if the items cannot be obtained through free means.

161.    For example, paying players may get access to certain capabilities such as access to shortcuts, special characters with unique skills, or even special items. Such capabilities may make the games impossible to beat by ordinary, non-paying players.

162.    Games with such imbalances may prevent the non-paying players from progressing or remaining competitive.

### D.  Patents Target Minors to Increase In-Game Spending

163.    Several video game manufacturers, developers, publishers, and suppliers have incorporated these design strategies into gaming patents that contribute to higher risk consumer behavior.

164.    Game companies often seek to keep their intellectual property confidential. As such, there are very few objective, transparent, or complete accounts on the precise nature of monetization in their games.

165.    Several patents shed light on the innovative video game monetization invented to

nudge users into making in-game purchases, including:

   a. U.S. Patent No. 8,360,866 B2, assigned to Leviathan Entertainment, LLC, describes an invention that encourages users to make in-game purchases when they face a difficult scenario, such as "kill[ing] a particular monster . . . or player character." Such an offer is referred to by Luchene as an "upsell message" and "can be, for example, for an item that is useful in overcoming the difficulty the player has encountered."

   b. U.S. Patent No. 10,099,140 B2, assigned to Activision Publishing, Inc., similarly describes a "customized messaging campaign for [a game] player" and allows messages to be "customized for a gamer based on his or her behavioral data" such as "level of interest or satisfaction with a game." Triggers for such messages may include "a player winning or losing a predetermined number of games in a row" and may include "promotions relating to microtransactions or downloadable content."

   c. U.S. Patent No. 9,789,406 B2, assigned to Activision Publishing, Inc., modifies the difficulty of multiplayer matches to encourage microtransaction purchases. Specifically, the game identifies "an in-game item that may be relevant for (*i.e.*, of interest to) a first player," then locates "a second user that has acquired (*i.e.*, purchased), used, or otherwise possesses the in-game item." Matchmaking variables are then tuned such that the first player and second user are matched in a gameplay session.

   d. U.S. Patent No. 9,623,335 B1, assigned to Kabam, Inc., utilizes a "user spend parameter value" to "determine which users should be provided with access to

an exclusive virtual section of the online game." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

e.  U.S. Patent No. 9,138,639 B1, assigned to Kabam, Inc., describes a system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

f.  U.S. Patent No. 8,702,523 B2, assigned to Microsoft, was created to capitalize on a player's tendency to commit to a purchase after investing significant time into a trial version of a game. In short, a user is made "aware of an opportunity to add an achievement to their collection by downloading and playing a demo or trial version of a particular game," but "[i]nstead of recording the achievement" upon completion, the game "initiates a notification to the user . . . that the achievement will not be recorded unless they purchase the full version of the game at that time." more specifically, with the patent:

   i.  Game play achievements for a free trial version are tracked and maintained even if the console is not connected via a network to the server so that when, and if, the console is eventually connected to the server, the achievements saved locally (e.g., on the console hard drive, on an associated memory unit, etc.) are uploaded and become automatically discoverable to other online users playing the game on different consoles.

ii. The machine license, a component of the patent, allows any user on the console access to the downloaded game product, including all game components and product-content, regardless of the console's connection to the internet or the existence of parental controls.

g. U.S. Patent No. 9,795,886 B1, assigned to Electronic Arts, Inc., allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

h. U.S. Patent No. 10,252,170 B2, assigned to Hasbro, Inc., encourages players to make purchases outside of a game to receive in-game benefits and allows players can earn in-game points for scanning codes that come with separately purchased physical toys. For instance, the patent allows the developer using the patent in their video game design to stay connected with the user by requiring a player to keep their "avatar" charged by earning points by scanning codes on toys, through continued game play, or engaging in real world activities, thereby creating an endless video game running on a mobile electronic device that allows a player to play continuously as long as the player earns points playing the game, which is enhanced to allow the player to earn points by creating input from real environment activities, such as by scanning a code on a physical object or by producing activity related data from athletic activity.

i. U.S. Patent No. 10,569,171 B2, assigned to Disney Enterprises, Inc., associates

a gaming device with a "video game application that is associated with media content, such as a television show broadcast by a television network and displayed on a television." Such device "captures, e.g., from a microphone of the gaming device, an audio signal from the media content being played concurrently with the video game application" and "uses content recognition techniques to identify the media content, unlocks 'premium' in-game content that augment gameplay of the video game application."

j.   U.S. Patent No. 9,582,965 B1, assigned to Kabam, Inc., incentivizes users to alter virtual item balances in an online game. A game may specify "target balances of virtual items to be reached in user inventories" and may specify "a time by which such target balances must be reached." For instance, the player may be given a goal of reaching a target balance of 3,000 gems within 48 hours to receive a premium virtual item. The player has the option to use real-world money to buy gems to earn that goal. After the 48-hour time period passes, another goal may be set that specifies a target maximum balance of 1,000 gems, encouraging users to spend the newly acquired gems that were just purchased.

k.   U.S. Patent No. 9,403,093 B2, assigned to Kabam, Inc., encourages users to make purchases on multiple game platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating the play the game."

l.   U.S. Patent No. 9,626,475 B1, assigned to Kabam, Inc., facilitates a time-

limited event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

m. U.S. Patent No. 9,666,026 B1, assigned to Aftershock Services, Inc., provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers provided "may include a first offer having a first value that progressively decreases based on an amount of users that have previously accepted the first offer in order to incentivize early acceptance of the offer."

n. U.S. Patent No. 9,808,708 B1, assigned to Kabam, Inc., adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

o. U.S. Patent App. No. 20160346677 A1, assigned to Electronic Arts, Inc., but currently abandoned, describes a system which provides "[a]pproaches to facilitating chance-based wait time reductions." Essentially, such a system would allow users to spend money to reduce waiting periods that may or may not be disclosed at the time of sale.

p. International Application No. PCT/US2019/042697, a pending patent application filed by Sony Interactive Entertainment, LLC, would patent technology that suggests microtransactions to players who are stuck in the game

to keep them engaging and playing the video game. more specifically, this patent would collect and "process[] game data of the player for determining a current state and process[] game data of other players that have completed the objective" in order to suggest to the player what "downloadable content (DLC), add-ons, upgrades, items, tips, strategy, communal data" or otherwise would be useful to the player to complete their objective. The patented method further includes operations for identifying successful attempts of completing the objective by other players and the resources used in doing so, and send selects a resource that is usable by the player to complete the objective based on those resources by the other players in the successful attempts and presents the resource to the player for immediate use. *See also* US 202000030702A1, filed July 24, 2020.

166.    There was once a time when such lopsided consumer video game monetization-related inventions would have been patent ineligible. However, because of the introduction of these patents, game developers and publishers can further deceive and harm society's most vulnerable—minor children—while lining their own pockets.

167.    The mere fact that one video game publisher or developer holds a patent on certain monetized technology does not mean that similar schemes are not in other companies' games.

168.    It is common practice for manufacturers, developers, publishers, and suppliers, like Defendants, to utilize technology patented by other companies by entering into licensing agreements with the company holding the patent—or buy the rights to the patent outright.

**E.  These Predatory Monetization Schemes Attract "Whales" to Defendants' Games**

169.    What players and parents, including Plaintiffs, often do not understand is that their

gaming experience is not accidental, but rather carefully engineered by the game's manufacturers, designers, developers, publishers, and suppliers.

170.    In every game, there are several hundred, or maybe even thousands, of players who spend much more money in the game than the other players.

171.    Companies employ tactics specifically to attract heavy spending users—or "whales" or "VIPs."—and to induce them into spending even more money. For instance, when "whales" get stuck in the game, they are given a bonus to continue because it is better for the gaming companies to give them occasional free things than for the players to get fed up and stop paying.

172.    Gaming companies, like Defendants, have specialized departments within their companies to focus on these "whales" or "VIPs," to stay in contact with them, and to form relationships with them.

173.    To target those who may be likely to spend additional money in the game, game manufacturers, developers, publishers, and suppliers, like Defendants, will monitor players and collect user information, from their game play to their social networks. Companies can then further target these users with advertisements or offers in an effort to increase their revenue at the expense of the player.

174.    The gaming industry is built on those consumers who "maintain the game" and in turn create the revenue for the game companies. The proportion of heavy users significantly increases revenue numbers for these companies. By monetizing player addiction, game companies notably increase their bottom line.

**F. Defendants Include Specific Features in their Games to Keep Players Engaged – and Addicted**

175.    In addition to microtransactions, video games include several additional features to

keep players engaged and playing longer, including the use of algorithms, feedback loops, continuously adding new product content, and using tactics to ensure users are creating habits in their gameplay.

176.    Many gaming features now are based on algorithms within the game to manipulate the type of play that users are experiencing.

177.    For instance, Activision Blizzard, Inc. holds numerous patents that provide a framework of artificial intelligence to monitor, analyze, and control users' game time to increase game play time and fuel additional purchases.[1]

178.    Upon information and belief, video game developers and publishers, including but not limited to Epic Games, Take-Two, Rockstar Games, Rockstar San Diego, Rockstar North, Microsoft, Mojang Studios, Sony, and Roblox Corp., and video game product suppliers and manufacturers, including but not limited to Microsoft and Nintendo, license this patented technology from Activision Blizzard, Inc., which allows the licensee, including all Defendants, to control users' experiences within the game.

179.    Defendants are also utilizing several psychological tools to increase game play time, such as the use of feedback loops.

180.    Feedback loops are systems where the game reacts to how well the player is doing in order to make the games more rewarding, or for tougher games, more challenging.

181.    Feedback loops are a core part of video games because developers and publishers have a vested interest in making players want to play their games for as long as possible.

182.    There are two kinds of feedback loops: positive and negative.

---

[1]    *See* Patents assigned to Activision publishing, JUSITIA, https://patents.justia.com/assignee/activision-publishing-inc (last accessed Oct. 29, 2023).

183.   Positive feedback loops mean that when you're doing well, the game rewards you with things to help you do even better.

184.   Negative feedback loops, on the other hand, add a challenge to a game when you are doing too well.

185.   Feedback loops are used to bring balance to games that would otherwise get too difficult or too boring.

186.   By introducing both positive and negative feedback loops into a game, designers can build a dynamic level of difficulty control.

187.   A player's successes are reinforced through positive feedback loops, while their increasing ability to overcome the core game's challenges is curtailed by the use of negative feedback loops.

188.   When done well, feedback loops enhance the player's experience by maintaining a consistent level of challenge throughout a game, while still rewarding the player for their achievements.

189.   In theory, this creates the holy grail of the games design world, a game that maintains the feeling of challenge and achievement for the entirety of the game and keeps players playing longer.

190.   Gaming companies, like Defendants, also know that the best way to get a player to come back to the game and spend money is to make the game a habit or part of their life.

191.   Creating a habit consists of a cycle of three things: reminder, routine, and reward. The specific purpose of these rewards is to create a daily routine, and ultimately a habit, of playing the game for the user.

192.   Gaming companies, like Defendants, know this and use deceptive and unfair tactics

to keep players coming back multiple times a day to play. For instance, gaming companies, like Defendants, try to addict players to their games by providing daily rewards or time-released rewards to keep players consistently coming back.

193.    Another tactic gaming companies, like Defendants, use to addict players is to add more game content over time thereby keeping users playing over a longer period of time.

194.    By constantly adding downloadable content or product upgrades to their video game products, *e.g.*, expansion packs and microtransactions, Defendants make it hard for players to finish a game while simultaneously keeping them hooked in the game.

**G.  Dark Patterns and Drip Pricing Have Allowed Defendants to Further Exploit Users**

195.    For decades, unscrupulous direct mail marketers and brick-and-mortar retailers have relied on design tricks and psychological tactics, such as pre-checked boxes, hard-to-find-and-read disclosures, and confusing cancellation policies, to get consumers to part with their money or data.

196.    The term "dark patterns" was coined in 2010 by user design specialist Harry Brignull to describe the deceptive and manipulative design practices used to trick consumers into making choices that could or may cause them harm—and that they would or may not have otherwise made.

197.    The purpose behind "dark patterns' is to take advantage of consumers' cognitive biases and steer their conduct or delay access to information needed to make fully informed decisions.

198.    Research shows that "dark patterns" are highly effective at influencing consumer behavior.

199.    The use of these manipulative design practices, or "dark patterns," has only grown

in scale and sophistication as more and more commerce has moved online, thereby creating ever greater challenges for consumers.

200.    Further challenging consumers is the common practice of using multiple "dark patterns" in combination, rather than in isolation.

201.    "Dark patterns" tend to have even stronger effects when they are combined, so they are rarely used in isolation.

202.    "Dark patterns" have a compounding effect, thereby increasing the impact of each and exacerbating the harm to the consumer.

203.    The use of manipulative design techniques, including "dark patterns," in the digital world can pose heightened risks to consumers. For example, the pervasive nature of data collection techniques, allows companies to gather massive amounts of information about consumers' identities and online behavior, enabling businesses to adapt and leverage advertisements to target a particular demographic or even a particular consumer's interests.

204.    Companies that market online can experiment with digital dark patterns more easily, frequently, and at a much larger scale than traditional brick-and-mortar retailers, to determine which design features most effectively influence consumer behavior. For example, online a company can easily and quickly rearrange products to mimic the consumers' behaviors, but also can easily test new marketing practices and digital dark patterns on consumers, deceiving consumers or manipulating them into taking unwitting or detrimental actions.

205.    Some dark patterns manipulate consumer choice by inducing false beliefs- such as a minor's belief that a skin or other in-game purchase means the child will actually obtain the desired object or game skill level.

206.    Other dark patterns operate by hiding or obscuring material information from

consumers, such as burying key limitations of the product or service in dense Terms of Service documents that consumers do not see before purchase.

207.     Free-to-play or "freemium" games are an example of games that fail to disclose to a minor that a game they purchase is not the entire game.

208.     Another variation on the hidden-fee dark pattern is "drip pricing," in which companies advertise only part of a product's total price to lure in consumers, and do not mention other mandatory charges until late in the buying process.

209.     Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction.

210.     Microtransactions built into many video games by design are a form of drip-pricing.

211.     Each Defendant uses, or has used at relevant times, "dark patterns in the design, development, manufacture, advertising, marketing, promotion, supply, and sale of their respective gaming products.

**H.  Cloud Gaming Enhances Defendants' Predatory Activities**

212.     Not only do individual games have predatory strategies built in to encourage users' spending and continued play, but several games are also now available on cloud-based systems.

213.     Cloud gaming, or gaming on demand, is a type of online gaming that runs video games on remote servers and streams them directly to a user's device.

214.     Traditionally, games would run locally on a user's video game console, personal computer, or mobile device.

215.     Cloud gaming products allow users to stream any game available on the product at any time.

216.     Cloud gaming eliminates the need for users to purchase expensive computer

hardware or install games directly onto a local game system.

217.     This means players have easy access to hundreds or even thousands of games at one time.

218.     What's more, the catalogue of games available online through video game streaming is ever-changing and evolving.

219.     The never-ending availability of a wide variety of games encourages users to stay engaged with the streaming product, by ensuring they always have something new and different to play.

**I.    Defendants' Predatory Schemes Created a Generation of Gaming Addicts**

220.     The feedback loops, other psychological properties, and cloud gaming products are designed to keep players continuously engaged, while the game patents are designed to study the skill level and behavior of the minor, even across social media platforms outside the game, so the game can bombard the minor with solicitations to purchase additional downloadable game content and/or loot boxes based upon psychological behavioral analyses that employ addiction methodology to seduce the minor to increase playing time and remain in the game. Essentially, the feedback loops, online video game products, and predatory monetization schemes work together to addict players to the games.

221.     During the last three decades, video games have become one of the major pastimes and one of the most growing industries worldwide. Today, 67% of all Americans play video games.[2]

222.     In 2008, the American National Purchase Diary ("NPD") group reported that 3%

---

[2] Hosseini et al., *Computer Gaming and Physiological Changes in the Brain: An Insight from QEEG Complexity Analysis*. 46(3) APPLIED PSYCHOPHYSIOLOGY AND Biofeedback 301 (2021).

of the 174 million players using PC, MAC, or game consoles were extreme gamers who are playing an average of 45 hours a week. NPD reported that the percentage of extreme gamers had increased to 4% by 2010.[3]

223.　Gaming addiction, also known as gaming disorder or internet gaming disorder ("IGD"), is characterized by severely reduced control over gaming habits, resulting in negative impacts on daily functioning, including personal, social, educational, and occupational responsibilities.

224.　IGD is a growing and prolonged behavioral pattern of gaming, leading to behavioral and cognitive syndromes. Those affected not only experience increased loss of control over gaming, but also increased tolerance and the presence of withdrawal syndrome if unable to play at increasing periods of time.

225.　Gaming addicts are usually 12 to 20 years of age and spend a minimum of 8-10 hours playing video games. Preventing them from playing can lead to tension and anger and they may spend long stretches of time playing—without food or sleep.

226.　IGD can be diagnosed when an individual engages in gaming activities at the cost of fulfilling daily responsibilities or pursuing other interests without regard for the negative consequences.

227.　The main features of gaming disorder are impaired control over gaming, increasing priority given to gaming over other activities, and continuation or escalation of gaming despite negative consequences.

228.　The Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), the manual used by clinicians and researchers to diagnose and classify mental disorders, recognizes gaming

---

[3] *Id.*

disorder as a condition for further study that warrants more clinical research and experience.

229.    Gaming disorder is the only behavioral addiction recognized in the DSM-5.

230.    The DSM-5 acknowledges that several consequences from gaming disorder arise within only 5 to 12 weeks of beginning to play.

231.    Likewise, gaming disorder, with both online and offline variants, has been included in the International Classification of Diseases ("ICD-11"), the global categorization system for physical and mental illnesses published by the World Health Organization.

232.    The American Psychiatric Association ("APA") suggests the effects or symptoms of IGD may be similar to those of other proposed psychological addictions.

233.    For instance, IGD may be an impulse control disorder like compulsive gambling.

234.    The APA has developed nine criteria for characterizing internet gaming disorder: (1) preoccupation with internet games; (2) withdrawal symptoms when internet gaming is taken away; (3) tolerance, resulting in the need to spend increasing amounts of time engaged in internet games; (4) unsuccessful attempts to control participation in internet games; (5) loss of interests in previous hobbies and entertainment as a result of, and with the exception of, internet games; (6) continued excessive use of internet games and despite knowledge of psychosocial problems; (7) deceiving family members, therapists, or others regarding the amount of internet gaming; (8) use of internet games to escape or relieve negative moods; and (9) jeopardizing or losing a significant relationship, job, or education or career opportunity because of participation in internet games.

235.    These nine criteria are also outlined in the DSM-5.

236.    Using these nine criteria, the IGD-20 Test was developed and was the first standardized psychometric tool to assess internet gaming disorder.

237.    The IGD-20 Test includes twenty (20) questions designed to assess the extent of

problems caused by disordered gaming and the degree of symptoms experienced by gamers.

238.    The IGD-20 Test conceptualized disordered gaming according to the six first-order latent components well-established in behavioral addictions: salience, mood modification, tolerance, withdrawal symptoms, conflict, and relapse.

239.    The Internet Gaming Disorder Scale-Short-Form ("IGDS9-SF") was then created, as a brief standardized psychometric tool to assess gaming disorder.

240.    The IGDS9-SF includes a total of nine items reflecting the nine clinical criteria identified by the APA.

241.    Another commonly used instrument for the measurement of addiction is the Problem Video Game Playing ("PVP") Questionnaire, which is a scale measured by using a survey containing nine yes-or-no questions.

242.    The PVP Questionnaire's survey questions are based on the DSM criteria for substance dependence and for pathological gambling, as well as the literature on addictions.

243.    Approximately 3-4% of gamers are addicted to video games. In a 2021 systematic review and meta-analysis, the global prevalence of gaming disorder was found to be 3.05%, meaning as many as 60 million people (or more) are suffering from gaming disorder.

244.    These statistics are even higher for minors: 8.5% of youths aged between 8 and 18 suffer from gaming disorder.

245.    Comorbidity studies also indicate that individuals with ADHD may have an increased susceptibility to developing gaming disorder.

**J.  Effects of Video Games on Adolescent Brains**

246.    Research has shown prolonged gaming damages the prefrontal cortex, causing a loss of grey matter, lower cognitive function, and inability to regulate impulse control.

247.    Researchers have concluded that excessive use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction.

248.    Clinical evidence has shown that subjects addicted to online games experience biopsychological symptoms and complications. These symptoms may include the traditional symptoms of drug addiction, such as hangover, changes in mood, adaptability, withdrawal, conflict, and recurrence symptoms.

249.    In 2008, the United States Federal Communications Commissioner said that online gaming addiction is one of the top reasons for college dropouts in the United States.

250.    Empirical studies indicate that internet gaming disorder is associated with detrimental health-related outcomes.

251.    Brain imaging studies have shown that long-term video game playing affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

252.    Other studies have shown excessive use of videogames leads to more negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

253.    The prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 or 30.

254.     The executive control center of the prefrontal cortex is essential for weighing risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals.

255.    This may explain why young people are more likely to engage in hours of play

while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes to draw on, minors and young adults are less able to weigh negative consequences and curb potentially harmful behavior like excessive video gaming, continuing to impact frontal lobe development.

256.    Brain imaging studies have also shown structural changes in the brain, particularly a reduction in and white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and gray-matter volume (associated with emotions, perception, memory, and motor control). Specifically, several regions of the brain showed reduction in gray-matter volume:



Regions that showed reduced gray-matter volume in IGD participants in more than two studies.[4]

257.    Brain activation studies have shown that videogame playing involved changes in reward and loss of control, and that gaming pictures activate regions similar to those activated by cue-exposure to drugs.

258.    Activation studies also show evidence that individuals with IGD have impaired inhibition, and that video game cues activate craving, attention, and executive function areas of the brain. These cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain as a result of prolonged exposure.

---

[4] Aviv Weinstein et al., *Neurobiological mechanisms underlying internet gaming disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).



Regions that showed activation in response to internet and video game cues in IGD participants in more than two studies.[5]

259.    Structural studies have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible as a result of changes in reward.

260.    One comparison study of young adults with a mean age of 24 also revealed that individuals who engage in excessive internet gaming tend to have lower cognitive function, especially in terms of verbal ability and working memory.

261.    Research has shown that a minor with a diagnosis of ADHD, autism, or oppositional defiant disorder ("ODD") is at a higher risk of video game addiction, worsening of ability to control impulsivity, and brain damage.

262.    Research has shown that while video games may foster creativity in children, such benefits are outweighed by the negative aspects of addiction, which develop quickly in children and neurodivergent individuals exposed to video games for extended periods of time.

263.    Video game play is associated with dopamine release similar in magnitude to that of drug abuse and gambling.

264.    These increased dopamine releases in the brain can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is taken away or is unavailable

---

[5] *Id.*

to play.

265.    As the APA has explained, gaming disorder specifically leads to the need to spend more time gaming, an inability to reduce time spent gaming, and unsuccessful attempts to quit gaming.

266.    As concern over video game addiction grows, the use of psychopharmacology, psychotherapy, twelve-step programs, and use of continually developing treatment enhancements have been proposed to treat this disorder.

267.    By designing and distributing these games with addictive technologies, Defendants ensured that they could increase and extend profits by addicting their most vulnerable users. They created, then exploited, an addiction among this country's most vulnerable, and Plaintiffs seek to hold them accountable.

**K. The Harm: O.A.'s Addiction and Injuries, and Plaintiffs' Damages**

268.    O.A. is an 11-year-old individual addicted to and/or compulsively playing video games, including the following games: Fortnite, Red Dead, Minecraft, and Roblox.

269.    O.A. plays video games using multiple devices and online video game products, including: Xbox One, Xbox One X, Xbox 360, Nintendo Switch, Xbox Game Pass Ultimate, Xbox Game Pass Gold, and Google Play.

270.    Despite parental efforts to limit game time—efforts made astonishingly difficult, if not impossible, by the addictive design of Defendants' video game products and the absence of parental controls within each Defendant's product (including but not limited to the absence of time-limit restrictions an inability to disable or limit Defendants' allowance of cross-sharing and cross-product play)—O.A. spends several hours per day using Defendants' products to play video games.

271.    O.A. spends approximately 4-6 hours per day playing these games.

272.    O.A. has spent approximately thousands of hours, in total or collectively, using Defendants' products and playing video games.

273.    O.A. cannot refrain from gameplay and/or spending money while using Defendants' products.

274.    O.A. has spent large sums of money and/or used gift cards to purchase in-game transactions and downloadable products available in and accessible through Defendants' products. These funds do not include Plaintiffs' expenditures on Xbox One, Xbox One X, Xbox 360, Google Play, Nintendo Switch, Xbox Game Pass Ultimate, and Xbox Game Pass Gold, or copies of games.

275.    O.A. has experienced the following as a result of the brain damage, gaming addiction and harm caused by Defendants' products: severe emotional distress, diminished social interactions, loss of friends, poor hygiene, and withdrawal symptoms such as rage, anger, and physical outbursts.

276.    As a result of the gaming addiction and harm proximately caused by Defendants' misconduct, O.A. requires treatment, including out-patient counseling, private tutoring, and an education "504" plan at school. O.A. has also been diagnosed with depression and ADHD.

277.    Shane Ayers has lost hope in his ability to control O.A.'s game playing time and worries about O.A.'s mental and physical condition when attempting to take games away from O.A.

278.    Shane Ayers has experienced mental anguish, emotional distress, pain, suffering, and financial loss as a result of each Defendant's intentional, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, as described herein---and is reasonably likely to continue to

experience those injuries in the future due to the permanent impact of Defendants' wrongs on Plaintiffs.

279.    As a result of O.A.'s gaming addiction and the harm proximately caused by each Defendant's intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, Shane Ayers has experienced loss of society and companionship—and has been financially damaged due to O.A.'s addiction and uncontrollable in-game spending.

**L.  Defendants' Conduct Specifically Led to Plaintiffs' Damages**

280.    Each Defendant is aware that its video games are harmful to minors, young adults, and neurodivergent individuals because each Defendant specifically designed its products to addict and prey upon those users' developing brains.

281.    To this avail, each Defendant employs behavioral psychologists and/or neuroscientists to develop games that will best utilize psychological tactics to keep players engaged for longer periods of time.

282.    Due to the psychological aspects of the games, many of Defendants' products have been banned in other countries to avoid the harm to children that all Defendants are causing daily in the United States.

283.    No bans are in place here, and Defendants continue their pattern of addicting and harming our Nation's youth, young adults, and their families, including Plaintiffs.

**M. Defendants' Products Used by O.A.**

**<u>Fortnite</u>**

284.    Fortnite is an online video game and game platform designed, developed and published by Epic Games.

285.    Fortnite, first released by Epic Games in 2017, is available to public to play in six distinct game mode versions: *Fortnite: Save the World, Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival.*

286.    *Fortnite: Save the World*, released as a paid early access game in 2017 and as a premium game in 2020, is a player-versus-environment, cooperative hybrid tower defense-shooter and survival game in which up to four players collaborate fight off zombie-like creatures and defend objects with traps and fortifications they can build.

287.    In *Fortnite: Save the World*, players work together on missions while fighting off zombie-like creatures and avoiding the effects of an encroaching cataclysmic storm, and, based on the success of the missions, players are awarded a number of in-game items, which includes but is not limited to hero characters, weapon and trap schematics, and survivor rewards, which can be leveled up through gained experience, to improve gameplay.

288.    *Fortnite Battle Royale,* released in 2017 as a free game supported by microtransactions, is a player-versus-player, battle royale game that a user—playing alone, in a duo, or in a 3-4 player squad—fights against up to 100 other players to be the last person (or team) alive.

289.    In *Fortnite Battle Royale,* after being airdropped weaponless from a "Battle Bus" into the game's map, game players must scavenge for weapons, items, resources, and vehicles while trying to stay alive and attack and eliminate other players—all while the safe area of the map shrinks down in size due to an incoming toxic storm.

290.    *Fortnite Creative*, released in 2018, is a survival sandbox game mode that allows users to create games such as battle arenas, racecourses, and platforming challenges; gives users

complete freedom to "spawn" or create any item from *Fortnite Battle Royale* on a personal island; and supports Unreal Editor for Fortnite so that players can edit worlds using Fortnite assets.

291.     *Lego Fortnite*, released in December 2023 and developed by Epic Games with the Lego Group, is a survival sandbox game that provides game players the opportunity to play as Lego Minifig versions of characters as they collect materials, build various buildings, craft various weapons and tools, and fight monsters.

292.     *Rocket Racing,* released in December 2023 and developed by Epic Games with Psyonix as a spin-off title to *Rocket League*, is a Fortnite game mode that allows players to race vehicles, gaining speed boosts from special lanes sections or by drifting, as well as the ability to jump and racing on vertical and inverted surfaces, while avoiding obstacles on the course.

293.     *Fortnite Festival*, released in December 2023 and developed by Epic Games with Harmonix, is a rhythm game in which the user can either play (a) the "Main Stage" hitting notes in a rhythm as either Lead, Guitar/Bass, Drums, or Vocals, or (b) the "Jam Stage" cooperating with other players to make remixes using any part of any song built into the game design.

294.     *Lego Fortnite, Rocket Racing,* and *Fortnite Festival* game modes interface with Fortnite's battle pass system, include microtransactions, and offer new rewards associated with each distinct game mode.

295.     All Fortnite game modes, while offering different content, share the same general gameplay design and are powered by the same game engine (Unreal Engine)—all of which have been internally developed and made available by Epic Games.

296.     Each Fortnite game mode uses similar graphics, art assets, and game mechanics designed and developed by Epic Games.

297.    *Fortnite: Save the World* is a pay-to-play video game product that is available for play on PlayStation 4, Xbox One, and personal computers running macOS or Windows.[6]

298.    All other Fortnite versions—*Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival*—are free-to-play video game products available for play on all available gaming consoles, including Sony's PlayStation 4 and PlayStation 5, Microsoft's Xbox One and Xbox Series X/S, and Nintendo's Switch.

299.    The *Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival* game modes also can be played on Google Play and iOS mobile devices, as well as personal computers running macOS or Windows.[7]

300.    *Fortnite Battle Royale,* and the other Fortnite game modes, can be downloaded and played for free through Microsoft's Xbox Cloud Gaming without need for a Xbox Game Pass subscription:

---

[6] In 2020, due to legal battles between Epic Games and Apple, Inc., the macOS client of *Fortnite: Save the World* remained downloadable and players who had downloaded the game for play using a macOS client could still play then game, however, it would not be updated.  Since May of 2022, *Fortnite: Save the World* has been available for play via Xbox Cloud Gaming and GeForce Now on macOS devices.

[7] In 2020, the iOS and Google Play clients of *Fortnite Battle Royale* were removed by Apple, Inc. and Google, LLC—and became unavailable on certain mobile phones—as a result of legal battles between those companies and Epic Games. The game remained playable if it had already been downloaded on mobile devices running either an iOS or Google Play client.

YOU DO NOT NEED AN XBOX GAME PASS PAID SUBSCRIPTION TO PLAY FORTNITE THROUGH XBOX CLOUD GAMING. ALL YOU NEED IS A FREE MICROSOFT ACCOUNT, HIGH-SPEED INTERNET CONNECTION, AND COMPATIBLE DEVICE. ONCE YOU'RE READY, GO TO XBOX.COM/PLAY TO START PLAYING WITH MOBILE TOUCH CONTROLS OR A SUPPORTED CONTROLLER. SEE OUR FAQ BELOW FOR MORE DETAILS. [8]

301.   Fortnite is also available to download for free on multiple video game platforms with the Epic Games Store app or Valve's Steam app.

302.   All Fortnite game modes are cross-platform play compatible, but to use that option, product users are required to have an Epic Games account for cross-saving between platforms.

303.   All Fortnite game modes are monetized through the use of V-Bucks, an in-game currency that can be purchased with real-world funds.

304.   In *Fortnite: Save the World,* V-Bucks also can be earned through completing missions and other achievements.

305.   In *Fortnite: Save the World,* V-Bucks can be used to buy loot boxes, in the form of llama-shaped pinatas, to gain a "random" assortment of items.

306.   In all other Fortnite game modes, including *Fortnite Battle Royale*, V-Bucks can be used to buy cosmetic items like character models.

---

[8] https://www.fortnite.com/mobile/xbox-cloud-gaming

307. In *Fortnite Battle Royale,* V-Bucks can be used to purchase a battle pass, which is a tiered progression of customization rewards for gaining experience and completing certain objectives during the course of a *Battle Royale* season.

308. Epic Games developed Fortnite games to make sure that the players keep coming back and playing Fortnite.

309. In the first two weeks of the release of *Fortnite Battle Royale*, there were over 10 million people playing the game.

310. In June of 2018, less than a year after the release of *Fortnite: Save the World, Fortnite Battle Royale,* and *Fortnite Creative*, there were more than 125 million Fortnite players and Epic Games's monthly earnings totaled hundreds of millions of dollars.

311. From 2017-2019, Fortnite video games had generated over $9 billion in gross revenue through microtransactions and in-game purchases.

312. In 2021 alone, Fortnite generated $5.8 billion in revenue.

313. Fortnite has an average of 239 million monthly players, and a potential peak of 15 million players in a day.

314. Fortnite gained immense popularity because of its clever manipulation of human psychology.

315. The team that developed Fortnite included psychologists, statisticians, analysts, and coordinators who worked for nearly four years to develop a game that was as addictive as possible.

316. One tactic used by Epic Games is a psychological trick of "lose by a little, win by a lot" or "near miss" effect. Essentially, when a player loses a round, they lose by only a slight margin, compelling them to play another round because they were just a few moves away from winning. When players lose, they rationalize their defeat and often tell themselves that what

stopped them from winning was the smallest mistake. As a result, players want to play another match over and over again.

317.    The "near miss" effect means that when users perceive that they lost by only a slight margin, they do not actually have to win a match to feel the high of a win. Such strategy lies in getting users close to the feeling of winning, because when they are that close, they feel the same buzz and go on to play more rounds. On the other hand, when they do win a round, they win a lot of perks, giving them a spurt of dopamine and the adrenaline rush to play again.

318.    In the hopes of increasing their rank in the game through wins, players continue to play without any pause or rest.

319.    Fortnite also uses random reward tactics—known in psychology as the "variable interval schedule"—the idea that randomized small wins will continue to draw in users.

320.    With each small win, the brain is rewarded with a small spurt of dopamine—no matter how random small rewards may be.

321.    Additionally, the design of Fortnite purposefully keeps players drawn in. For instance, the bright and vibrant colors and cartoonish representation of the game make it more appealing than other bleak multiplayer battle royale games.

322.    Similarly, the mechanics of the game inject elements of variety, allowing players to find ideal hiding spots, loot drops, explore the entire map, build towers and forts using resources, and more—an intentional design through which Epic Games ensures that Fortnite players never once get bored during gameplay.

323.    To keep players even more engaged, Epic Games often rolls out updates that keep players busy with engaging and fresh features, new maps, live events, and the latest trends. Such updates can also remove minor glitches that may be bothering the players as well.

324.    Fortnite also keeps players coming back daily by giving "Daily Quest" assignments that players can complete to earn V-bucks:



325.    Players will thus continually log into the game to complete these quests and earn V-bucks for in-game spending.

326.    These features, combined with the ease of accessibility—the game is free to play on multiple platforms and devices—fosters addiction in minors and young adults because it draws players in and allows them to play nearly anywhere at any time.

327.    Upon information and belief, Epic Games has also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Fortnite games.

328.    Epic Games has failed to disclose the risks of harm purposefully built into its game.

329.    Epic Games does not disclose any of the psychological tactics or addictive features it purposefully includes in Fortnite to any of its users.

---

[9] https://fortnite.fandom.com/wiki/Quests_(Battle_Royale).

330.    Several studies have concluded that Fortnite is more addictive than heroin and other illegal drugs.

331.    Epic Games does not warn the public that its Fortnite game products are addictive and likely to cause brain damage, particularly in minors and neurodivergent individuals, when used as intended.

332.    Epic Games touts its game as "educational" and markets it for use in the classroom, including but not limited to offering "Free Fortnite lesson plans" to educators on subjects ranging from history, geography, and programming:



[10]

333.    Engaging—and addicting—children early and in environments such as their classroom serves only to increase Epic Games's revenue through continued play of young users, at the expense of these users' mental and physical health.

---

[10] https://dev.epicgames.com/documentation/en-us/fortnite-creative/education-in-fortnite-creative

334.   Epic Games does not adequately inform users of the inherent risks involved with using and playing any Fortnite video game product.

335.   None of the game modes in the Fortnite game series includes a warning that the game was designed to addict and harm users.

**Red Dead**

336.   The Red Dead video games are a series of Western-themed, action-adventure games following the storylines of American outlaws at the turn of the twentieth century that are designed, developed, published, sold, and otherwise made available by the Red Dead Defendants for play and use to Florida citizens including Plaintiffs.

337.   Red Dead Redemption is a version of the video gaming Red Dead series designed, developed, and published by the Red Dead Defendants in 2010 for play on PlayStation 3 and Xbox 360.

338.   Over 11 million copies of Red Dead Redemption were sold by August 2011, and over 15 million copies by February 2017.

339.   In August of 2023, the Red Dead Defendants released a version of Red Dead Redemption for play on Nintendo Switch and PlayStation 4.

340.   Red Dead Redemption 2, another version of the video gaming Red Dead series, was released for PlayStation 4 and Xbox One in October 2018, and for Windows and Stadia in November 2019.

341.   Red Dead Redemption 2 generated $725 million in revenue in just three days after release—the largest opening weekend in the history of entertainment. Just two weeks after launch, Red Dead Redemption 2 had sold over 17 million units. As of December 2023, over 61 million units have been sold.

342.     Red Dead Online is the multiplayer component of Red Dead Redemption 2 that was released in May 2019.

343.     The Red Dead Defendants consider Red Dead Online a separate product from Red Dead Redemption, even though both versions share assets and gameplay.

344.     Red Dead Online was developed using elements of Red Dead Redemption and Red Dead Redemption 2, along with elements of Grand Theft Auto Online (another game designed, developed, and released by Take-Two, Rockstar Games, and Rockstar North) including the introduction of microtransactions.

345.     In each Red Dead game version, the player takes the role of an outlaw and engages in combat and gunplay to progress the storyline.

346.     Players can cover, blind-fire, free-aim, and get into physical altercations with enemies.

347.     A large number of weapons are introduced in each game, as well as numerous methods of transportation throughout the open world settings.

348.     Each version of Red Dead Redemption includes various options for exploration, random encounters, and side-missions throughout the open world setting.

349.     Side activities are varied and include dueling, bounty hunting, searching for collectibles, playing poker, and hunting animals.

350.     Each of these activities provides opportunity for reward to the player.

351.     Both games are critically acclaimed, with reviewers praising the visuals, music, acting, open world gameplay, story, and level of detail.

352.     Red Dead Redemption has a main campaign that lasts approximately 18 hours; by comparison, Red Dead Redemption 2 has a main campaign that lasts over 60 hours.

353.    The video gaming Red Dead series also includes numerous other opportunities for exploration and side missions to extend play time. For instance, completing all aspects of the original Red Dead Redemption game is likely to take around 46 hours, while Red Dead Online is likely to take 183 hours to complete.

354.    Red Dead Online is free to everyone who owns Red Dead Redemption 2. Anyone who does not own Red Dead Redemption 2 must separately purchase Red Dead Online.

355.    In Red Dead Online, players customize a character and can explore the environment either alone or in a group.

356.    The Red Dead Online world features events in which 32 characters can participate individually or within a posse group.

357.    As players complete activities throughout the game world, they receive experience points to raise their character's rank and receive bonuses to progress in the game.

358.    Red Dead Online introduced and includes numerous microtransaction opportunities for players to make in-game product purchases.

359.    Players are able to earn "cash" and earn or purchase "gold bars," both of which are virtual currency without a set exchange rate. For instance, the Red Dead Defendants "reward" players by giving more gold bars to users who spend more real-world currency, as demonstrated below.



360.   Both "cash" and "gold bars" are used to unlock products within Red Dead Redemption 2 and Red Dead Online, including custom modifications to weapons, horse kits, and other unique items for gameplay, as demonstrated below.

---

[11] https://store.rockstargames.com/buy-red-dead-online-gold-bars



361.    Red Dead Online and the microtransactions built into the game earns the Red Dead Defendants millions of dollars in revenue each quarter.

362.    The Red Dead Defendants designed and developed the video gaming Red Dead series for long-term use or extended play by providing unlimited opportunities for game play in both a single-player and multi-player environment.

363.    The video gaming Red Dead series, particularly Red Dead Online, is designed to take advantage of the dopamine hits players receive when unlocking new products with microtransaction purchases, combined with the expansive game worlds, the various side missions,

---

[12] https://www.rdr2.org/guides/weapon-customization-guide/

and rapid gameplay, making the games more addictive and encourage players to continue playing for long, extended periods of time.

364.    The video gaming Red Dead series, particularly Red Dead Redemption and Red Dead Online, are some of the most addictive video games on the market.

365.    The Red Dead Defendants are aware that video gaming Red Dead series includes significant psychological aspects to encourage continuous game play and eventually lead to addiction—especially of minors, young adults, and neurodivergent individuals.

366.    Upon information and belief, the Red Dead Defendants specifically designed the video gaming Red Dead series in concert with psychologists and neuroscientists to discover the best addictive aspects to include in their games.

367.    Upon information and belief, the Red Dead Defendants have also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the video gaming Red Dead series.

368.    Though the Red Dead Defendants know of the addictive features and technology included in their games, they do not inform their users of the risks inherent with playing this game, nor do they adequately inform users of the inherent risks involved with using and playing the video gaming Red Dead series or that the games were designed to be addictive and harm users.

**Minecraft**

369.    Minecraft is a 3D sandbox video game first developed and published by Mojang Studios, who made the video game available to the public in 2009, prior to a full release on November 18, 2011.

370.    Minecraft can be played on PC, various gaming consoles, and mobile devices.

371.    Since the first full release of Minecraft in 2011, the video game has been continuously updated with many major and minor product update, including but not limited to

gameplay-altering mechanics, new product content and items, microtransactions, and tweaks to existing product features, which are available free to users who have purchased the game.

372.    In May of 2012, Mojang Studios and Microsoft, acting through its video game design and publishing studio, Xbox Game Studios, released Minecraft for play on Xbox 360 and as the flagship game to play with friends via Microsoft's new Xbox Live feature.

373.    The Xbox 360 version of Minecraft, like the product versions that came later for play on other gaming consoles or updated Xbox consoles, differed from the personal computer version of Minecraft in many ways, including but not limited to a newly designed crafting system, the control interface, in-game tutorials, split-screen multiplayer, and the ability to play with friends over the internet.

374.    With the introduction of Minecraft as a video game product for play on gaming consoles like Xbox 360, the Minecraft Defendants introduced microtransactions and made in-product downloadable content available for purchase.

375.    All Minecraft versions since 2012 have been designed to include microtransactions and on-going product updates to enhance game play and keep players engaged in the product.

376.    In December of 2013, Mojang Studios and Sony Interactive Entertainment, LLC released Minecraft for play on PlayStation 3.

377.    Microsoft acquired Mojang Studios and all product rights to Minecraft in 2014.

378.    That same year, Minecraft was made available for play on Xbox One and PlayStation 4.

379.    In 2015, Minecraft was made available for play on the Wii U, which is a gaming console product designed, manufactured, and sold by Nintendo of America, Inc.

380.    In May of 2017, Minecraft was made available to play on the Nintendo Switch, and then in September of 2017 for Nintendo 3DS.

381.    On September 20, 2017, the Minecraft Defendants released a *Better Together Update* for Xbox One, Windows 10, VR, and mobile versions, which enabled cross-platform play between those products and became known as the *Bedrock Edition* of Minecraft.

382.    The *Bedrock Edition* was also provided as a product update to the Nintendo Switch version of Minecraft in 2017, thereby enabling cross-platform play between the Nintendo Switch, Xbox One, virtual reality gaming headsets, mobile devices, and personal computers.

383.    In December of 2019, the PlayStation 4 version of Minecraft was updated to become part of the *Bedrock Edition*, thereby enabling cross-platform play for users with a Xbox Live account.

384.    The *Bedrock Edition* of Minecraft is the most commonly available and played version of the product, allowing cross-platform play with Microsoft's Xbox One and Xbox Series X/S, Sony's PlayStation 4 and PlayStation 5, Nintendo's Switch, personal computers, mobile phones, and virtual reality gaming headsets.

385.    Minecraft is the best-selling video game to date, with over 300 million copies of its games sold.

386.    Minecraft has over 163 million monthly active players.

387.    Regardless of version or platform, Minecraft gameplay is designed with no required goals to accomplish thereby allowing players extensions freedom in exploring virtually infinite terrain within a blockish, procedurally generated, three-dimensional world.

388.    While there are no set goals, Minecraft does include an achievement system and can earn "advancements" in the *Java Edition,* "trophies" when playing on PlayStation consoles, and "achievements" in *Bedrock Edition* and when playing on Xbox consoles.

389.    Minecraft players can discover and extract raw materials, craft tools and items, and build structures and machines; however, the core gameplay revolves around picking up and placing block-objects in a 3D grid.

390.    In Minecraft, the game world is virtually infinite on a horizontal plane and procedurally generated based on a players exploration, using a map seed that is obtained from the system clock at the time of world creation.

391.    Although a single video game product, Minecraft gameplay can be different each and every time a player logs in to play.

392.    Minecraft includes multiple game modes for a variety of gameplay, including but not limited to, survival mode, in which players must acquire resources to build in the world and maintain health, and creative mode, in which players have unlimited resources and access to flight.

393.    Depending on the chosen game mode, players can fight hostile mobs or cooperate or compete against other players in the same world.

394.    When starting a new world, players must choose one of five game modes, as well as one of four difficulties, ranging from "Peaceful" to "Hard."

395.    Minecraft is easy for any player to play because it does not have a lengthy instruction manual or demo of the game to learn how to play.

396.    Each player's main task in Minecraft is to survive all the problems using specific resources.

397.    When a player uses the given resources to protect their territory and advance in the game, the player feels like they have accomplished something and can easily get addicted to that feeling.

398.    The Minecraft Defendants designed Minecraft with multiplayer options, allowing players to interact and communicate with each other in the game world, which combined with the technologies and algorithms built into the game product prays upon the chemical reward receptors of user's brains to create addictive engagement.

399.    These versions also allow children to enter and engage with others in dangerous "chat room" features throughout the game.

400.    On certain devices, Minecraft pushes constant notifications about new features, skins for avatars, and new objects in the games. These notifications pop up on screen whether players are already playing Minecraft or not.

401.    These interactive features serve only to lure players to spend more time in the game.

402.    Once a player succeeds with one stage, they move on to the next one.  Essentially, Minecraft can last for eternity if the player is not strong-willed enough to stop playing.

403.    Minors and players with neurodivergent diagnoses, such as ADHD, can easily become hyper focused and addicted to building worlds within Minecraft.

404.    The Minecraft Defendants were aware of these propensities, and specifically developed their games along with psychologists and neuroscientists, to include addictive psychological traits.

405.    At the expense of users' mental and physical well-being, the Minecraft Defendants fail to inform the public, users, or parents about the risk of addiction and other negative consequences that can arise from gameplay.

406.    The Minecraft Defendants touts the game as educational and market it to educators

for use in the classroom:

## GET MINECRAFT EDUCATION FOR YOUR CLASSROOM

Engage students in game-based learning across the curriculum. Minecraft Education is a game-based platform that inspires creative, inclusive learning through play. Explore blocky words that unlock new ways to take on any subject or challenge. **Download Minecraft Education** to get started with a free demo.

[13]

407.    The Minecraft Defendants offer teachers ready-built lessons and curriculums

centered around their game:

---

[13] https://education.minecraft.net/en-us



408.    The Minecraft educational game products offered by the Minecraft Defendants to teachers and parents are built of the *Bedrock Edition* codebase and can be played on personal computers and tablets.

409.    The Minecraft Defendants do not adequately inform users of the inherent risks involved with using and playing Minecraft or that the game was designed to addict and harm users.

410.    The Minecraft Defendants are aware that the more time a user plays the game, the more likely they are to continue purchasing in-game product upgrades.

411.    The Minecraft Defendants intend to introduce and addict as many users as possible to increase their own profits as these users continue playing—and spending—as they grow.

412.    The Minecraft Defendants have profited from the release of their addictive video game product to the public. For instance, in 2021, the Minecraft video game generated approximately $380 million across all different gaming platforms.

---

[14] https://education.minecraft.net/en-us

**Roblox**

413.   Roblox is an online video game, developed and published by Roblox Corp., formally released for use by consumers in September of 2006.

414.   Roblox Corp.'s "mission" for Roblox is have a billion people actively using and playing its game each day:



415.   Between its 2006 release and 2015, Roblox was only available for play on personal computers and mobile phones; however, with the release of Roblox for play on Microsoft's Xbox One gaming console in November of 2015 and the Oculus Rift virtual reality gaming headset in April 2016, the numbers of people (particularly minors) grew exponentially.

416.   Roblox Corp. also saw an accelerated increase in the numbers of consumers downloading and playing Roblox as a result of the COVID-19 pandemic.

417.   As of August of 2020, Roblox had over 164 million monthly active users, with more than half of those users being American children under age 16.

418.   The numbers of consumers, particularly minors, using and playing Roblox continued to grow in 2023, when Roblox Corp. released versions of its Roblox product for play on Sony's PlayStation 4 and the virtual reality gaming headsets, Meta Quest 2 and Meta Quest

---

[15] https://corp.roblox.com/

Pro.

419.    Roblox Corp. markets Roblox as accessible on any device and, as of 2024, has released Roblox for use and play on personal computers, video gaming consoles, mobile phones, tablets, and virtual reality video gaming headsets:



420.    While Roblox Corp. has not released a version of Roblox for download and play on Nintendo Switch, Nintendo Switch users can access and play Roblox using the gaming console's built-in web browser.

421.    Currently, Roblox has over 66 million daily active users and over 217 million monthly active users, with more than 50% of consumers playing Roblox being under age 13.

422.    Roblox Corp. describes Roblox as an online, social gaming platform and game creation system that allows users to play games (or "experiences") built within Roblox and to program their own games (or "experiences") using Roblox Corp.'s proprietary engine, Roblox Studio.

423.    Roblox Corp. designed the game-creation aspect of its product to allow players to create their own Roblox video games, as well as purchasable, one-time "game passes" and "developer products" microtransactions, for play and purchase by other Roblox users, including

---

[16] https://corp.roblox.com/

minors.

424.    Roblox Corp. designed the social-gaming aspect of its product to allow players to play Roblox games (or experiences) created by other users, which includes allowing players to buy, sell, and create virtual items, accessories, and limited-availability products for use in gameplay.

425.    Roblox is free to play; however, Roblox is designed to encourage in-game purchases and product upgrade microtransactions, which can be purchased using Robux, the game's virtual currency.

426.    Robux can be obtained (a) purchased with real currency; (b) received a part of a recurring stipend given to users with a Roblox Premium membership; and (c) earned from selling "game passes" or developer products" to other Roblox players.[17]

427.    Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increases.

428.    For instance, corresponding with the increase of Roblox players due to the COVID-19 pandemic, Roblox Corp. earned $2.2 billion in revenue from Roblox in 2022—a 16% increase from 2021 earnings, which had been increased by 107% from its 2020, which had themselves been an 111% increase over 2019.

429.    Roblox Corp. specifically designed Roblox with certain addictive properties—at the risk of children's mental and physical health—to profit from product user's extended, long-term gameplay and corresponding in-game spending.

430.    Roblox Corp. hired psychologists and scientists to work with software engineers

---

[17] In the latter instance, should the user choose to exchange Robux acquired from purchases made by other Roblox players for real world currency, Roblox Corp. retains a percentage of the revenue.

and game developers to ensure that their game includes the best psychological traits and technologies for player retention and addiction.

431.     Roblox Corp. used numerous addictive principles and technologies in Roblox's design. For example, in Roblox, players can create games and maps for other users to try and play, making it a challenge in and of its own. Through research and product development, Roblox Corp. learned that when playing games and completing challenges like this, a user's brain releases dopamine—the neurotransmitter in the brain that enables an individual to feel happiness and pleasure—and triggers the game player's brain to seek these dopamine hits on a more regular or compulsive basis leading to abuse, addictive behavior, and video game addiction.

432.     Additionally, the variety within Roblox ensures that users are never bored and want to stop playing the game; there are always new challenges, maps, and characters to try, making the game feel like an ever-evolving entity that never stops providing entertainment.

433.     The ability for users to create their own games and challenges, combined with users' ability to spend real-world funds to change their avatar's image and abilities, makes sure that the gaming experience is different for players each time they log in.

434.     Such constant variety keeps players "hooked," or coming back daily and playing for hours.

435.     Roblox's "social gaming" design allows users to interact with friends or other users within the game—and creates a competitive environment whereby players are presented with microtransactions and in-game product purchases and pressured to spend money to keep up with their Roblox friends and competitors.

436.     Roblox Corp. makes in-game spending as easy as possible, and designed Roblox with addictive features to target minors and encourage them to engage in microtransactions in

order to advance in the game, resulting in addicted and incompetent users quickly spend large sums of money inside the game without their parents, guardians, or other family members' knowledge or consent.

437.    Roblox Corp. does not adequately inform users of the inherent risks involved with using and playing Roblox or that the game was designed to addict and harm users

438.    Though it is equipped with the knowledge of the addictive risks inherent in its game, Roblox Corp. has failed to inform the public, users, or parents of such risks.

439.    Roblox Corp. describes its game as an educational tool for children: "Roblox provides a fun, supportive, and educational space where your child's imagination can thrive."[18]

440.    Roblox Corp. even markets itself to educators, encouraging the use of Roblox in learning environments:



441.    While marketing its video game as an educational tool to benefit minors and neurodivergent individuals, Roblox Corp. does not disclose the psychology and addictive characteristics behind Roblox's design or that Roblox contains numerous addictive principles that are negatively impacting minors' and young adults' livelihoods, including their ability to learn and

---

[18] https://corporate.roblox.com/faq/
[19] https://education.roblox.com/

engage in critical thinking.

**Xbox and Xbox Network: Xbox One, Xbox One X, Xbox 360, Xbox Game Pass Ultimate, Xbox Game Pass Gold**

442.     Xbox is a video gaming brand, owned and operated by Microsoft, that consists of Xbox gaming consoles, as well as video games and online video gaming through the Xbox network, Xbox Game Pass, and Xbox Cloud Gaming.

443.     Microsoft designs, develops, manufactures, produces, supplies, and sells Xbox video game consoles—and markets all Microsoft video game products—to the consumers across the world, and specifically in Florida and to Plaintiffs.

444.     Microsoft has manufactured and released five versions of its Xbox consoles: Xbox (1st Generation), Xbox 360 (2nd Generation), Xbox One (3rd Generation), Xbox Series X (4th Generation), and Xbox Series S (4th Generation).

445.     Microsoft released the original Xbox was released in North America in 2001, and a year later launched its integrated Xbox Live product to allow players to play video games online.

446.     When it was released in 2002, Xbox Live required a subscription for use but was a wild success due to features, including but not limited to, a "buddy list" and access to popular online video games like Halo 2.

447.     Microsoft released Xbox 360 in 2005, and with that release, launched an upgraded Xbox Live product that included, *inter alia*, a limited "Free" or "Silver" tier that allows users to play online video games for free.

448.     Microsoft released upgraded and revised versions of its Xbox 360 console, the Xbox 360 S, and Xbox 360 E, which provided hardware and software updates to the product.

449.     Microsoft released Xbox One in North America in 2015.

450.     In marketing Xbox One, Microsoft emphasized the console's internet-based

features, including but not limited to the ability to record and stream gameplay, and the ability to integrate with a set-top box to watch television.

451.    Microsoft also released upgraded and revised versions of Xbox One, known as Xbox One S and Xbox One X, which provided hardware and software upgrades to the product.

452.    Microsoft released its fourth generation of Xbox consoles—Xbox Series X and Xbox Series S—in North America in 2020, with each model designed to be family playable.

453.    Both the Xbox Series X and Xbox Series S (collectively, "Xbox Series X/S") consoles are fully compatible with all Xbox One games and most hardware, backwards compatible with games playable on Xbox One from the Xbox 360 and original Xbox console.

454.    To help transition Xbox One users to the newer Xbox Series X/S consoles, Microsoft designed and introduced a Smart Delivery system—a product that provides automatic free updates to Xbox One versions of games to the Xbox Series X/S versions for most of Microsoft's first-party games and several of its third-party games.

455.    Each Xbox console provides users the ability to play video games, using a hard copy of the video game, a digital copy downloaded from Microsoft Store (also known as Xbox Games Store, hereinafter "Xbox Store"), using the Xbox Network (formerly known as Xbox Live) and/or using Xbox Game Pass Cloud Gaming.

456.    Microsoft developed and maintains the Xbox Store— a product-platform through which users can purchase thousands of games to be stored on their console through digital download--for use with its Xbox consoles.

457.    When a user purchases and downloads a game from either store, regardless of whether that is a first-party video game or third-party video game, all design elements and downloadable content for said games is stored on the users' Xbox console and, if connected to the

Internet, will receive product updates released by the game developer.

458.    Microsoft markets the Xbox Store as "safer for the whole family" to use:



459.    Xbox Network is an online multiplayer gaming service created and operated by Microsoft for use with its Xbox consoles, and includes the Xbox Store and Xbox Game Pass Cloud Gaming.

460.    Xbox Network is available as both a free and a paid-subscription based product, known as Xbox Game Pass.

461.    Xbox Game Pass Core, formerly Xbox Live Gold, is a paid tiered subscription service offered by Microsoft that provides users access to online games, multiplayer abilities, and other features.

462.    Xbox Game Pass Ultimate, the highest tier of paid subscriptions at $17 per month, provides product users the same benefits as the other tiers, but also provides users access to Xbox Game Pass Cloud Gaming (hereinafter "Xbox Cloud Gaming").

463.    Xbox Cloud Gaming is Microsoft's Xbox cloud gaming service.

464.    Xbox Cloud Gaming was initially released in beta testing in November of 2019,

---

[20] https://www.xbox.com/en-US/microsoft-store

and launched for Xbox Game Pass Ultimate subscribers on September 15, 2020.

465.    Xbox Cloud Gaming operates by linking the device to a remote server in the cloud.

466.    Gameplay is saved in the cloud and can be accessed and played from numerous devices at any given location.

467.    In fact, Xbox Cloud Gaming allows for gameplay from a number of devices—no longer is a console required. Games can be accessed instead from the content library of Xbox Cloud Gaming includes thousands of games spanning every game rating category:



21

468.    This means that anyone with an Xbox Cloud Gaming account can access and play any game on their Xbox console, computer, or mobile device.

469.    The games in the Xbox Cloud Gaming library are extensive and everchanging, which keeps players coming back to either finish a game before it disappears or check for new and exciting game options to play:

---

21 https://www.xbox.com/en-US/browse/games



470.    Once a game is downloaded to the user's Xbox console or made available on the Xbox Network, Microsoft provides video game developers and publishers a framework to initiate and process in-game purchases and microtransactions through the Xbox Store and Xbox Cloud Gaming.

471.    This framework enables game developers to sell microtransactions and/or loot boxes through Microsoft's video game products, described herein.

472.    In exchange, Microsoft keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

473.    Microsoft specifically designed its Xbox video game products to attract users to purchase games and in-game products therein—regardless of the content such games may include.

474.    Xbox Game Pass Ultimate also offers users daily, weekly, and monthly "quests" that can be completed for varying amounts of Microsoft Reward points:

---

[22] https://www.xbox.com/en-us/games?xr=shellnav

# How it works

Xbox Game Pass Ultimate and Console plan members can earn Microsoft Rewards points by playing games from the Xbox Game Pass library. Here's how to get started.

## 1.

### Browse current Quests

Check out current Quests on your Xbox console in the Xbox Game Pass section or on your Xbox Game Pass mobile app. New Quests are added every day.

## 2.

### Participate in Quests

Find the list of Quests in the Xbox Game Pass membership area on your Xbox console or on the Xbox Game Pass mobile app. You will receive an instant notification when your Quest is ready to be turned in.

## 3.

### Claim and track your points

Go to the Xbox Game Pass area on your Xbox console or on your Xbox Game Pass mobile app to claim and track your points.

## 4.

### Redeem points

Head to the Microsoft Rewards app to spend your points! Redeem points for Xbox gift cards and use for in-game content, games, devices, movies, apps accessories and more.

23

475.    The ease of access, quest challenges, and constantly evolving game library draws players in, and keeps them coming back.

476.    Over 20 million people have played video games using Xbox Cloud Gaming.

477.    Xbox Cloud Gaming allows these users to connect with each other by including a feature to add and interact with friends, called "Xbox Social."

478.    This social media-esque feature permits users to add friends to a Friends list and then see what games your friends are playing and/or invite them to join your game:

---

23 https://www.xbox.com/en-US/xbox-game-pass/quests



479.    The Xbox Network, including but not limited to Xbox Cloud Gaming, is designed to allow Xbox users and video game players to chat with each other individually or in groups.

480.    To find friends, users are encouraged to link to other social media accounts with their Xbox subscription.

481.    Minors and young adults are therefore encouraged to log-in more often and for longer periods to keep up with their friends, engage and play with friends, and compete with friends within the games.

---

24    https://support.xbox.com/en-US/help/friends-social-activity/share-socialize/use-xbox-game-bar-to-play-and-chat-with-friends

-78-

482.     Upon information and belief, Microsoft hires behavioral psychologists and neuroscientists to design its Xbox consoles, Xbox Network (and all products and features thereof), its video games, and marketing in the best way possible to attract users, especially minors, young adults, and neurodivergent individuals.

483.     Microsoft is aware that several of the video games available for play on the Xbox, and available for download in the Xbox Store and Xbox Cloud Streaming, are designed to continuously encourage users to purchase in-game products, to be addictive, and pose unreasonable risk of harm to users, particularly minors and neurodivergent individuals.

484.     Microsoft does not adequately inform users of the inherent risks involved with using its products or that the products—along with the games being played thereon---were designed to addict and harm users.

**Nintendo Switch and Nintendo eShop**

485.     Nintendo is the manufacturer of the Nintendo Switch and Nintendo Switch Lite video gaming consoles (collectively, "the Switch" or "Nintendo's Switch").

486.     While it is a handheld device, the Switch allows users to play physical (or hard copies) of video games, the console is also designed for online gaming and online game purchases.

487.     In order for users to enable users to use all of these design features, Nintendo has designed a product platform, the "Nintendo eShop," for users to download certain games and play them on the Switch device.

488.     Fortnite, along with over 11,000 other video games, are available for users to play through the Nintendo eShop.

489.   Once a game is downloaded to the Switch, Nintendo provides video game developers and publishers a framework to initiate and process in-game purchases and microtransactions through the Nintendo eShop.

490.   This framework enables game developers to sell microtransactions and/or loot boxes through the Nintendo platform. For example:



491.   In exchange, Nintendo keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

492.   Nintendo specifically designed this platform to attract users to purchase games and in-game products therein—regardless of the content such games may include.

493.   Nintendo also designed the Switch with a built-in web browser, which allows users (including minors) to access and play video games, such as Roblox, not available in the Nintendo eShop.

494.   Upon information and belief, Nintendo hires behavioral psychologists and neuroscientists to design its Switch consoles, Nintendo eShop, its video games, and marketing in

---

[25]https://www.nintendo.com/us/search/#q=minecraft&p=1&cat=gme&sort=df&f=topLevelFilters&topLevelFilters=DLC

the best way possible to attract users, especially minors, young adults, and neurodivergent individuals.

495.    Nintendo is aware that several of the video games available for play on the Switch, and available for download in the Nintendo eShop, are designed to continuously encourage users to purchase in-game products, to be addictive, and pose unreasonable risk of harm to users, particularly minors and neurodivergent individuals.

496.    Nintendo does not adequately inform users of the inherent risks involved with using its platforms or that the platforms—along with the games being played thereon—were designed to addict and harm users.

**Google Play**

497.    Google designed, developed, published, markets, and supplies the Google Play app, also known as the Google Play Store or Play Store and formerly Android Market, to consumers throughout the world, including in Florida.

498.    Google Play was launched on March 6, 2012.

499.    Google Play serves as a digital media store and makes applications, including video games, available for to consumers for download either for free or at a cost.

500.    Through Google Play, Google provides a product-platform for users to download video games and play them on Android mobile devices:



501.    Google Play is also a product-platform for users to download and play video games

on a Android-based tablet:



502.    Google Play is also a product-platform for users to download video games and play

them on a personal computer or Google's Chromebook:

---

[26] https://play.google.com/store/games?device=phone
[27] https://play.google.com/store/games?device=tablet



[28]

503.   Minecraft and Roblox are available in the Google Play app.

504.   Once a gaming app or game is downloaded, Google distributes the game and provides a framework for "in-app billing" to initiate and process transactions.

505.   To encourage developers to make their video games available to consumers on Google Play, Google markets Google Play to game developers as a video game store that supports a variety of monetization strategies, including paid distribution, in-app products, subscriptions, and ad-based models.

506.   Google requires video game developers to use Google Play's payment system for in-game purchases and to comply with Google's Developer Policies.

507.   Google takes a percentage of all revenue generated by in-game microtransactions, in-app purchases, and subscriptions. More specifically, from 2012-2016, Google took 30% of all revenue generated by in-game microtransactions, in-app purchases, and subscriptions. From 2016 to the present, Google takes 15% of all such revenue.

---

[28] play.google.com/store/games?device=chromebook

508.     This app-monetization framework enables Google to profit from video game developers and publishers use of addictive designs and psychological tactics, including but not limited to the sale of microtransactions, loot boxes, and/or in-app subscription services in games available through Google Play.

509.     Google specifically designed Google Play to attract users to purchase games and spend money on in-game microtransactions—regardless of the content or subject matter of the video game.

510.     Upon information and belief, Google hires behavioral psychologists and neuroscientists to design Google Play and market its product in the best way possible to attract users, especially minors and young adults.

511.     Google is aware that several of the games on available on Google Play contain addictive designs that pose an unreasonable risk of harm to users (particularly minors and neurodivergent individuals); yet Google markets these games for download and profits from those users.

512.     Google does not adequately inform users of the inherent risks involved with using Google Play or that Google Play—along with the games being played thereon—were designed to addict and harm users.

**N.  Minors' Access to Defendants' Products**

513.     Defendants market their gaming products, including Fortnite, Red Dead, Minecraft, Roblox, Xbox One, Xbox One X, Xbox 360, Xbox Game Pass Ultimate, Xbox Game Pass Gold, Google Play, and Nintendo Switch and their respective in-product transactions and complementary online subscription products to minors, young adults, and neurodivergent individuals.

514.     O.A. is a minor and, therefore, is such a person to whom Defendants directed their

marketing efforts and to whom Defendants sold their gaming products.

515.    O.A.—as a minor—lacked the capacity to contract, and thus Plaintiffs expressly disaffirm any contract O.A. may have made with any of the Defendants, or that Defendants may claim O.A. made with them before reaching the age of majority.

516.    O.A.'s continued use of Defendants' products is compulsive and due to addiction and in no way was an affirmation of any contract.

517.    After consumers purchase Defendants' gaming products, Defendants condition users' access to their gaming products on accepting terms and conditions—and failure by users to accept and to continue to accept any new terms and conditions results in a loss of access to the purchased product. Each Defendant's terms of services or terms and conditions document is a contract of adhesion that has no variation or negotiable terms prior to signing between the parties. Accordingly, any terms to which Plaintiffs agreed prior to utilizing each Defendant's product, or while using such product, are void and unenforceable.

518.    Defendants' products were designed to addict O.A. to the products, which proximately caused O.A.'s mental and physical health issues; therefore, Defendants' terms and conditions and any other purported contracts are void as against public policy as an individual cannot consent to harming a minor.

## V.    TOLLING OF STATUTE OF LIMITATIONS

519.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though fully set forth herein.

520.     Through the exercise of reasonable diligence, Plaintiffs could not have discovered that Defendants' products caused their injuries because, at the time of their injuries, the cause was unknown to Plaintiffs.

521.    Plaintiffs did not suspect and had no reason to suspect Defendants' products caused their injuries until within the last year.

522.    Due to the highly technical nature of the Defendants' products, Plaintiffs were unable to independently discover that Defendants' products caused their injuries until within the last year.

523.    Defendants had exclusive knowledge of the material defects designed and implemented into their products, and they have at all times through the present failed to disclose these designs.

524.    Defendants' fraudulent concealment has tolled the running of any statute of limitations.

525.    Defendants had a duty to disclose dangerous and defective features of their products that cause foreseeable harm to users—especially children and teens.

526.    Defendants knowingly, affirmatively, and actively concealed from Plaintiffs the risks associated with the defects of their products and that these products caused their injuries.

527.    Defendants' tortious and fraudulent acts continue to this day; as of the date of this Complaint, Defendants have not disclosed, and continue to conceal, that they designed and implemented dangerous features into their products.

528.    Despite their knowledge of the defects and their attendant safety risks, Defendants continue to market their products to children and teens—and even their educators—while simultaneously omitting the disclosure of known and foreseeable harms.

529.    Plaintiffs were unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

530.    For the foregoing reasons, Defendants are estopped from relying on any statutes of limitations or repose as a defense in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by Defendants' active concealment with respect to all claims against Defendants.

## VI.    CAUSES OF ACTION

### COUNT I
### STRICT LIABILITY – DESIGN DEFECT
### (Against all Defendants)

531.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

532.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and/or otherwise distributing the video game products used by O.A.: Fortnite, Red Dead, Minecraft, and Roblox, Xbox One, Xbox One X, Xbox 360, Xbox Game Pass Ultimate, Xbox Game Pass Gold, Google Play, and Nintendo Switch.

533.    Each of the Defendant's video game products is designed as, and intended to be used for, video gameplay by end-users/consumers of all ages, including minors and young adults, throughout the world, including in Florida.

534.    Each Defendant markets and advertises their video game products, in Florida and throughout the United States, for personal use and video gameplay by end-users/consumers of all ages, including minors and young adults.

535.   Each Defendant defectively designed its respective products to addict minors and young adults who were particularly unable to, and did not, appreciate the risks posed by the products and were particularly susceptible to harm from those products. More specifically:

   a.   Epic Games designed Fortnite to be as addictive as possible and with psychologically addictive features and tricks to ensnare game players, including but not limited to, designing the game to include a "near miss" effect, loot boxes, random rewards, bright and vibrant colors, and continual gameplay variety;

   b.   The Red Dead Defendants designed the video gaming Red Dead series, including but not limited to Red Dead Online, with psychologically addictive features, including but not limited to varied gameplay through side missions and an expansive game world and various cosmetic items and weapons to earn or purchase;

   c.   The Minecraft Defendants designed Minecraft to take advantage of the chemical receptors in product user's brains and with addictive psychological features and traits to make the video game as addictive as possible, including, but not limited to, designing and developing a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects;

   d.   Roblox Corp. designed Roblox with psychologically addictive properties and technologies, including but not limited to ever-changing gameplay, microtransactions, social aspects, and the use of algorithms to target players to purchase numerous characters, skins, and other in-game products;

   e.   Microsoft designed its Xbox One, Xbox One X, and Xbox 360 with addictive features and for use with addictive video game products, and designed its Xbox

Network, including Xbox Game Pass Ultimate and Xbox Game Pass Gold, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, to take advantage of the chemical reward system of users' brains, and these addictive features include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users;

f.  Nintendo designed the Switch with addictive features to take advantage of the chemical reward system in users' brains users, and designed the Nintendo eShop as a platform to house addictive gaming products and to purchase addictive materials for play on the Switch;

g.  Google designed the Google Play app to house addictive gaming products and to take advantage of the chemical reward system in users' brains, in order to profit from users' purchases of addictive materials on Google Play;

536.   The defects in the design of each of the Defendant's respective gaming products existed prior to the release of these products to O.A. and the public, and there was no substantial change to any of the products between the time of their manufacture (in regard to consoles or physical game copies) and the time of their distribution to O.A. via download or URL access (in regard to digital game copies and cloud gaming).

537.   O.A. used these products as intended and in a manner reasonably anticipated, and each Defendant knew or, by the exercise of reasonable care, should have known that O.A. would

use these products without Plaintiffs inspecting them for and/or being unable to discover their addictive nature.

538.    Each Defendant designed its respective products to take advantage of the chemical reward system of a user's brain (especially a minor, young adult, and/or neurodivergent user's brain) to create and cause addictive engagement, compulsive use, and additional mental and physical harm. More specifically:

a.   Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

b.   The Red Dead Defendants designed the video gaming Red Dead series, including but not limited to Red Dead Online, in conjunction with psychologists, neuroscientists, and other behavioral experts—and with designers and developers of other addictive video game products—to ensure the addiction of minors, young adults, and neurodivergent individuals;

c.   The Minecraft Defendants designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

d.   Roblox Corp. designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

e.   Microsoft designed Xbox One, Xbox One X, Xbox 360 and the Xbox Network, including Xbox Game Pass Ultimate and Xbox Game Pass Gold, in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the

minor and young adult users continually purchase addictive video game products for play on Xbox consoles.

f.   Nintendo designed the Switch and Nintendo eShop in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive products for play on the Switch;

g.   Google designed the Google Play app in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive video game products;

539.   Each of the Defendant's respective products are defective in design and unreasonably dangerous when put to a reasonably anticipated use for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner.

540.   Youth, including O.A., and young adults are among the ordinary consumers of each of the Defendant's products.

541.   Minors and young consumers, and their parents and guardians, do not expect: (a) Defendants' products to be psychologically and neurologically addictive when the products are used in its intended manner by its intended audience; (b) the patented design strategies and other features embedded by each Defendant in its respective products to make them initially and progressively more stimulative, to maximize young consumers' usage time and consequently addict them; or (c) each of the Defendant's revenues to be directly tied to this addictive mechanism and young consumer spending more time and money in downloadable in-game products and/or microtransactions.

542.    Each of the Defendant's respective products are likewise defectively designed such that it creates an inherent and unreasonable risk of danger; specifically, a risk of brain damage in and abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals leading to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

543.    Defendants' respective products were defective and unreasonably dangerous when they left the Defendants' respective possession and control. The defects continued to exist through the products' distribution to and use by consumers, including O.A., who used the products without any substantial change in the products' condition.

544.    The risks inherent in the design of each of the Defendant's respective products significantly outweigh any benefit of such design.

545.    Each Defendant could have utilized cost-effective, reasonably feasible alternative designs including software design changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to:

a.    Choosing not to use "addictive" patents identified herein in the game design;

b.    Redesigning gaming software to limit rather than promote addictive engagement;

c.    Implementing robust age verification;

d.    Implementing effective parental controls;

e.    Implementing effective parental notifications;

f.    Warning of health effects of use and extended use upon sign-up or log-in;

g.      Implementing default protective limits to the length and frequency of gaming sessions;

h.      Implementing opt-in restrictions to the length and frequency of gaming sessions;

i.      Implementing self-limiting tools, including but not limited to game play time notifications, warnings, or reports;

j.      Implementing blocks to use during certain times of day (such as during school hours or late at night);

k.      Implementing limits on number of games playable per day;

l.      Implementing limits on the strategic timing and clustering of offers and/or assignments and challenges to keep players engaged and playing longer;

m.      Implementing limits on minors' in-game purchases, downloadable content, microtransactions, and total in-game spending per day;

n.      Designing products that did not include the defective features listed in this Complaint while still allowing users to engage with games without addictive engagement; and

o.      Others as set forth herein.

546.    Alternative designs were available that would reduce neurodivergent users, young adults, and minors' addictive and compulsive engagement with each of the Defendant's respective products, and which would have effectively served the same purpose of Defendants' products while reducing the gravity and severity of danger posed by those products' defects.

547.    O.A. used Defendants' products as intended and/or in reasonably foreseeable ways.

548.     As a direct and proximate result of their use of Defendants' defectively designed products, O.A. sustained physical and mental injuries, emotional distress, pain, suffering, mental anguish, and economic injuries and damages.

549.     O.A.'s injuries and damages were reasonably foreseeable to each Defendant at the time of their respective products' development, design, advertising, marketing, promotion, and distribution, especially considering each Defendant's conduct—described herein and including, but not limited to, specifically designing their video game products to be addictive.

550.     The defective design of the video game products used by O.A., including Fortnite, Red Dead, Minecraft, Roblox, Xbox One, Xbox One X, Xbox 360, Google Play, Nintendo Switch, Xbox Game Pass Ultimate, and Xbox Game Pass Gold was a substantial factor in causing harm to O.A.

551.     As a direct and proximate result of Defendants' respective products' defective design, O.A. became addicted to video games and sustained brain damage, loss of cognitive function and ability to regulate impulsivity, decline in ability to learn and be educated, mental harm, emotional distress, pain, suffering, and mental anguish.

552.     O.A. was injured as a direct and proximate result of each of the Defendant's respective defective designs, as described herein, and Plaintiffs suffered economic damages as a result thereof.

553.     The defective design of Defendants' respective products, as identified and described herein, is a proximate cause of the harm and injuries to O.A.

554.     Plaintiffs' damages, which were proximately caused by Defendants' defective design, are O.A.'s physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; O.A.'s inability to attend school; economic loss related to expenses incurred as a

result of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to O.A.'s physical and mental injuries. O.A.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

555.    Defendants are strictly liable due to the defective design of their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

556.    Each Defendant, in defectively designing their video game products, acted with intent, reckless disregard, and a depraved indifference to the consequences of its conduct on end-users/consumers on the health, safety, and welfare of its customers (including minors, young adults, and neurodivergent users).

557.    The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

558.    The nature of the intentional and fraudulent acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, O.A. continues to use Defendants' respective products. While O.A. uses Defendants' respective products, Plaintiffs will not be able to independently verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

**COUNT II**
**STRICT LIABILITY – FAILURE TO WARN**
**(Against All Defendants)**

559.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

560.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by O.A.: Fortnite, Red Dead, Minecraft, Roblox, Xbox One, Xbox One X, Xbox 360, Xbox Game Pass Ultimate, Xbox Game Pass Gold, Nintendo Switch and Google Play.

561.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public, in Florida and throughout the United States, for the personal use of the end-user/consumer.

562.    Each of the Defendant's respective products are also marketed and advertised to minors, young adults, and neurodivergent individuals in Florida and throughout the United States.

563.    None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors, young adults, and neurodivergent individuals.

564.    None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that their products pose a higher risk of addiction, worsening of an ability to control impulsivity, and brain damage in neurodivergent individuals, including individuals with a diagnosis of ADHD, autism, or ODD.

565.    Each of the Defendants sold and distributed its respective products to O.A. in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of

harm to youth as described herein, including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

566.    Each of the Defendant's respective products are dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they cause brain damage and encourage unhealthy, addictive engagement, and compulsive use.

567.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth, young adults, and neurodivergent users considering its own internal information and knowledge regarding its products at the time of development, design, marketing, promotion, advertising, and distribution.

568.    Defendants' respective products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things:

a.  Defendants' respective products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries;

b.  Defendants' respective products harvest and utilize user data in such a way that increases a user's risk of addiction to these products and simultaneous physical and mental injuries;

c.  The feedback loops and strategized patented material in Defendants' respective products are designed to promote increasingly stimulative and alarming gameplay to encourage compulsive engagement by the user, raising the risk of mental health harms, including but not limited to addiction;

    d.   New users of Defendants' respective products can identify themselves as minors, begin to use the product, and do so indefinitely, without any time or usage limitations, without any spending limitations, without ever receiving a safety warning, and without ever having to provide information so that each Defendant can warn the users' parents or guardians;

    e.   The likelihood and severity of harms is greater for minors and young adults, especially those who are neurodivergent; and

    f.   The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another and by patented technology and code design, some of which is currently publicly unknown and hidden from users.

569.    Ordinary users could not and/or would not have recognized the potential risks of Defendants' respective products when used in a manner reasonably foreseeable to each of the Defendants.

570.    Defendants' respective products were defective and unreasonably dangerous when they left the Defendants' respective possession and control without reasonable instructions and/or warnings regarding the harm outlined herein.

571.    Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using Defendants' respective products, Plaintiffs would have heeded the warnings and/or instructions.

572.    Each Defendant's failure to adequately warn Plaintiffs about the risks of its defective products was a proximate cause and a substantial factor in the injuries sustained by Plaintiffs.

573.    Each Defendant, in failing to warn consumers and end-users that their video game products were addictive and have a risk of harm (including but not limited to brain damage), acted with intent, reckless disregard, and a depraved indifference to the consequences of its conduct on end-users/consumers on the health, safety, and welfare of its customers (including minors, young adults, and neurodivergent users).

574.    As a direct and proximate result of each Defendant's failure to warn, O.A. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses, as described herein.

575.    Defendants are strictly liable due to each Defendant's failure to warn of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

576.    Plaintiffs' injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

577.    The nature of the fraudulent and unlawful acts that created safety concerns for O.A. are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, O.A. continues to use Defendants' respective products. When O.A. uses Defendants' respective products, Plaintiffs will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

**COUNT III**
**NEGLIGENCE – DESIGN**
**(Against All Defendants)**

578.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

579.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by O.A.: Fortnite, Red Dead, Minecraft, Roblox, Xbox One, Xbox One X, Xbox 360, Xbox Game Pass Ultimate, Xbox Game Pass Gold, Nintendo Switch, and Google Play.

580.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

581.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults in Florida and throughout the United States.

582.    Each Defendant knew or, by the exercise of reasonable care, should have known, that its respective products were dangerous, harmful, and injurious when used by youth, young adults, and neurodivergent individuals in a reasonably foreseeable manner. This knowledge includes, but is not limited to:

　　　　a.　Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a product user's brain, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b.  The Red Dead Defendants designed the video gaming Red Dead series, including but not limited to Red Dead Online, to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.  The Minecraft Defendants designed Minecraft to take advantage of the chemical receptors in product user's brains and with addictive psychological features and traits to make the video game as addictive as possible, including, but not limited to, designing and developing a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects;

d.  Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e.  Microsoft designed its Xbox One, Xbox One X, and Xbox 360 with addictive features and for use with addictive video game products, and designed its Xbox

Network, including Xbox Game Pass Ultimate and Xbox Game Pass Gold, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, and Microsoft targeted users to make purchases of addictive video game products, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d. Nintendo designed the Switch with addictive features and with the intent that users use the Switch console to play addictive video games, and designed the Nintendo eShop as a platform to house addictive gaming products and pushed users to purchase products in the Nintendo eShop for use and play on the Switch, while knowing that extended play, abuse, and compulsive use by minors and neurodivergent people can lead to addiction, brain damage, and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f. Google designed Google Play to sell, supply, and house addictive gaming products and pushed users to purchase video games through Google Play, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

583.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth, young adults, and neurodivergent individuals. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to O.A.

584.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Defendants' respective products. Those risks include brain damage, abuse, addiction, and compulsive use in youth, young adults, and neurodivergent individuals, and which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

585.    Each Defendant knew that minors, young adults, and neurodivergent individuals would use its respective products.

586.    Despite this knowledge, each Defendant designed its video game products to create addictive engagement and compulsive use, including spending, in foreseeable users, including Plaintiffs.

587.    Each Defendant, as video game product designer, manufacturer, publisher, importer, distributor, and/or supplier, had a duty to design, manufacture, and supply a product that is reasonably safe for use.

588.    Each Defendant had a non-delegable duty to use ordinary care in its design and to package the product in order to protect those who will use it and who are in the area of its use from

unreasonable risk of harm while it is being used for its intended purpose or while it is being used for any purpose which should reasonably be expected by the manufacturer.

589.    Each Defendant owed a duty to design, publish, supply, and sell reasonably safe products to foreseeable users, including O.A.

590.    Each Defendant owed these duties to Plaintiffs, and particularly to O.A. as the foreseeable end-user.

591.    Each Defendant breached the duties owed to Plaintiffs, and particularly to O.A. These breaches include, but are not limited to:

    a.   Utilizing patented designs and technology for purposes of addicting users to the Defendant's respective products;

    b.   Failing to use ordinary care in the design of its products by negligently designing them with features and patented technology as described above that specifically are addictive and harmful to youth, who are particularly unable to appreciate the risks posed by the products;

    c.   Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

    d.   Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

    e.   Failing to use ordinary care in the design of its products by negligently designing its products with features and patented technology as described above that created or increased the risk of brain damage, abuse and addiction in youth, which can lead to a cascade of negative effects including but not limited to

dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.   Failing to use ordinary care to use cost-effective, reasonably feasible alternative designs, including changes to feedback loops and the addictive features described above, and other safety measures, to minimize the harms described herein; and

g.   Otherwise failing to use ordinary care in the design of the products.

592.   Alternative designs that would reduce the addictive features of Defendants' respective products were available, would have effectively served the same purpose as each of the Defendant's defectively designed products, and would have reduced the gravity and severity of danger Defendants' respective products posed minors, young adults, and neurodivergent individuals, including the danger and harm experienced by O.A.

593.   A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

594.   At the time each of the Defendants put its products into the market in Florida and throughout the United States, the products were defective as outlined herein, and at the time O.A. received and used each of the Defendant's products, the products remained defective.

595.   At all relevant times, O.A. used Defendants' respective products in the manner in which they were intended by Defendants to be used.

596.   As a direct and proximate result of each of the Defendant's breached duties, Plaintiffs were harmed.

597.   Defendants' design of their respective products was a substantial factor in causing the Plaintiffs' harm and injuries, as described herein.

598.     As a direct and proximate result of each of the Defendant's breached duties, O.A. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

599.     As a direct and proximate result of each of the Defendant's breached duties, Plaintiffs have suffered—and continue to suffer—economic loss and damages, as described herein.

600.     Defendants negligently designed their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

## COUNT IV
## NEGLIGENCE – FAILURE TO WARN
### (Against All Defendants)

601.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

602.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by O.A.: Fortnite, Red Dead, Minecraft, Roblox, Xbox One, Xbox One X, Xbox 360, Xbox Game Pass Ultimate, Xbox Game Pass Gold, Nintendo Switch, and Google Play.

603.     Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

604.     Each of the Defendant's respective products are also marketed and advertised to minors and young adults in Florida and throughout the United States.

605.     Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably

foreseeable manner, particularly by youth, young adults, and neurodivergent individuals. More specifically, Defendants knowledge includes but is not limited to:

a. Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a product user's brain in order to create addictive engagement, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b. The Red Dead Defendants designed the video gaming Red Dead series, including but not limited to Red Dead Online, with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. The Minecraft Defendants designed Minecraft with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited

to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d.   Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e.   Microsoft designed its Xbox One, Xbox One X and Xbox 360 with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Game Pass Ultimate and Xbox Game Pass Gold, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, and Microsoft targeted users to make purchases through the product, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.   Nintendo designed the Switch with addictive features, and the Nintendo eShop as a platform to house addictive gaming products and used algorithms and other psychological tactics to push users to make purchases on the Nintendo eShop, while knowing that extended play, abuse, and compulsive use by minors and

neurodivergent people can lead to addiction, brain damage, and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g. Google designed the Google Play with addictive features as a platform to house addictive gaming products and used algorithms and other psychological tactics to push users to make purchases, while knowing that extended play, abuse, and compulsive use by minors and neurodivergent people can lead to addiction, brain damage, and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

606.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to O.A.

607.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as O.A. would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

608.   Each Defendant knew that minors, including O.A., would use its respective products.

609.   Defendants failed to give appropriate warnings about the risks of their products. None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors, young adults, and neurodivergent individuals.

610.   None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that their products pose a higher risk of addiction, worsening of an ability to control impulsivity, and brain damage in neurodivergent individuals, including individuals with a diagnosis of ADHD, autism, or ODD.

611.   Had Plaintiffs received proper or adequate warnings about the risks of Defendants' respective products, Plaintiffs would have heeded such warnings.

612.   Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product for a purpose and in a manner which the manufacturer should reasonably foresee.

613.   Each Defendant had a duty to warn and/or instruct about particular risks of their video game products, both before and after leaving a Defendant's possession.

614.    Each Defendant owed these duties to users including O.A.

615.   Each Defendant breached the duties owed to O.A., a foreseeable user. These breaches include, but are not limited to:

      a.   Failing to warn users that Defendants' respective products cause brain damage, addiction, compulsive use, and/or other simultaneous physical and mental injuries;

b.      Failing to otherwise provide reasonable and adequate warnings to Plaintiffs, as set forth above, about the dangers inherent or reasonably foreseeable posed by the use of each Defendant's product;

c.      Failing to adequately instruct Plaintiffs regarding the risks of each of the Defendant's respective products and the need to alter O.A.'s game play to avoid such risks; and

d.      Otherwise failing to warn and/or instruct product users, including Plaintiffs, of the risk and harm associated with normal, foreseeable, and intended use of Defendants' video game products.

616.    A reasonable company under the same or similar circumstances as Defendants would have used reasonable care to provide adequate warnings to consumers, including the parents of minor users, as described herein.

617.    At all relevant times, each Defendant could have provided adequate warnings and/or instructions to prevent the harm and injuries described herein but failed to do so.

618.    Had Plaintiffs received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, Plaintiffs would have heeded such warnings.

619.    As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate warnings, Plaintiffs were harmed and sustained the injuries set forth herein. Each Defendant's failure to provide adequate and sufficient warnings was a substantial factor in causing harm to Plaintiffs.

620.    Each Defendant negligently failed to warn consumers, including Plaintiffs, of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and

Plaintiffs are entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

**COUNT V**
**NEGLIGENCE - ORDINARY**
**(Against All Defendants)**

621.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

622.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by O.A.: Fortnite, Red Dead, Minecraft, Roblox, Xbox One, Xbox One X, Xbox 360, Xbox Game Pass Ultimate, Xbox Game Pass Gold, Nintendo Switch, and Google Play.

623.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public in Florida and throughout the United States for the personal use of the end-user/consumer.

624.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults in Florida and throughout the United States.

625.    Each Defendant owed O.A. a duty to act as a reasonably careful company would under the circumstances.

626.    Each Defendant has breached the duties owed to O.A.

627.    A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

628.   A reasonably careful company would protect O.A. from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

629.   A reasonably careful company would not invite, encourage, or facilitate youth, such as O.A., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

630.   A reasonably careful company would disclose the serious safety risks presented by its respective products; yet each Defendant failed to do so. More specifically:

a.   Epic Games failed to disclose that it designed the Fortnite games with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

b.   The Red Dead Defendants failed to disclose that they designed the video gaming Red Dead series, including but not limited to Red Dead Online, to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users (*i.e.*, minors, young adults, and neurodivergent individuals) can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

c. The Minecraft Defendants failed to disclose that they designed Minecraft to include addictive features and psychological tactics to increase gameplay and product use, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage injury and, as such, the products pose significant risk of harm;

d. Roblox Corp. failed to disclose it designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e. Microsoft failed to disclose that it designed its Xbox One Xbox One X and Xbox 360 with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Game Pass Ultimate and Xbox Game Pass Gold, with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm;

f. Nintendo failed to disclose that it designed the Switch with addictive features and the Nintendo eShop as a platform to house and push addictive products to

users, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent people, can lead to injury and, as such, the products pose significant risk of harm;

g.   Google failed to disclose that it designed the Google Play app as a product for consumers to buy, download, and house addictive video gaming products and, in conjunction therewith, push addictive video game products to users, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm;

631.   O.A. was a foreseeable user of the Defendants' respective products.

632.   Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of O.A.'s use of Defendants' respective products.

633.   Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its respective products (as developed, set up, managed, maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious when used by youth such as O.A. in a reasonably foreseeable manner. More specifically, each Defendant should have known this because each designed their respective gaming products with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, physical damage to the brain, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

634.   At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained,

supervised, and operated by that Defendant) posed unreasonable risks of harm to youth such as O.A., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

635.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its respective products, such as O.A., would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

636.    Each Defendant's conduct was closely connected to O.A.'s injuries and Plaintiffs' damages, which were highly certain to occur.

637.    Each Defendant could have avoided Plaintiffs' injuries with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its respective products which harmed O.A.

638.    Each Defendant's failure to act as a reasonable company would under similar circumstances harmed Plaintiffs.

639.    A reasonable company engaged in the manufacture, design, development, and supply of video games to minors would comply with applicable federal and state laws designed to protect children; yet, Defendants did not do that.

640.    Each Defendant is required to comply with the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq.*, and the corresponding federal regulations, 16 C.F.R. § 312 *et seq.*

641.     COPPA protects minors who use the internet and requires each Defendant to utilize a heightened duty of care for users under the age of 13 due to the recognized safety risks pose to such users from interactive online products like Defendants' respective gaming products. *See, e.g.,* 16 C.F.R. §§ 312.4, 312.5.

642.     Each of the Defendants collects or uses personal information from children under the age of 13—including O.A.—through its respective products that are directed to (or that each Defendant has actual knowledge were used by) children.

643.     Each Defendant has actual knowledge that it collects personal information, including but not limited to avatars generated from a child's image, biometric and health information, and geolocations, directly from users of its respective websites or online services.

644.     Each Defendant utilizes data collected users' personal information to design and develop new products and microtransactions, and also uses the collected personal information with algorithms and other patented technologies to target product users.

645.     As described above, each Defendant has collected or used personal information from children younger than age 13 in violation of COPPA by, at least:

    a.  Failing to provide through their respective websites and apps a clear, understandable, and complete direct notice to parents or guardians that described each Defendant's respective practices regarding the collection, use, or disclosure of children's personal information, in violation of 16 C.F.R. § 312.4(a) and (c);

    b.  Failing to make reasonable efforts, and/or take into account available technology, to ensure parents or guardians received such notice on their

websites and applications so that parents or guardians could provide informed

consent, in violation of 16 C.F.R. § 312.4(b)-(c); and

c.  Failing to obtain verifiable parental or guardian consent before any collection,

use, or disclosure of personal information from children, in violation of 16

C.F.R. § 312.5(a)(1).

646.   Epic Games, in connection with its Fortnite video game product, violated COPPA

and those violations include, but are not limited to:

a.  Deploying design tricks, known as dark patterns, to dupe millions of players

(including minors like O.A.) into making unintentional purchases in its Fortnite

game;

b.  Failing to notify parents that children had open access to in-game purchases and

to obtain consent prior to processing purchases;

c.  Collecting personal data from children, including O.A., without first obtaining

parents' verifiable consent despite being aware that many children were playing

Fortnite;

d.  Requiring parents who requested that their children's personal information be

deleted to jump through unreasonable hoops, and sometimes failed to honor

such requests;

e.  Utilizing default settings that enable live on-by-default text and voice

communications for users and these default settings harm children and teens—

and violate COPPA because these default settings, along with Epic Games's

role in matching children and teens with strangers to play Fortnite together,

harmed children and teens, exposing children and teens to bullying, threats,

harassment, and other dangerous and psychologically traumatizing issues such as suicide while on Fortnite;

f.   Tricking users, including minors like O.A., into making purchases while playing Fortnite. More specifically, Epic Games has deployed a variety of dark patterns aimed at getting consumers of all ages to make unintended in-game purchases. Fortnite's counterintuitive, inconsistent, and confusing button configuration led players to incur unwanted charges based on the press of a single button. For example, players could be charged while attempting to wake the game from sleep mode, while the game was in a loading screen, or by pressing an adjacent button while attempting simply to preview an item. These tactics led to hundreds of millions of dollars in unauthorized charges for consumers;

g.   Charging account holders, including Plaintiffs, without authorization and allowed minors, including O.A., to purchase in-game content without parental consent;

h.   Locking the accounts of customers who disputed unauthorized charges with their credit card companies; thereby revoking access to all the content they have purchased, which can total thousands of dollars and, even when Epic Games agreed to unlock an account, consumers were warned that they could be banned for life if they disputed any future charges; and

i.   Purposefully obscuring cancel and refund features to make them more difficult to find.

647.     The Red Dead Defendants, in connection with the video gaming Red Dead series (including but not limited to Red Dead Online), violated COPPA and those violations include, but are not limited to:

a.   Collecting and maintaining personal information from minors without parental consent, including minors' names, usernames, email addresses, physical addresses; IP addresses, web and app browsing activity, device usage, profile inferences, and precise location;

b.   Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

c.   Collecting minors' information from third-party accounts;

d.   Automatically collecting minors' information through tracking technologies;

e.   Sharing minors' information with third parties and business partners; and

f.   Failing to provide through their respective websites and apps a clear, understandable, and complete Privacy Policy describing the collection, use, and distribution practices in regard to users'—including minors'—personal information.

648.     The Minecraft Defendants, in connection with Minecraft, violated COPPA and those violations include, but are not limited to:

a.   Collecting and maintaining personal information from minors without parental consent. For example, when learned that certain users were children after they provided their birthdates in the first step of the account creation process but went on to request phone numbers from the children, before seeking to involve a parent;

b.  Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

c.  Utilizing a deficient post-collection notice and verifiable parental consent process, including but not limited to:

    i.  Collecting personal information, from the child in violation of COPPA and then suggesting that the child seek parental involvement—this limited notice of the Minecraft Defendants information practices failed to ensure parents received adequate notice about the Minecraft Defendants' collection, use, and disclosure practices concerning children's personal information;

    ii.  Failing to include the information required by 16 C.F.R. § 312.4(b);

    iii.  Failing in the direct notice to describe the Minecraft Defendants' collection and use practices with regard to personal information collected from children and instead directed parents to the company's online notice of its information practices (the "Privacy Statement"); and

    iv.  Not disclosing in the direct notice to parents that the Minecraft Defendants intended to collect such personal information as images that could contain a child's likeness;

d.  Failing to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that the Minecraft Defendants collect personal information from children;

e.  Failing to include a complete Privacy Statement was incomplete. More specifically, until at least 2019, the Minecraft Defendants' Privacy Statement

contained a section entitled "Collection of data from children"; however, this section did not describe what personal information was collected from children or the Minecraft Defendants' use and disclosure practices for personal information collected from children as required---and instead the section discussed Microsoft's information practices regarding Microsoft products and children generically.

649. Roblox Corp., in connection with its Roblox online game platform and game creation system, violated COPPA and those violations include, but are not limited to:

    a. Using a "voice chat" feature that requires users, including minors, to submit uniquely identifying scans of their face to utilize the feature under the guise of "age verification" when Roblox Corp. is using sophisticated artificial intelligence to create faceprints—as uniquely identifying as a fingerprint—to track the user and their gaming patterns;

    b. Allowing advertising to be surreptitiously interlaced with organic content in a multitude of ways, while knowing millions of young children are exposed to that advertising daily;

    c. Failing to adequately disclose to children when advertising is present withing experiences and videos on Roblox; and

    d. Failing to ensure that social media influencers clearly and conspicuously disclose their material connections to Roblox in a manner that is understandable to children.

650. Microsoft, in connection with its Xbox game consoles and Xbox Network, including but not limited to its Xbox One, Xbox One X, Xbox 360, Xbox Store and Xbox Game

Pass, violated COPPA and those violations include, but are not limited to:

    a.  Collecting personal information from children who signed up to its Xbox gaming system without notifying their parents or obtaining their parents' consent, and by illegally retaining children's personal information;

    b.  Allowing children, after creating an account on Xbox, to create a profile that will include their "gamertag," and allowing them to upload a picture or include an avatar, which is a figure or image that represents the user, which Microsoft then combines with a unique persistent identifier it creates for each account holder, even children, to share with third-party game and app developers;

    c.  Allowing—by default—all users, including children to play third-party games and apps while using Xbox Game Pass, requiring parents to take additional steps to opt out if they do not want their children to access them; and

    d.  Using the data collected on minor children less than 13 years old to use a patented system of analyzing gamer behavior, tracking kids with their respective gamer tag, and used a deceptive marketing of in-game purchases or prepaid cards to ensure minors remained engaged in the games which proximately caused the addiction and/or internet gaming disorder.

651.    Nintendo, in connection with the Switch and the Nintendo eShop, **v**iolated COPPA and those violations include, but are not limited to**:**

    a.  Failing to notify parents that children had open access to in-game purchases;

    b.  Collecting personal data from children, including account information, content interaction, purchase information, location information, and health information, despite being aware that numerous children were playing games through

Nintendo Switch;

c.  Requiring parents who requested that their children's personal information be deleted to complete a number of steps to make such request; and

d.  Requiring users or parents to take additional steps to opt out if they do not want unnecessary data collected;

e.  Sharing personal information of children with third parties, including service providers, game publishers, and Nintendo business partners, and failing to regulate how those third parties utilize the personal information;

f.  Utilizing third parties to collect personal information and activity from minors without parental consent;

g.  Using dark patterns to entice minors, including D.G., into microtransactions without parental consent or consent of the account holder, including but not limited to attracting and enticing minors into microtransactions based on the minor-player's gaming behavior and their personal data (e.g., IP addresses, geolocation, voice) that is illegally collected, not deleted, or gained through passive tracking applications; and

h.  Collecting and retaining children's voice and audio information.

652.  Google, in connection with Google Play, violated COPPA and those violations include, but are not limited to:

a.  Employing dark patterns in video gaming apps, *e.g.,* Roblox, Minecraft, Call of Duty, and Grand Theft Auto, including, but not limited to, tricking minors into paying for goods or services that they did not want or intend to buy, whether the transaction involves single charges or recurring charges;

b. Using dark patterns to entice minors, including O.A., into microtransactions without parental consent or consent of the account holder. For example, once the account holder downloaded the app and children began playing the game, purchases are disguised as play money whereby a child is prompted to use or acquire seemingly fictitious currency, but in reality the child is making an in-app purchase using real money and, unbeknownst to the account holder or child, the child is making multiple real purchases, ranging from $0.99 to $99.99 each, by simply tapping buttons to advance or obtain prizes within the game;

c. Collecting personal information from children who created a Google account without notifying their parents or obtaining their parents' consent, and by illegally retaining children's personal information;

d. Automatically collecting and storing information about services used by children, queries entered by children, and YouTube videos watched by children; and

e. Collecting and retaining children's voice and audio information.

653. Each Defendants' COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minor into buying microtransactions or unknowingly make in-game purchases using the game patens and other illegal dark patterns.

654. Likewise, each Defendant had a duty to comply with Fla. Stat. § 501.1735, which states platforms that provide an online service, product, game, or feature, like Defendants' gaming products, likely to be predominantly accessed by children, like O.A., may not:

a.  Process the personal information of any child if the online platform has actual knowledge of or willfully disregards that the processing may result in substantial harm or privacy risk to children;

b.  Profile a child unless both of the following criteria are met:

   i.   the online platform can demonstrate it has appropriate safeguards in place to protect children, and

   ii.  (a) profiling is necessary to provide the online service, product, or feature requested for the aspects of the online service, product or feature with which the child is actively and knowingly engaged; or (b) the online platform can demonstrate a compelling reason that profiling does not pose a substantial harm or privacy risk to children;

c.  Collect, sell, share, or retain any personal information that is not necessary to provide an online service, product, or feature with which a child is actively and knowingly engaged unless the online platform can demonstrate a compelling reason that collecting, selling, sharing, or retaining the personal information does not pose a substantial harm or privacy risk to children;

d.  Use personal information of a child for any reason other than the reason for which the personal information was collected, unless the online platform can demonstrate a compelling reason that the use of the personal information does not pose a substantial harm or privacy risk to children;

e.  Collect, sell, or share any precise geolocation data of children unless the collection of the precise geolocation data is strictly necessary for the online platform to provide the service, product, or feature requested and then only for

the limited time that the collection of the precise geolocation data is necessary to provide the service, product, or feature;.

f.  Collect any precise geolocation data of a child without providing an obvious sign to the child for the duration of the collection that the precise geolocation data is being collected;

g.  Use dark patterns to lead or encourage children to provide personal information beyond what personal information would otherwise be reasonably expected to be provided for that online service, product, game, or feature; to forego privacy protections; or to take any action that the online platform has actual knowledge of or willfully disregards that may result in substantial harm or privacy risk to children; and

h.  Use any personal information collected to estimate age or age range for any other purpose or retain that personal information longer than necessary to estimate age. The age estimate must be proportionate to the risks and data practice of an online service, product, or feature.

655.  Each Defendant violated Fla. Stat. § 501.1735 as outlined herein, including but not limited to:

a.  Profiling children in order to prey on the minors and trick minor into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns and/or to knowingly target minors to addict them to Defendants' products so Defendants can increase profits as much as possible;

b.  Processing children's information with a willful disregard for the harms outlined herein; and

c.  Collecting and retaining information not necessary to provide an online service, product, or feature with which a child is actively and knowingly engaged posing an unnecessary and unreasonable risk of harm to children.

656.  Each of the Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the risk of using Defendants' respective products that were known to each of the Defendants, or that each of the Defendants should have known through the exercise of reasonable care, and how to alter regular gameplay in order to avoid such risks.

657.  Each Defendant has breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a.  Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including O.A.;

b.  Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including O.A., including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including O.A.;

d. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including O.A.;

e. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including O.A., including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including O.A.;

g. Developing, patenting, and licensing unreasonably dangerous features and algorithms for video game products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users, like O.A.;

h. Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and

operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users; and

i.   Facilitating use of their respective products by youth under the age of 13, including by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols.

658.   Each Defendant has breached its duties of care owed to Plaintiffs through its nonfeasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a.   Failing to implement effective protocols to block users under the age of 13;

b.   Failing to implement effective parental controls;

c.   Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

d.   Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content, product upgrades, and/or microtransactions;

e.   Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

f.   Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

659.    Each Defendant further breached the duty owed to recognize the safety risks posed to such users from interactive online products, such as Defendants' respective products, pursuant to 15 U.S.C. § 6501 *et seq.*

660.    A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users like O.A.; yet Defendants did not do this. This was a breach of duties owed to Plaintiffs.

661.    As a direct and proximate result of each Defendant's breach of one or more of its duties, O.A. has been injured and Plaintiffs were harmed. Such injuries and harms include addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

662.    As alleged herein, each Defendant's breach of one or more of its duties is a proximate cause of O.A.'s injuries and the damages sustained by Plaintiffs.

663.    As a direct and proximate result of each of the Defendant's breach of duties, O.A. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

664.    Each Defendant was negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

**COUNT VI**
**GROSS NEGLIGENCE**
**(Against All Defendants)**

665.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

666.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by O.A.: Fortnite, Red Dead, Minecraft, Roblox, Xbox One, Xbox One X, Xbox 360, Xbox Game Pass Ultimate, Xbox Game Pass Gold, Nintendo Switch, and Google Play.

667.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public in Florida and throughout the United States for the personal use of the end-user/consumer.

668.    Each of the Defendant's respective products are also marketed and advertised to young adults and minors, including O.A.

669.    Each Defendant owed O.A. a duty to act as a reasonably careful company would under the circumstances.

670.    A reasonably careful company would not create an imminent and/or clear and present danger from and in the use of its products (including an imminent risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

671.    A reasonably careful company would protect O.A. from imminent and/or a clear and present danger from and in the use of its products; yet each Defendant failed to do that.

672.    A reasonably careful company would not invite, encourage, or facilitate youth,

including O.A., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

673.    A reasonably careful company would disclose the serious safety risks presented by its respective products; yet each Defendant failed to do that. More specifically:

   a.   Epic Games failed to disclose that it designed the Fortnite games with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a user's brain, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage and other injury such that the products pose significant risk of harm;

   b.   The Red Dead Defendants failed to disclose that they designed the video gaming Red Dead series, including but not limited to Red Dead Online, with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, young adults, and neurodivergent individuals, can lead to brain damage and injury and, as such, the products pose significant risk of harm;

   c.   The Minecraft Defendants failed to disclose that it designed Minecraft with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a user's brain, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage and other injury such that the products pose significant risk of harm;

d.  Roblox Corp. failed to disclose that it designed Roblox with addictive properties, including but not limited to using technologies, algorithms, and psychological tricks within the game to keep users playing and engaged with Roblox, despite knowing that abuse, addiction, and compulsive use by foreseeable users, *e.g.*, minors and neurodivergent individuals, can lead to brain damage and injury and, as such, the products pose significant risk of harm;

e.  Microsoft failed to disclose that it designed its Xbox consoles, including Xbox One, Xbox One X and Xbox 360, with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Game Pass Ultimate and Xbox Game Pass Gold with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by foreseeable users, like O.A., can lead to injury and, as such, the products pose significant risk of harm;

f.  Nintendo failed to disclose that it designed the Switch with addictive features and the Nintendo eShop as a platform to house and used algorithms and other psychological tactics to push users to purchase addictive products, while knowing that extended play, abuse, and compulsive use of these products by foreseeable users, *i.e.*, minors and neurodivergent people, can lead to addiction, brain damage, and injury and, as such, the products pose significant risk of harm;

g.  Google failed to disclose that it designed Google Play as a product for consumers to buy, download, and house addictive video gaming products and, in conjunction therewith, to push addictive video game products to users, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and young adults, can lead to injury and, as such, the products pose significant risk of harm;

674.  O.A. was a foreseeable user of each of the Defendant's respective products.

675.  Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of O.A.'s use of each of the Defendant's respective products.

676.  Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its respective products (as developed, set up, managed, maintained, supervised, and operated by that Defendant) created an imminent risk and/or clear and present danger when used by youth, including O.A., in a reasonably foreseeable manner. More specifically:

a.  Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b.  The Red Dead Defendants designed the video gaming Red Dead series, including but not limited to Red Dead Online, to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or

neurodivergent individual) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by such foreseeable users can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

c. The Minecraft Defendants designed Minecraft with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d. Roblox Corp. designed Roblox to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by such foreseeable users can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

e. Microsoft designed its Xbox One, Xbox One X and Xbox 360 with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Game Pass Ultimate and Xbox Game Pass Gold, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, and Microsoft targeted users to make purchases through the product, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury,

including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.   Nintendo designed the Switch with addictive features, and the Nintendo eShop as a platform to house addictive gaming products and used algorithms and other psychological tactics to push users to make purchases on the Nintendo eShop, while knowing that extended play, abuse, and compulsive use by minors and neurodivergent people can lead to addiction, brain damage, and injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

g.   Google designed Google Play as a product for consumers to buy, download, and house addictive video gaming products and to take advantage of the chemical reward system of a user's brain to push users to make purchases through Google Play, while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

677.   At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed imminent and/or clear and present danger to youth, including O.A., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

678.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its respective products, including O.A., would not have realized the dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

679.    Each of the Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the risk of using Defendants' respective products that were known to each of the Defendants, or that each of the Defendants should have known through the exercise of reasonable care, and how to alter regular gameplay in order to avoid such risks.

680.    Each Defendant designed, developed, managed, operated, tested, produced, manufactured, labeled, marketed, advertised, promoted, controlled, supplied, leased, sold, and/or otherwise distributed its products, which Defendants knew or should have known posed imminent and/or clear and present danger, throughout Florida and the United States with a conscious disregard of the consequences described herein.

681.    Each Defendant's conduct was closely connected to Plaintiffs' injuries and damages, which were highly certain to occur.

682.    Each Defendant could have avoided Plaintiffs' injuries and damages with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its respective products which harmed O.A.

683.    Each Defendant also owes a particularly heightened duty of care to users under the age of 13 due to the recognized safety risks posed to such users from interactive online products,

such as Defendants' respective products. *See* 15 U.S.C. § 6501 *et seq.; Florida COPPA Statute.*

684.    Each Defendant failed to use even slight diligence in fulfilling the duties owed to Plaintiffs.

685.    Accordingly, each Defendant has grossly breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a.    Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including O.A.;

b.    Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including O.A., including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.    Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including O.A.;

d.    Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and

operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users, including O.A.; and

e.  Facilitating use of their respective products by youth under the age of 13, including by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols.

686.  Each Defendant has grossly breached its duties of care owed to Plaintiffs through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a.  Failing to implement effective protocols to block users under the age of 13;

b.  Failing to implement effective parental controls;

c.  Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

d.  Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content and/or microtransactions;

e.  Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

f.  Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

687.    Each Defendant further grossly breached the duty owed to Plaintiffs by failing to recognize the safety risks posed to such users from interactive online products, such as Defendants' respective products, pursuant to 15 U.S.C. § 6501 *et seq.; FL COPPA statute.*

688.    A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and protective of youth users including O.A.; yet Defendants did not do this. This was a breach of duties owed to Plaintiffs.

689.    As a direct and proximate result of each Defendant's gross breach of one or more of its duties, O.A. has been injured and Plaintiffs were harmed. Such injuries and harms include addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

690.    Each Defendant's breach of one or more of its duties proximately caused Plaintiffs' injuries and damages.

691.    Each Defendant's breach, or negligent act, as described and identified herein, was done with knowledge that Defendants' video game products (including those identified herein and used by O.A.) posed imminent, clear, and real danger to foreseeable users of those video game products (including O.A.).

692.    As a direct and proximate result of each Defendant's course of conduct and breach of duties, O.A. has been gravely injured, and has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

693.   Each Defendant was grossly negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

694.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

695.   At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by O.A.: Fortnite, Red Dead, Minecraft, Roblox, Xbox One, Xbox One X, Xbox 360, Xbox Game Pass Ultimate, Xbox Game Pass Gold, Nintendo, and Google Play.

696.   Defendants outrageous, extreme, and reckless conduct, as described herein, caused Shane Ayers and O.A. to experience extreme emotional distress; and that misconduct includes but is not limited to:

    a.   Each of the Defendants intentionally designed its respective products to addict minor, young adult, and neurodivergent users, the type of individuals who were particularly unable to appreciate the risks posed by Defendants' products and were particularly susceptible to harms from those products.

    b.   Epic Games designed Fortnite to be as addictive as possible, employing numerous psychological tricks, tactics, and technologies to ensnare users into extended, compulsive, abusive, and addictive use of its product, including but not limited to, designing the game to include a "near miss" effect, random rewards, bright and vibrant colors, and continual gameplay variety;

c.  The Red Dead Defendants designed the video gaming Red Dead series, including but not limited to Red Dead Online, to be as addictive as possible and to include various addictive tactics, including but not limited to varied gameplay through side missions and an expansive game world, the availability of various and ever-changing cosmetic items and weapons for purchase, and a "cash" reward system related to time spent playing and advancing in the game;

d.  The Minecraft Defendants designed Minecraft to take advantage of the chemical receptors in product user's brains and with addictive psychological features and traits to make the video game as addictive as possible, including, but not limited to, designing and developing a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects;

e.  Roblox Corp. designed Roblox with psychologically addictive properties and technologies, including but not limited to ever-changing gameplay, microtransactions, social aspects, and the use of algorithms to target players to purchase numerous characters, skins, and other in-game products;

f.  Microsoft designed its Xbox One, Xbox One X and Xbox 360 with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Game Pass Ultimate and Xbox Game Pass Gold with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, and these addictive features include but are not limited to an everchanging,

constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users;

g.  Nintendo defectively designed the Switch with addictive features, and designed the Nintendo eShop as a platform to house addictive gaming products and used algorithms and other psychological tactics to push users to make purchases in the Nintendo eShop;

h.  Google designed Google Play as a product for consumers to buy, download, and house addictive video gaming products and to take advantage of the chemical reward system of a user's brain to push users to make purchases through Google Play, and Google targeted video game developers to put their addictive gaming products on Google Play and marketed those products on Google Play as safe for use and without warning of risk of harm, and market Google Play as safe for use by all, including minors;

i.  Each Defendant intentionally designed its respective products to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

j.  Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

k.   The Red Dead Defendants designed the video gaming Red Dead series, including but not limited to Red Dead Online, in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors, young adults, and neurodivergent individuals;

l.   The Minecraft Defendants designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

m.   Roblox Corp. designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

n.   Microsoft designed its Xbox consoles, Xbox Network, Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the minor and young adult users continually purchase addictive video game products for play on Xbox consoles;

o.   Nintendo designed the Switch and Nintendo eShop in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive video gaming products;

p.   Google designed Google Play in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

q.   Each Defendant intended for their products to be psychologically and neurologically addictive when used in their intended manner by their intended

audience; and intended for minors, like O.A., to use each Defendants' respective product and intended for users, like O.A., to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of Defendants' conduct and immoral tactics;

r.   Each Defendant knew that extended use of video games, *i.e.,* their products, could likely cause addiction, yet each Defendant engaged in the course of conduct and reckless behavior surrounding their video game products;

s.   Each Defendant intentionally failed to warn users, prospective users, or their parents/guardians of the addictive components of its video games and gaming products; and

t.   Each Defendant displayed flagrant disregard and an entire want of care to the consequences of their conduct, including to the health, safety, and welfare of their customers.

697.   Each Defendant's conduct in designing and developing its products to knowingly and purposefully addict and harm users—especially minors, young adults, and neurodivergent individuals—was intentional, reckless, extreme, and outrageous, and was beyond all possible bounds of decency, and was to be regarded as atrocious and utterly intolerable in a civilized community.

698.   Each Defendant knew users, like O.A., would likely become addicted to Defendants' respective products because each Defendant designed and developed their respective products to become more stimulative over time, to maximize young consumers' usage time, and

to addict them so Defendants can continue to profit off users, including O.A., after initial purchase or download.

699.    Each Defendant knew that when users, like O.A., became addicted to Defendants' respective products due to the addictive and defective qualities thereof, that parents and families, like Plaintiffs, would be forced to deal with an uncontrollable video game addiction in their child and the harmful effects of such addiction.

700.    Each Defendant intended to inflict emotional distress (*e.g.*, causing addiction) on users, like O.A., and should have known product users and their families, like Plaintiffs, would suffer emotional distress as a result of Defendants' conduct.

701.    Plaintiffs have sustained severe emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct.

702.    Further, O.A.'s family has endured O.A.'s bouts of gamer's rage and emotional disturbances which have required, including out-patient counseling, private tutoring, and an education "504" plan at school.

703.    Defendants' conduct—individually and collectively—including their decision to intentionally create and market products that addict and abuse children and cause them severe mental and physical harm and distress—is extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

704.    No reasonable person would be expected to endure such severe emotional distress as each Defendant has caused Plaintiffs.

705.    As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, O.A. has experienced extreme emotional distress and will require

additional treatment for their mental health conditions proximately caused by Defendants' outrageous behavior.

706.    As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, Shane Ayers has experienced severe emotional distress that has resulted in pain, suffering, and mental anguish, including having to witness O.A. suffer from addiction, pain, and mental distress caused by Defendants' outrageous conduct.

707.    As a direct and proximate result of each Defendant's outrage, Plaintiffs have been damaged. more specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

## COUNT VIII
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)
### (Pleaded in the Alternative)

708.    Plaintiffs reallege and incorporate paragraphs 1 - 407 by reference each of the preceding paragraphs above as though set forth fully herein.

709.    Plaintiffs plead this in the alternative.

710.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and otherwise distributing the video game products used by O.A.: Fortnite, Red Dead, Minecraft, Roblox, Xbox One, Xbox One X, Xbox 360, Google Play, Nintendo Switch, Xbox Game Pass Ultimate, and Xbox Game Pass Gold.

711.    Each Defendant owed O.A. a duty to act as a reasonably careful company under the

circumstances and not cause severe emotional distress to foreseeable users; yet each Defendant did just that.

712.    Each Defendant defectively designed its respective products to be addictive to young adults and minors, including O.A., who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products. In particular:

    a.   Epic Games designed Fortnite to be as addictive as possible, employing numerous psychological tricks, tactics, and technologies to ensnare users into extended, compulsive, abusive, and addictive use of its product, including but not limited to, designing the game to include a "near miss" effect, random rewards, bright and vibrant colors, and continual gameplay variety;

    b.   The Red Dead Defendants designed the video gaming Red Dead series, including but not limited to Red Dead Online, to be as addictive as possible and to include various addictive tactics, including but not limited to varied gameplay through side missions and an expansive game world, the availability of various and ever-changing cosmetic items and weapons for purchase, and a "cash" reward system related to time spent playing and advancing in the game;

    c.   The Minecraft Defendants designed Minecraft to take advantage of the chemical receptors in product user's brains and with addictive psychological features and traits to make the video game as addictive as possible, including, but not limited to, designing and developing a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects;

d.   Roblox Corp. designed Roblox with psychologically addictive properties and technologies, including but not limited to ever-changing gameplay, microtransactions, social aspects, and the use of algorithms to target players to purchase numerous characters, skins, and other in-game products;

e.   Microsoft designed its Xbox One Xbox One X and Xbox 360 with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Online Products/Subscriptions used by O.A., i.e., Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming], with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, and these addictive features include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users;

f.   Nintendo defectively designed the Switch with addictive features, and designed the Nintendo eShop as a platform to house addictive gaming products and used algorithms and other psychological tactics to push users to make purchases in the Nintendo eShop;

g.   Google designed Google Play as a product for consumers to buy, download, and house addictive video gaming products and to take advantage of the chemical reward system of a user's brain to push users to make purchases through Google

Play, and Google targeted video game developers to put their addictive gaming products on Google Play and marketed those products on Google Play as safe for use and without warning of risk of harm, and market Google Play as safe for use by all, including minors;

713.    Each Defendant defectively designed its respective products to take advantage of the chemical reward system of users' brains (especially young users including O.A.) to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

a.  Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

b.  The Red Dead Defendants designed the video gaming Red Dead series, including but not limited to Red Dead Online, in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors, young adults, and neurodivergent individuals;

c.  The Minecraft Defendants designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

d.  Roblox Corp. designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

e.  Microsoft designed its Xbox consoles, Xbox Network, Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the minor and young

adult users continually purchase addictive video game products for play on Xbox consoles;

f.   Nintendo designed the Switch and Nintendo eShop in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive video gaming products.

g.   Google designed Google Play in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive video gaming products.

714.   Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of O.A.'s use of Defendants' respective products.

715.   At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth, including O.A., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

716.   Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users, including O.A., of its respective products, including O.A., would not and could not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

717.   A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a

manner that is safer for and more protective of youth users, including O.A.; yet Defendants did not do this and caused Plaintiffs to experience severe emotional distress and psychological trauma.

718.    A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that and caused Plaintiffs to experience severe emotional distress and psychological trauma.

719.    A reasonably careful company would protect O.A. from unreasonable risk of injury from and in the use of its products, and the emotional distress likely to result therefrom; yet each Defendant failed to do that and caused Plaintiffs to experience severe emotional distress and psychological trauma.

720.    A reasonably careful company would not invite, encourage, or facilitate youth, young adults, and neurodivergent individuals, including O.A., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products, and that such foreseeable users would experience severe emotional distress as a result of that designed-addictive behavior; yet each Defendant did just that and caused Plaintiffs to experience severe emotional distress and psychological trauma..

721.    A reasonably careful company would disclose the serious safety risks presented by its respective products and that those safety risks included psychological trauma; yet each Defendant failed to disclose such risks and caused Plaintiffs to experience severe emotional distress and psychological trauma.

722.    Each Defendant has breached the duties owed to O.A. and caused Plaintiffs to endure psychological trauma.

723.    Defendants' products, including Fortnite, Red Dead, Minecraft, and Roblox are

psychologically and neurologically addictive when used in their intended manner by their intended audience; and Defendants reasonably should have known that when used as intended by minors, young adults, and neurodivergent individuals, including O.A., to use each Defendants' respective product and for users, including O.A., to become addicted to the product, or should have known that users (particularly minors, young adults, and neurodivergent individuals) would become addicted and experience emotional and physical injuries, including severe emotional distress, as a result of Defendants' conduct and immoral tactics.

724.   Each Defendant knew, or should have known, that users, including O.A., would become addicted to Defendants' respective products because each Defendant designed and developed their respective products to become more stimulative over time, to maximize young consumers' usage time, and made them addictive to these vulnerable consumers so Defendants can continue to profit off of users, including O.A., after initial purchase or download.

725.   Each Defendant knew, or should have known, that the harm caused to foreseeable users of Defendants' video game products, including the harm caused to minors, young adults, and neurodivergent individuals and experienced by O.A., would cause severe emotional distress to those in close personal relationship to the harmed user, including parents like Shane Ayers.

726.   Each Defendant's conduct was closely connected to Plaintiffs' emotional distress, which was highly certain to occur.

727.   As a direct and proximate result of each Defendant's breach of one or more of its duties, Plaintiffs have sustained emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct.

728.   As a direct and proximate result of each of the Defendants' negligent conduct and infliction of emotional distress, O.A. has experienced extreme emotional distress, including

diminished social interactions, loss of friends, poor hygiene, and withdrawal symptoms such as rage, anger, and physical outbursts.

729.    and is required (and will require) additional treatment for their mental health conditions proximately caused by Defendants' outrageous behavior.

730.    As a direct and proximate result of each of the Defendants' negligent conduct and infliction of emotional distress, Shane Ayers has experienced extreme emotional, including a fractured parent-child relationship, and loss of parenting role.

731.    As a direct and proximate result of each Defendant's negligent infliction of emotional distress, Plaintiffs have been damaged. more specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

732.    Each Defendant negligently caused Plaintiffs to experience emotional distress and psychological trauma, such that Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT IX
## FRAUDULENT MISREPRESENTATION
### (Against All Defendants)

733.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

734.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video

game products used by O.A.: Fortnite, Red Dead, Minecraft, Roblox, Xbox One, Xbox One X, Xbox 360, Xbox Game Pass Ultimate, Xbox Game Pass Gold, Nintendo Switch and Google Play.

735. As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users, particularly minors, young adults, and neurodivergent individuals.

736. Each Defendant knew their video game products posed risk to minors, like O.A., based on internal research and external studies known in the industry and to each Defendant; yet each Defendant misrepresented the safety and value of their games for the purpose of inducing users, like O.A., to purchase/download the game and to continue using Defendants' products to the addiction knowingly caused by Defendants' products.

737. Each Defendant could have disclosed the defective condition of their video game products to the public and could have advised that the products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

738. Each Defendant intentionally and knowingly did not disclose the serious safety risks presented by its respective products.

739. Each Defendant intentionally omitted or knowingly did not disclose material facts about their respective products, or their collective use of patents designed to addict players to Defendants' products. For instance,

        a. Epic Games did not inform the public, users, or parents, including Plaintiffs, that Fortnite poses significant risk of harm due to Epic Games's decision to design Fortnite to be as addictive as possible, while knowing that abuse,

addiction, and compulsive use by youth and neurodivergent people can lead to brain damage and injury;

b.  The Red Dead Defendants did not inform the public, users, or parents of minor users, including Plaintiffs, that the video gaming Red Dead series, including but not limited to Red Dead Online, pose significant risk of harm due to the Red Dead Defendants' decision to design their products to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals can lead to brain damage and injury;

c.  The Minecraft Defendants did not inform the public that they designed Minecraft games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to brain damage and injury;

d.  Roblox Corp. did not inform the public that it designed Roblox games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to injury;

e.  Microsoft did not inform the public that it designed its Xbox consoles and its Xbox Network, Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming products with addictive features, or that these products could be used to download addictive games and content, despite knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to brain damage and injury;

    f.   Nintendo did not inform the public that it designed the Switch and eShop with addictive features, or that these products could be used to download addictive games and products, despite knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injury;

    g.   Google did not inform the public, parents, or users, including Plaintiffs, that it designed Google Play with addictive features, or that this product could be used to download addictive games and products, despite knowing that abuse, addiction, and compulsive use of these games and products by minors and neurodivergent individuals can lead to injury.

740.    Each Defendant concealed the serious safety risks presented by its respective products. Defendants' acts of fraudulent concealment include, but are not limited to:

    a.   Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a product user's brain, while knowing that abuse, addiction, and compulsive use by such users (particularly minors and neurodivergent people) can lead to brain damage and injury, but concealed this information from the public and product users, including Plaintiffs;

    b.   The Red Dead Defendants designed the video gaming Red Dead series, including but not limited to Red Dead Online, with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals can

lead to brain damage and injury—but concealed this information from the public and product users, including Plaintiffs;

c. The Minecraft Defendants designed the Minecraft games with addictive psychological features to take advantage of the chemical reward system in user's brains and keep users playing more often and longer, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injury, but concealed this information from the public and product users, including Plaintiffs;

d. Roblox Corp. designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to brain damage and injury, but concealed this information from the public and product users, including Plaintiffs;

e. Microsoft designed its Xbox One, Xbox One X and Xbox 360 with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Game Pass Ultimate and Xbox Game Pass Gold, with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the public, product users, and parents, including Plaintiffs;

f.   Nintendo designed the Switch and Nintendo eShop with addictive features, and the Nintendo eShop as a platform to house addictive gaming products—while knowing that abuse, addiction, and compulsive use of such products by minors and neurodivergent individuals can lead to injury—but concealed this information from the public, parents, and product users, including Plaintiffs;

g.   Google designed Google Play with addictive features and as a product for consumers to buy, download, and house addictive video gaming products—while knowing that abuse, addiction, and compulsive use of such products by minors and neurodivergent individuals can lead to injury—but concealed this information from the public, parents, and product users, including Plaintiffs;

741.   Each Defendant knew of the risks associated with use of their products based on internal research and external studies known within the industry and to each Defendant, and each Defendant intentionally concealed those findings in order to induce youth, including O.A., to continue using its respective products and avoid losing users and revenue.

742.   Each Defendant knew that its concealment was material.

743.   Each Defendant intended its concealment to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game product transactions in each Defendant's product.

744.   In addition to hiding and concealing the dangers of their video game products, each Defendant made material misrepresentations (and others) about their respective products while knowing or believing those representations to be false *and* with the intent that Plaintiffs (and the public) rely on those misrepresentations.

745.   Defendants' false representations involve, but are not limited to, material misstatements about the safety of Defendants' video game products:

     a.  Epic Games misrepresented Fortnite as educational and safe for use by minors, young adults, and neurodivergent individuals, including O.A., while knowing that abuse, addiction, and compulsive use by such product users can lead to brain damage and injury, and knowing that it had designed and developed Fortnite to be as addictive as possible;

     b.  The Red Dead Defendants misrepresented the video gaming Red Dead series, including Red Dead Online, as safe for use by minors, young adults, and neurodivergent individuals, including O.A., while knowing that abuse, addiction, and compulsive use by such foreseeable users can lead to injury, and knowing that they had designed and developed their products to be as addictive as possible;

     c.  The Minecraft Defendants misrepresented the Minecraft games as safe for use by minors and young adults, while knowing they had been designed and developed with addictive psychological features to keep users playing Minecraft more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by youth can lead to brain damage and injury, such that Minecraft poses significant risk of harm to users;

     d.  Roblox Corp. misrepresented the Roblox games as safe for use by minors, young adults and neurodivergent individuals, while knowing they had been designed and developed with addictive psychological features to keep users playing Roblox more often and for longer periods of time, and while knowing

that abuse, addiction, and compulsive use by youth can lead to injury, such that Roblox poses significant risk of harm to users;

e.   Microsoft misrepresented that its Xbox consoles, Xbox Network, Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming were safe for use by minors, young adults, and neurodivergent people, while knowing that it was designed and developed with addictive features to keep such users using Microsoft's video game products, playing video games, and purchasing addictive content, and while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to brain damage and injury, such that Microsoft's video game products pose significant risk of harm to users, including O.A.;

f.   Nintendo misrepresented that its Switch and Nintendo eShop were safe for use by minors and young adults, while knowing that they was designed and developed with addictive features to keep users purchasing addictive products, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that its products pose significant risk of harm to users, like O.A.;

g.   Google misrepresented that Google Play was safe for use by minors and young adults, while knowing that it was designed and developed with addictive features to keep users purchasing addictive purchase addictive video game products, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that its products pose significant risk of harm to users, like O.A.

746.    Each Defendant also knowingly and recklessly misled the public—particularly product users, and their parents, including Plaintiffs, into believing these products were safe or even beneficial for children to use. These misrepresentations of material fact include, but are not limited to:

a.  Epic Games marketed Fortnite as educational and safe for use by minors, young adults, and neurodivergent individuals (in and outside the classroom), despite knowing that its Fortnite games contained an inherent risk of abuse, addiction, and compulsive use by such users leading to brain damage and other damages that arise therefrom, and that have been experienced by O.A.;

b.  The Red Dead Defendants marketed the video gaming Red Dead series, including Red Dead Online, as safe for play and without warning of the addictive design and risk of injury associated with the products, despite knowing that the video gaming Red Dead series contained an inherent risk of abuse, addiction, and compulsive use by foreseeable users and the harms that arise therefrom, and that have been experienced by O.A.;

c.  The Minecraft Defendants marketed Minecraft as "educational" and for use in the classroom despite knowing that its Minecraft games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by O.A.;

d.  Roblox Corp. marketed Roblox as safe for all ages and as an educational tool without warning of the addictive design and risk of injury associated with its video game product and foreseeable use thereof, despite knowing that Roblox

contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by O.A.;

e.   Microsoft knew that its Xbox consoles, Xbox Network, Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming products, as well as the Fortnite, Red Dead, Minecraft, and Roblox  games, contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent people, and the harms that arise therefrom, but intentionally marketed its products for use by such individuals and directed its misstatements towards users of Fortnite, Red Dead, Minecraft, and Roblox, and other games designed, developed and utilizing the patents and technology described herein;

f.   Nintendo knew that its Switch, Nintendo eShop platform, and the Fortnite games, contained an inherent risk of abuse, addiction, and compulsive use by youth and neurodivergent individuals, and the harms that arise therefrom, but intentionally marketed its products for use by the general public, including minors, and directed its misstatements towards users of these gaming products and other games designed, developed and utilizing the patents and technology described herein;

g.   Google knew that Google Play, as well as and the Minecraft and Roblox games, contained an inherent risk of abuse, addiction, and compulsive use by youth and neurodivergent individuals, and the harms that arise therefrom—but intentionally marketed Google Play for use by the general public, including minors, and directed its misstatements towards users of Minecraft and Roblox

and other games designed, developed and utilizing the patents and technology described herein;

747. Each Defendant knew that its acts of concealment and omissions, nondisclosures, and misrepresentations involved material information.

748. Defendants' omission, nondisclosures, and misrepresentations were material because a reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products.

749. If Defendants had not concealed, omitted, and misrepresented material facts regarding the safety of their products, Shane Ayers would not have allowed O.A. to use Defendants' video game products and would not have purchased, downloaded, played, continued to use, and/or purchased downloadable game or content upgrades or in-game transactions in each Defendant's product.

750. As a direct and proximate result of each Defendant's material omissions and intentional nondisclosures, Plaintiffs had no reason to believe that each Defendant's products were unsafe for children to use.

751. As a direct and proximate result of each Defendant's concealment of material information, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

752.     As a direct and proximate result of each Defendant's concealment, omission, nondisclosures, and misrepresentation of material information, O.A. has been injured and Plaintiffs have sustained damages, as described herein.

753.     Each Defendant took affirmative steps to conceal the true nature and risk posed by their respective products and each Defendant's fraudulent concealment constitutes intentional, willful, wanton, and reckless conduct displaying an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers; therefore, an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct is warranted.

754.     Defendants' fraudulent concealment tolls any applicable statute of limitations.

755.     At all relevant times, within their respective video game products, each Defendant included the ability for users, including Plaintiffs, to purchase in-game downloadable products or microtransactions; yet each Defendant hid the risk of harm posed by those products and that each Defendant used patented technologies and psychological features to target users based on their use of the product and other interactions with Defendants' products.

756.     Users of Defendants' products, including minors, young adults, and neurodivergent individuals such as O.A., were deceived by each Defendant in connection with these microtransactions through false representations and material misstatements built into each of the Defendants' products.

757.     Defendants' methods of deceit include but are not limited to, using features and patented technology in each Defendant's product, including patented matchmaking technologies and algorithms to "put" players in certain game scenarios requiring additional purchases to

advance, AI avatars or "friends" to encourage purchase, and disguised features of the Defendants' products, which misrepresent to users, like O.A., that game-selected purchases would help them advance in the game or complete necessary missions.

758.   Defendants made these false representations and material nondisclosures with intent that product users, like O.A., spend money on microtransactions.

759.   At the time each Defendant utilized these technologies to deceive O.A., and each Defendant knew that the representations made through the game were false and existed only to entice O.A. to continue spending.

760.   Each Defendant intended its fraudulent in-game microtransactions and psychological tactics to take advantage of users like O.A.

761.   At the same time, each Defendant knew that misrepresentations served only to increase users'—including O.A.'s—inherent risk of danger, specifically a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

762.   O.A. reasonably relied on Defendants' misrepresentations within each Defendant's product to make several in-game purchases that actually had little to no value to O.A. within the game.

763.   Had Plaintiffs known that the representations in each Defendant's respective products regarding in-game purchases were false and fraudulent, and the result of Defendants' use of patented technologies, O.A. never would have purchased Defendants' video game products or spent money on additional in-game downloadable content or microtransactions built into the product design.

764.    Furthermore, as detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

765.    Even though each Defendant knew of the risks based on its internal information and external studies known to each Defendant, each Defendant intentionally and knowingly misrepresented those findings to avoid losing revenue so that product users, like O.A., would continue using each Defendant's respective products.

766.    Each Defendant knowingly and recklessly misled the public, users, and their parents and/or guardians, including Plaintiffs, into believing their video game products were safe or even beneficial for children to use.

767.    Each Defendant intended its misrepresentations, concealment, misstatements, and omissions to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

768.    By intentionally making numerous material misrepresentations, downplaying any potential harm associated with its respective products, and reassuring the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant did fraudulently induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product..

769.    Each Defendant knew that its concealment, misstatements, and omissions were material, and that users, like O.A., would be induced into spending money that they would not spend on Defendants' products if they knew the truth.

770.    A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the

use of Defendants' products—to be important when deciding whether to use, or continue to use, those products. Thus, Plaintiffs justifiably relied on each Defendant's material misrepresentations that the products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content or in-game product transactions in each Defendant's product.

771.    As a direct and proximate result of each Defendant's fraudulent inducement, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably relied on Defendant's fraudulent conduct when purchasing, downloading, playing, and/or continuing to use each Defendant's respective products, and/or purchasing downloadable game content or in-game product transactions in each Defendant's product.

772.    As a direct and proximate result of each of the Defendant's concealment of material information, Plaintiffs have been financially and otherwise harmed through each of the Defendant's inducements to utilize their products, download and play their games, and/or continuously spend funds through its products.

773.    By intentionally making numerous material misrepresentation, including, but not limited to, downplaying any potential harm associated with its respective products, and affirmative representations to the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant intended to mislead the public, users, and their parents, including Plaintiffs, into believing its products were safe for children to use.

774.    Each Defendant knew that its misstatements and false representations, as identified herein, were material.

775.    The misrepresentations described herein were made to Plaintiffs—particularly to O.A.—prior to their purchase of each Defendant's product and to O.A. while O.A. was using Defendants' products as intended.

776.    Each Defendant intended its material misstatements and false representations to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game product transactions in each Defendant's product.

777.    Plaintiffs relied on Defendants' material misstatements and false representations in deciding whether to use, or continue to use, each of Defendants' products; specifically, Fortnite, Red Dead, Minecraft, Roblox, Xbox One, Xbox One X, Xbox 360, Google Play, Nintendo Switch, Xbox Game Pass Ultimate, and Xbox Game Pass Gold.

778.    Plaintiffs' reliance on each Defendant's material misrepresentations when purchasing, downloading, playing, continuing to use, and/or downloadable game content upgrades or in-game transactions in each Defendant's product was justifiable and reasonable under the circumstances.

779.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, *i.e.,* Defendants' deceit, Plaintiffs were not aware and could not have been aware of the material facts that each Defendant misrepresented or falsified, and therefore Plaintiffs justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

780.    As a direct and proximate result of each of the Defendant's material misrepresentations and false statements (*e.g.,* Defendants' deceit), Plaintiffs have been damaged. Such damage includes O.A.'s physical and mental injuries (and the permanency thereof); pain and

suffering; mental anguish; O.A.'s inability to attend school; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to O.A.'s physical and mental injuries. O.A.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

781.    Each Defendant engaged in fraudulent misrepresentations and deceit that is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial and in an amount a jury finds will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

782.    In conjunction with Defendants' acts of concealment, omission, nondisclosure, and misrepresentation, each Defendant knowingly and recklessly misled the public, users, and their parents and/or guardians, including Plaintiffs, into believing these products were safe or even beneficial for children to use.

## COUNT X
## NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

783.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

784.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by O.A.: Fortnite, Red Dead, Minecraft, Roblox, Xbox One, Xbox One X, Xbox 360, Google Play, Nintendo Switch, Xbox Game Pass Ultimate, and Xbox Game Pass Gold.

785.    Each Defendant had a pecuniary interest in the video game products used by O.A.

786.   Each Defendant—and all designers, developers, manufacturers, publishers, and suppliers of video gaming products having a pecuniary interest in these video game products— had a duty to communicate accurate information and to make truthful statements of material fact to the public about their video game products. This duty includes but is not limited to telling Plaintiffs the truth about the addictive design and dangerous condition of Defendants' products used by O.A. and that those products posed serious health risks to users, particularly youth, young adults, and neurodivergent individuals.

787.   As detailed herein, each Defendant designed and developed their products to be addictive and knew, or should have known, its respective products pose serious health risks to users, particularly minors, including O.A.; yet each Defendant made false statements of material fact relating to the educational and developmental value, along with the safety of daily, prolonged use and safety of use by minors due to age-based controls. More specifically, each Defendant made numerous partial material representations to the public, users, and their parents, including Plaintiffs, downplaying any potential harm associated with its products and reassuring the public, users, and Plaintiffs that its products were safe or even beneficial for children to use:

a.   Epic Games misrepresented Fortnite as safe for use by minors, young adults, and neurodivergent individuals, even marketing the games as "educational" and for use in classrooms, despite knowing that, due Fortnite's product design, the video game contains an inherent risk of abuse, addiction, and compulsive use by youth that can lead to brain damage and injury;

b.   The Red Dead Defendants misrepresented the video gaming Red Dead series, including but not limited to Red Dead Online, as safe for use by minors, young adults, and neurodivergent individuals, despite knowing that, due to the Red

Dead Defendants' design and development of their products, the games contained an inherent risk of abuse, addiction, and compulsive use by such foreseeable users can lead to brain damage and injury;

c. The Minecraft Defendants misrepresented Minecraft as safe for use by minors and young adults, even marketing the games as "educational" and for use in classrooms, despite knowing that, due to their own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth and neurodivergent individuals that can lead to brain damage and injury;

d. Roblox Corp. misrepresented Roblox as safe for use by minors and young adults, even marketing the games as "educational" and safe for use by all, despite knowing that, due to their own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to injury;

e. Microsoft misrepresented its Xbox consoles and its Xbox Network, Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming products, as well as the Fortnite, Red Dead, Minecraft, and Roblox games, as safe for use by minors, young adults, and neurodivergent individuals, even marketing the products toward such users, despite knowing that, due to their own design, Microsoft's video game products contain an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals that can lead to brain damage and injury;

f. Nintendo misrepresented its Switch and Nintendo eShop platforms, as well as and the Fortnite games, as safe for use by minors, young adults, and neurodivergent individuals, even marketing the platforms toward such

individuals, despite knowing that, due to their own design, the Switch and the games played thereon (and available through the Nintendo eShop) contained an inherent risk of abuse, compulsive use, and addiction that can lead to brain damage and injury in these foreseeable users of Nintendo's products;

g. Google misrepresented Google Play, as well as and the Minecraft and Roblox games, as safe for use by minors and young adults, even marketing those video game products on Google Play as safe for use despite knowing that, due to their own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to brain damage and injury.

788.   Each Defendant made these false statements and misrepresentations with intent to induce Plaintiffs (and the general public) to purchase and use their respective products believing them to be safe for use as intended, and to continue to use their product and make in-game purchases and microtransactions.

789.   Each Defendant knew, or should have known, that their product was addictive and poses safety risks to users based on its internal research and industry-trade secrets known to each Defendant and, therefore, were careless and negligent in ascertaining the truth of their statements prior to making them to Plaintiffs and the public.

790.   Defendants' false statements and material misrepresentations downplaying any potential harm associated with its products did, in fact, induce Plaintiffs to purchase and use Defendants' products—and Shane Ayers relied upon Defendants' false statements and misrepresentations in allowing O.A. to use Defendants' games and gaming products, Likewise, O.A. relied on Defendants' false statements and misrepresentations in conjunction with in-game purchases and Defendants' deceptive microtransaction mechanisms, including the use of fake

"friends" to induce O.A. into spending money.

791.    Plaintiffs' reliance on Defendants' false statements was justifiable and reasonable since each Defendant concealed or misstated the truth about the addictive-design of their products.

792.    Plaintiffs have been damaged because of the false statements of each Defendant and Plaintiffs' reliance on each Defendant's statements. This damage includes the injuries and harms to Plaintiffs, described above, including but not limited to O.A.'s addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life. Further, as a direct and proximate result of each of the Defendant's material misrepresentations, O.A. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

793.    Plaintiffs would not have incurred these damages, injuries, and economic losses but for the addictive and harmful propensities of Defendants' gaming products.

## COUNT XI
## CIVIL CONSPIRACY
### (Against All Defendants)

794.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

795.    A civil conspiracy occurs when two or more persons with an unlawful objective, after a meeting of the minds, commit at least one act in furtherance of the conspiracy and thereby damage another. Such a conspiracy occurred here.

796.    Defendants conspired to addict users, including O.A., to Defendants' gaming

products.

797.   As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like O.A., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by O.A. and other users.

798.   Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each of the Defendants to utilize the same patents to keep users, including minors like O.A., addicted to Defendants' products.

799.   More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like O.A., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

800.   As described herein, Epic Games knowingly conspired and otherwise acted in concert with Microsoft and Nintendo to violate the FDUTPA, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Florida's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

801.   In particular, Epic Games, Microsoft, and Nintendo knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce,

manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Fortnite video game product, and that addicted and harmed O.A..

802.    As described herein, the Red Dead Defendants knowingly conspired and otherwise acted in concert with Microsoft to violate the FDUTPA, fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, fraudulently induce Plaintiffs to enter into microtransactions and other purchases, design the video gaming Red Dead series to be addictive to minors, young adults, and neurodivergent individuals, and to otherwise engage in the wrongful, deceitful, and tortious acts identified herein.

803.    In particular, the Red Dead Defendants knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful video gaming Red Dead series that was addictive to and harmed O.A.

804.    As described herein, the Minecraft Defendants knowingly conspired and otherwise acted in concert with each other to design a video game product that is addictive and harmful to users, and with Microsoft and Google to violate the FUDTPA to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Florida's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

805.    In particular, the Minecraft Defendants, Microsoft, and Google agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce,

manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from Minecraft, a harmful video game product that addicted and harmed O.A..

806.    As described herein, Roblox Corp. knowingly conspired and otherwise acted in concert with Microsoft and Google to violate the FUDTPA, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Florida's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

807.    In particular, Roblox Corp., Microsoft, and Google knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from their harmful Roblox video game product, and that addicted and harmed O.A.

808.    As described herein, Microsoft conspired with and acted in concert with Epic Games, the Red Dead Defendants, the Minecraft Defendants, and Roblox Corp. to distribute, market, supply, and/or sell the Fortnite, Red Dead, Minecraft, and Roblox video games and all in-game downloadable products and in-game purchases contained therein through the Xbox Network to design their video game products to be addictive and which pose an unreasonable risk of harm to users, particularly minors, young adults, and neurodivergent individuals, and to violate the FUDTPA, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Florida's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

809.    In particularly, Microsoft and Epic Games, the Red Dead Defendants, the Minecraft Defendants, and Roblox Corp. knowingly agreed to, coordinated its efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively distribute, market, supply, sell, and benefit from Fortnite, Red Dead, Minecraft, and Roblox and all in-game downloadable products and in-game purchases made available through the Xbox Network, and that addicted and harmed O.A..

810.    As described herein, Nintendo knowingly conspired with and acted in concert with Epic Games to distribute, market, supply, and/or sell the Fortnite video games and all in-game downloadable products and in-game purchases contained therein through Nintendo eShop to design their video game products to be addictive and which pose an unreasonable risk of harm to users, particularly minors, young adults, and neurodivergent individuals, and to violate the FUDTPA, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Florida's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

811.    Nintendo and Epic Games knowingly agreed to, coordinated its efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively distribute, market, supply, sell, and benefit from the Fortnite video games and all in-game downloadable products and in-game purchases made available through Nintendo eShop, and that addicted and harmed O.A.

812.    As described herein, Google knowingly conspired with and otherwise acted in concert with the Minecraft Defendants and Roblox Corp. to distribute, market, supply, and/or sell the Minecraft and Roblox video games and all in-game downloadable products and in-game

purchases contained therein through Nintendo eShop to design their video game products to be addictive and which pose an unreasonable risk of harm to users, particularly minors, young adults, and neurodivergent individuals, and to violate the FUDTPA to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Florida's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

813.    In particular, Google, the Minecraft Defendants, and Roblox Corp. knowingly agreed to, coordinated its efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively distribute, market, supply, sell, and benefit from the Minecraft and Roblox video games and all in-game downloadable products and in-game purchases made available through Google Play, and that addicted and harmed O.A.

814.    Each Defendant made a conscious commitment to participate in the selling, lease, or otherwise distribution of its respective product to users, including O.A., while knowing of the unreasonable risk of harms from their products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries).

815.    Each Defendant shared a common purpose of fraudulently concealing the unreasonable risk of harm in its gaming product while continuing to market, sell, and otherwise distribute its product to users, including O.A.

816.    These conspiracies allowed Defendants to maximize profits, all while causing significant harm to users, like Plaintiffs.

817.    Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of the conspiracies described herein.

818.    Plaintiffs' injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

819.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' products. As a proximate result of Defendants' conspiring to make their games addicting, Plaintiffs continue to suffer injuries and damages as O.A. is unable to stop using Defendants' respective products as a result of their addiction, Defendants' defective product designs, and Defendants' failure to warn consumers, like Plaintiffs, about the harmful and addictive qualities and components of those video game products.

## COUNT XII
## AIDING AND ABETTING
### (Against All Defendants)

820.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

821.    Aiding and abetting arises where one party acts in concert with another tortfeasor.

822.    As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like O.A., with unfair and deceptive trade practices to maximize profits off the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by O.A. and other users.

823.    Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each of the Defendants to utilize the same patents to keep users, including minors like O.A., addicted to Defendants' products.

824.   More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like O.A., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

825.   Each Defendant that licenses harmful patented technology from the creator, designer, and/or developer of said harmful technology is therefore liable for the harmful consequences arising from such technology.

826.   Each Defendant knew of the risk of abuse, addiction, and compulsive use by youth, including O.A., arising from the harmful technologies and tactics contained in the patents, but continued to enter into licensing agreements, develop additional patents for license, and encourage the other Defendants to do the same.

827.   Additionally, Microsoft, Nintendo, and Google acted in concert with the Minecraft Defendants, Epic Games, Roblox Corp., and the Red Dead Defendants to place addictive games and technology in its video game products and encourage the purchase and use of such products by minors, young adults, and neurodivergent individuals.

828.   Microsoft, Nintendo, and Google do not place any restrictions on game developers collecting and tracking game playing behavior, game stimulus to trigger purchasing microtransactions, or amount of time a player, who is a minor, including O.A., can spend playing games.

829.   Each Defendant thus aided, abetted, and/or assisted in continuing to fraudulently conceal the unreasonable risk of harm in its own gaming product, and in all others.

830.   Such concerted conduct allowed Defendants to maximize profits, all while causing significant harm to users, including Plaintiffs.

831.   Plaintiffs sustained injuries and damages, as described herein, as a direct and

proximate result of the concerted conduct described herein.

832.    Plaintiffs' injuries and damages cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

833.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' products.

834.    As a proximate result of Defendants' conspiring to make their games addicting, O.A. continues to suffer injuries and is unable to stop using Defendants' respective products as a result of O.A.'s addiction, Defendants' defective design and Defendants' failure to warn consumers, including Plaintiffs, about the addictive qualities and components of those products.

835.    Each Defendant actively took part in the tortious, negligent, outrageous, fraudulent, deceptive, and malfeasance that proximately caused O.A.'s addiction and Plaintiffs' damages, as described herein.

836.    For these reasons, Defendants have shared liability for Plaintiffs' injuries and damages.

**COUNT XIII**
**SHANE AYERS'S LOSS OF CONSORTIUM**
**(Against All Defendants)**

837.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

838.    In Florida, a parent of an injured child may recover for the loss of companionship, society, love, affection, and solace as well as ordinary day-to-day services during the child's minority, expenses of treatment, and other damages based on a defendant's tortious conduct.

839.    As described herein, each Defendant has designed its video game products to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive

engagement, compulsive use, and additional mental and physical harm, engaged in intentional, deceptive, and unreasonable business practices in connection with Defendants' video game products, which injured Shane Ayer's child, O.A.

840.   As a direct and proximate result of the aforesaid careless, intentional, negligent, deceptive, fraudulent, reckless, willful, immoral, and unlawful acts on the part of each Defendant, and by reason of the personal injuries sustained by O.A., Shane Ayers has sustained damages—including great mental anguish and emotional distress—and may sustain such damages in the future by reason of O.A.'s injuries and a resulting loss of O.A.'s companionship, society, love, affection, and services.

## VII.   <u>PRAYER FOR RELIEF</u>

841.   Plaintiffs Shane Ayers, individually and on behalf of O.A., a minor, respectfully request judgment in their favor and against each of the Defendants to the full extent of the law, as follows:

a. For an award of compensatory damages for O.A. in an amount to be determined at trial on the following elements of damage:

i. The nature, extent, duration, and permanency of O.A.'s injuries;

ii. The reasonable expense of all necessary medical care, treatment, and services received including transportation and board and lodging expenses necessarily incurred in securing such care, treatment, and services;

iii. The present value of all necessary medical care, treatment, and services including transportation and board and lodging expenses necessarily incurred in securing such care reasonably certain to be required in the future;

iv. The pain, suffering, and mental anguish experienced in the past;

     v.   The pain, suffering, and mental anguish reasonably certain to be experienced in the future;

    vi.   The present value of any loss of ability to earn in the future;

  vii.   Any scars, disfigurement, and visible results of O.A.'s injuries;

 viii.   The reasonable expense of any necessary help in O.A.'s home which has been required as a result of O.A.'s injuries;

    ix.   The present value of any necessary help in O.A.'s home reasonably certain to be required in the future;

     x.   O.A.'s inability to attend school;

   xi.   Actual financial loss; and

  xii.   Any other actual pecuniary loss or future financial loss proximately caused by Defendants.

b.   For an award of compensatory damages for Shane Ayers, in an amount to be determined at trial, to fairly compensate Shane Ayers for pain, suffering, mental anguish, emotional distress, actual financial loss, and the reasonable value of any loss of the services of O.A. resulting from the injuries to O.A. proximately caused by Defendants' tortious acts and misconduct described herein;

c.   For an award of actual damages, including economic and pecuniary loss, in an amount to be determined at trial;

d.   For an award of statutory damages in an amount to be determined at trial;

e.   For an award of costs and attorneys' fees, as allowable by law;

f.   For pre-judgment and post-judgment interest, as allowable by law; and

g.   For such other and further relief as this Court may deem just and proper.

## VIII.   <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted, this 12th day of April, 2024.

**GOMEZ TRIAL ATTORNEYS**

<u>/s/ Joshua R. Harris</u>
Joshua R. Harris (FL124124)
182 N. Palafox St., Suite 109
Pensacola, FL 32502 (619) 237-3490
(619) 237-3496 (facsimile)
josh@getgomez.com

**REICH & BINSTOCK, LLP**
Robert Binstock*
4265 San Felipe, Suite 1000
Houston, Texas 77027
(713) 622-7271
(713) 623-8724 (facsimile)
bbinstock@reichandbinstock.com

**STERLINGTON LAW, PLLC**
Todd McClelland*
One World Trade Center
85th Floor
New York, New York 10007
(404) 483-6976
todd.mcclelland@sterlingtonlaw.com

*Attorneys for Plaintiffs Shane Ayers,
individually and on behalf of O.A., a minor*

*\*Motions for Admission Pro Hac Vice to be filed*