## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## GAINESVILLES DIVISION

| | | |
|---|---|---|
| SHANE AYERS, individually and on behalf of O.A., a minor, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No.: 1:24-cv-00064 |
| EPIC GAMES, INC., MICROSOFT CORPORATION, MOJANG AB, ROBLOX CORPORATION, NINTENDO OF AMERICA, INC., and GOOGLE, LLC, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

_____

## AMENDED AND SUPPLEMENTAL COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiffs Shane Ayers, individually and on behalf of O.A, a minor,

bring this action for personal injuries against Defendants Epic Games, Inc.,

Microsoft Corporation, Mojang AB, Roblox Corporation, Nintendo of

America, Inc., and Google, LLC to recover damages arising from the severe

injuries sustained by each Plaintiff because of the Defendants' defective and

dangerous video gaming products. Plaintiffs, therefore, file this *Amended

and Supplemental Complaint and Demand for Jury Trial* notifying each

Defendant of Plaintiffs' claims for relief pursuant to and as available under

Florida law, and in support thereof, allege and state:

## <u>INTRODUCTION</u>

1.    This action seeks to hold Defendants Epic Games, Inc., Microsoft Corporation, Mojang AB, Roblox Corporation, Nintendo of America, Inc., and Google, LLC (hereinafter collectively referred to as "**DEFENDANTS**" or "the **DEFENDANTS**") accountable for causing and contributing to a health crisis, nothing short of a global epidemic, of children suffering from an addiction or disordered compulsion to using the **DEFENDANTS**' addictive and unreasonably dangerous gateway "video gaming products"; here, those products consist of: Fortnite, Minecraft, Roblox, Nintendo Switch, Xbox One, Xbox One X, Xbox 360 and Xbox Game Pass products, and Google Play (hereinafter "Products" or "the Products"); the patent-protected technologies of addictive designs features incorporated into each product; and the mechanisms, systems, and/or devices through which users access and consume those products.

2.    The phrase "gateway" in this context refers to the Products that are typically amongst the first video gaming products that a minor child experiences using and, as such, serve as the minor child's entry into the world of video gaming.

3.    The addiction and/or disordered compulsion to using the

Products is a profound harm that triggers an extraordinary sequela of catastrophic and life-altering injuries to the user and their families. The Products are defective and unreasonably dangerous in that they were specifically designed (whether negligently and/or intentionally) to cause users, specifically minor children, to become psychologically addicted to using them, without any warning to the users (or their caregivers) of the harm using the products posed, to the extraordinary detriment to the users and their caregivers, specially including to the Plaintiffs herein, including that which manifested in physical, emotional, mental, and financial harm.

4.    Due to the in-game monetization scheme design, i.e., microtransactions, embedded into the Products that are fueled by operant conditioning and other methodologies intended to target the user's dopamine receptors to trigger the user's desire to hyperfocus on using the products more and more, and thus spend more and more real money in using the products, the defects and unreasonable dangers of the products are to the extraordinary financial benefit and gain to the **DEFENDANTS** herein. The defective Products are intended to and do cause compulsive, addictive use of the products and the in-game microtransactions work in tandem with those addictive design features to generate real money for the **DEFENDANTS**.

5.      This action arises from quintessential corporate greed, the result of a conscious and thorough thought-out decision borne from engaging in a ruthless cost-benefit analysis whereby the **DEFENDANTS**, under the guise of providing harmless and safe digital interactive games and fun to the masses, placed profits over the health and well-being of consumers, including minor children, to whom they aggressively market their defective Products. the **DEFENDANTS**' decision has resulted in a considerable and ever-growing population of children who have an addiction or disordered need to use their Products, to the extreme detriment of their still developing brains.

6.      Addiction is not restricted to substance abuse disorders. The working definition of addiction promulgated in the seminal article *Addictive behaviors: Etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of Psychology* defines addiction as follows:

> a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by

immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rate.

7.    Addiction researchers agree that addiction involves six core components: (1) Salience—the activity dominates thinking and behavior; (2) Mood modification—the activity modifies/improves mood; (3) Tolerance—increasing amounts of the activity are required to achieve previous effects; (4) Withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) Conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) Relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

8.    As of 2022, "Gaming disorder"—disordered use of and/or play with video gaming products—is a recognized mental health disorder by the World Health Organization and International Statistical Classification of Diseases and Related Health Problems. "Gaming disorder" is included within the subcategory "ICD-11" entitled "Disorders due to substance use or addictive behaviors". Other disorders found in that subcategory include alcoholism and gambling addiction. "Gaming disorder" is defined in the 11th

revision of the International Classification of Diseases as a pattern of persistent or recurrent gaming behavior, specifically "digital gaming" or "video-gaming," which may be online or offline, manifested by: impaired control over gaming (e.g., onset, frequency, intensity, duration, termination, context); increasing priority given to gaming to the extent that gaming takes precedence over other life interests and daily activities; and continuation or escalation of gaming despite the occurrence of negative consequences.

9.    Addicted and disordered use of video games and internet gaming is a recognized, diagnosable mental disorder and form of behavioral addiction codified by the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[1] The diagnostic symptoms of internet gaming disorder set forth in DSM-5 include: (1) Preoccupation with playing and/or using video games and withdrawal symptoms (sadness, anxiety, irritability) when access to play and/or use is removed, precluded, or reduced; (2) Tolerance, the need to spend more time playing and/or using video games to satisfy the urge and desire to do so; (3) Inability to reduce video game playing and usage time and/or unsuccessful attempts to quit gaming; (4) Giving up other activities, or loss of interest in

---

[1] It is also recognized in the recently released Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-5-TR).

previously enjoyed activities due to compulsion to play video games; (5) Continuing to play and use video games despite negative or problematic consequences; (6) Deceiving others about the amount of time spent playing and/or using video games; (7) The use of video games to relieve negative moods; and (8) Jeopardized school or work performance or relationships due to playing and/or using video games.

10.    The entities named as **DEFENDANTS** in this action placed into the stream of commerce certain Products that were intentionally designed to be as addictive as possible to those who used them, particularly to minor children who used them. Those entities did so despite having actual and/or constructive knowledge of the risk of harm those products posed to users and their families, because of their addictive design features.

11.    Plaintiff O.A., and children similarly situated, did not start using the Products here at issue with any knowledge or reason to think they could ever develop an addiction or disordered compulsion to using them. Nor, of course, did Plaintiff Shane Ayers, or other parents similarly situated, have any such knowledge or reason to think the same.

12.    The **DEFENDANTS**, however, did hope that the children who used the Products here at issue, including O.A., would develop an addiction or disordered compulsion to use them. The **DEFENDANTS** acted with the

intention to cause minor children, including O.A., who used their Products, to develop such an addiction or disordered compulsion, and had knowledge that such an addiction or disordered use could occur. **DEFENDANTS** purposely developed their Products to incorporate addictive design features, artificial intelligence ("AI"), and systems, to cause the user to develop an addiction or disordered compulsion to use them. The **DEFENDANTS'** intention as herein described was realized: O.A. did develop an addiction or disordered compulsion to using **DEFENDANTS'** Products and, in turn and as a result, the **DEFENDANTS** generated profits from their wrongful and tortious actions.

## NATURE OF THE ACTION

13.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

14.    Video game addiction is a world-wide epidemic harming our nation's youth and young adults; an epidemic which was and is proximately caused by the **DEFENDANTS'** conduct and defective Products.

15.    The rapid spread of video game addiction was and is proximately caused by the **DEFENDANTS'** concerted effort to get consumers, and particularly minors, addicted to using the **DEFENDANTS'** Products in order to maximize **DEFENDANTS'** profits.

16.    This action seeks to hold the **DEFENDANTS** accountable for causing and contributing to a global epidemic of children suffering from an addiction or disordered compulsion to use the **DEFENDANTS**' Products, an addiction and/or disordered use that triggers an extraordinary sequela of catastrophic and life-altering injuries to both the user and their families. The **DEFENDANTS** caused and contributed to creating such injuries and damages by participating in placing into the stream of commerce Products which were defective and unreasonably dangerous in that they were specifically designed and intended to cause users, specifically minor children, to develop an addiction or disordered compulsion to using them.

17.    **DEFENDANTS** manufactured, published, marketed, and sold Products, including those used by O.A., which **DEFENDANTS** specifically developed and designed to cause the addiction experienced by O.A. and other users.

18.    Plaintiffs' injuries and damages, legally and proximately caused by the **DEFENDANTS**' participation in placing their defective, unreasonably dangerous Products into the stream of commerce, include but are not limited to: O.A.'s injuries and damages, and Shane Ayers's mental anguish, emotional distress, and financial losses.

19.    This is an action for personal injuries rooted, in part, in strict

product liability based upon defective design and failure to warn. The design defects of the Products were present in the products when they left the hands of the **DEFENDANTS**, were not reasonably safe for ordinary consumers to use, and were particularly unsafe for minor children, because they contained addictive features intended to cause the user to want and then need to use the products more and more, until the user develops an addiction or disordered compulsion to use the products. The warning defects of the Products is reflected in the complete absence of any warnings directed to minor users and/or their caregivers regarding the risk of severe harm from using the products in a reasonably foreseeable manner, including severe physical, mental, and emotional injuries and harm caused by addicted and disordered use thereof, all of which were known to the **DEFENDANTS** at the time they placed the products into the stream of commerce, and which were unknown to the intended and foreseeable users and their parents, including Plaintiffs herein. There is no warning to anyone about the risks described herein that are posed by the **DEFENDANTS**' Products.

20. The **DEFENDANTS'** Products are defective in that they were negligently and intentionally designed to cause an intense dopamine release in the user that is similar in magnitude to that experienced by drug use or gambling. Dopamine is a neurotransmitter made in the brain that acts as a

chemical messenger that communicates messages between one's nerve cells in the brain, as well as between one's brain and the rest of one's body. Dopamine serves as the brain's all-important "reward center" and plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minor children and particularly true in neurodivergent minor children, whose brains are still developing.

21.    The repetitive release of dopamine that was designed to and does occur in users (especially minor children) of the Products when used as intended, create and reinforce dysregulated or dopaminergic neural pathways that propel the user to hyperfocus on using the products, first at an increasing rate and then with a compulsive desire until the desire to use the products is addictive or disordered. Dysregulated neural pathways trigger addictive, compulsive, and impulsive behaviors outside of the gaming world that cause life-altering impulsivity and inhibitory control behaviors that result in a myriad of physical, mental, and emotional disorders, and other injuries, including other addictions, withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage or

negative consequences to cognitive processes, attention disorders, severe depression, morbid obesity, and other harmful effects, all to the severe detriment and damage to the user; where, as here, the user is a minor child, the user's caretakers / family suffer severe emotional detriment and pecuniary damage.

22.    **DEFENDANTS** design their Products to be addictive by incorporating and utilizing traditional game theory tactics, operant conditioning (e.g., dark patterns, skinner boxes, feedback loops, rubber-banding), artificial intelligence, and reward systems, along with patented designs containing addictive features, systems, mechanisms, and shared technology, in their video gaming product designs to ensure consumers continue to use and engage in "microtransaction" spending within the **DEFENDANTS**' Products.

23.    **DEFENDANTS** rely on microtransactions to increase their profits from their Products. "Microtransactions" are not random but are the result of **DEFENDANTS**' use of patented technologies, algorithms, computer-generated "friends," targeted advertisements, or other deceptive tactics built into **DEFENDANTS**' Products. By designing their Products to be addictive, **DEFENDANTS** ensure that users, like O.A., will be exposed to and subjected to **DEFENDANTS**' deceptive conduct and harmful

"microtransactions."

24.    The **DEFENDANTS'** defective and unreasonably dangerous Products are used by millions of minors and young adults, many of whom like O.A. began playing as young children, who either have developed an addiction or disordered desire to using the products or at severe risk of developing that harm. Their addiction is like any other addiction that consumes the life of an addict and harms the addict's loved ones. The Products cannot be removed or restricted from the person addicted to using them without risking that the individual will engage in addictive, abusive, and self-harming behaviors or otherwise suffer physical, mental, and emotional withdrawal symptoms that require professional intervention and support.

25.    This action arises from the **DEFENDANTS**' brazen resolve to deny, in the face of abundant scientific evidence to the contrary, that their Products pose a risk of danger to the user. The **DEFENDANTS** have always known that representing their Products as safe was untrue because they purposefully caused the products to be designed with addictive qualities and features with the intention of causing users to want to use the products more and more.

26.    This is an action for personal injuries rooted, in part, in

negligence arising from the **DEFENDANTS**' participation in placing their defective, unreasonable dangerous Products into the stream of commerce and into the hands of Plaintiffs herein, products that included no warning of the dangers associated with their use for their intended purpose and as reasonably foreseeable, risks for which the **DEFENDANTS** had a duty to disclose to the consuming public but which they did not disclose, and which resulted in causing serious injuries to Plaintiffs. The **DEFENDANTS** knew, or in the exercise of ordinary care should have known, that their products would be harmful to a significant percentage of minor children who used them because those products were intentionally designed to incorporate and employ addictive design features. The **DEFENDANTS**, despite that actual or constructive knowledge, failed to (by choosing to not) redesign their products to ameliorate the potential harms posed by the products, and failed to warn users or the parents of users who are minor children of the risks posed by the products.

27.    This is an action for personal injuries rooted, in part, in common law negligence arising from the **DEFENDANTS**' breach of their duty to either warn or otherwise disclose to consumers the dangers posed by their Products, a duty which is heightened with respect to minor children. The **DEFENDANTS** either knew or should have foreseen the likelihood of risk

of harm posed by the dangers of using their products and the breach of their duty to disclose or warn of those dangers caused severe harm to the Plaintiffs herein.

28.    This is an action for personal injuries rooted, in part, in the tort of false representation as well as in intentional tort, including fraudulent deceit, deceit, and concealment. The **DEFENDANTS** made materials omissions of fact designed to lull potential users of their products, and caregivers of potential minor users, to have no concern in using their products and to trust that they were safe to use when done so in a reasonably foreseeable manner. The **DEFENDANTS** placed user safety below their own profits. The **DEFENDANTS** made untrue expressions of fact or suggestion of fact which Plaintiffs and the public relied upon, expressions **DEFENDANTS** knew were untrue and did not believe to be true and had no reasonable ground for believing to be true. The **DEFENDANTS** suppressed and concealed facts regarding the dangers posed by their products they knew or should have known to be true and which they had a duty to disclose to Plaintiffs, and those similarly situated as Plaintiffs. The **DEFENDANTS** expressly and impliedly represented to members of the general public, including purchasers and users of the products, including Plaintiffs herein, that their products were of merchantable quality and safe

for foreseeable use. Plaintiffs relied upon those representations in purchasing the products and allowing their minor children to use those products, when all the while the **DEFENDANTS** knew that their representations and expressions of product safety were untrue.

29.    This is an action for personal injuries rooted, in part, in the torts of civil conspiracy and aiding and abetting arising from the **DEFENDANTS'** knowledge that the other **DEFENDANTS**, and each of them, did commit or were committing the wrongful tortious acts alleged herein, agreed to and did commit the wrongful tortious acts alleged herein in concert with one another and/or pursuant to a common design, gave substantial assistance and encouragement to one another to engage in such conduct which, separately considered, constituted a breach of duty to the Plaintiffs. The **DEFENDANTS**, in pursuing a common plan or design to commit the tortious acts as alleged herein, and in actively participating in the tortious acts, and in lending aid or encouragement to the wrongdoing, and/or in cooperating with the wrongdoer, thereby ratified or adopted the other **DEFENDANTS'** acts done for their collective benefit, and as such each of the **DEFENDANTS** is equally liable for each of the other **DEFENDANTS'** tortious acts or failures to act.

30.    **DEFENDANTS'** defective products and tortious conduct were

the actual and proximate cause in the injuries and damages Plaintiffs sustained.

31.    The video game addiction, or gaming disorder, and injuries caused by using **DEFENDANTS**' Products impacts thousands of product users and their families across the United States, including in Florida.

32.    Plaintiffs are one of those families who have been negatively impacted by the addiction and harm caused by each of **DEFENDANTS**' Products. Plaintiffs have been injured and harmed as a proximate result of **DEFENDANTS**' actions and misconduct; for that they are entitled to compensation and other damages under Florida law; to wit, **DEFENDANTS**' defective products and tortious conduct, as herein alleged, were the actual and proximate cause in the injuries and damages Plaintiffs sustained.

33.    **DEFENDANTS**' intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts proximately caused damage to O.A.; to wit, **DEFENDANTS**' acts and omissions as described herein proximately caused damage to O.A.'s brain and cognitive development, proximately caused O.A.'s video game addiction and gaming disorder and the sequalae of symptoms, injuries, and harm associated therewith including mental anguish, severe emotional distress, diminished social interactions,

loss of friends, poor hygiene, weight gain, and, as a result of the addiction caused by O.A.'s use of **DEFENDANTS**' Products (e.g., Fortnite, Minecraft, Roblox, Xbox One consoles, Xbox Network and Game Pass products, Nintendo Switch, and Google Play), O.A. experiences withdrawal symptoms such as rage, anger, and physical outbursts towards themself and others if those video gaming products are restricted or taken away. In addition to these outbursts, O.A. would become angry and frustrated resulting in their destruction of their video game products such as their controllers, consoles, and other furniture throughout the house. As a result of the gaming addiction and harm proximately caused by **DEFENDANTS**' misconduct, O.A. will require treatment, including out-patient counseling, has dropped out of school, is attempting to return to school, may need to repeat a grade, and may require home-schooling.

34.    As a result of O.A.'s use of **DEFENDANTS**' defective Products, Shane Ayers's child has become addicted to playing video games and he has personally witnessed, but been unable to protect his child, from the sequelae of injuries and symptoms associated with their addiction and gaming disorder caused by their use of **DEFENDANTS**' Products. Shane Ayers has personally experienced emotional distress, pain, suffering, mental anguish, and loss of money as a proximate result of **DEFENDANTS**' misconduct,

acts, and omissions.

## PARTIES

### *The Defendants*

35.    **DEFENDANTS** in this action are EPIC GAMES, INC.,
MICROSOFT CORPORATION, MOJANG AB, ROBLOX CORPORATION,
NINTENDO OF AMERICA, INC., and GOOGLE, LLC, *i.e.*, the
**DEFENDANTS**. At all times herein mentioned, the **DEFENDANTS**, and
each of them, was the successor, successor in business, successor in product
line or a portion thereof, parent, subsidiary, wholly or partially owned by, or
the whole or partial owner of or member in an entity that designed,
developed, tested, patented, assembled, manufactured, packaged, labeled,
prepared, distributed, marketed, supplied, and/or sold the Products,
specifically including those used by Plaintiff O.A., and all of which the
**DEFENDANTS** put into the stream commerce in a defective condition,
whether in design or warning, whether negligently, intentionally, recklessly,
or otherwise, that could, and did as to O.A. cause disordered or addicted use
and severe damage to Plaintiffs. Said entities shall hereinafter collectively be
called "alternate entities."

36.    Each of the **DEFENDANTS** and their alternate entities are
liable to Plaintiffs for placing the Products into the stream of commerce and

into Plaintiff O.A.'s hands to their detriment, and to their family's severe injury, detriment, and damage and also because the **DEFENDANTS** and their alternate entities either knew, or should have known, were aware or should have been aware, that the products were defective and unreasonably dangerous in that they incorporated addictive design features that can cause the user to suffer a myriad of severe physical, mental, and emotional injuries to users, particularly minor children.

37.   Each of the **DEFENDANTS** and their alternate entities is liable for the tortious conduct of each successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, subsidiary, alter-ego, whole of partial owner, or wholly or partially owned entity, or entity that it as a member of, or funded, that designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective Products that caused injuries as herein alleged to Plaintiffs.

38.   Upon information and belief, and at all times herein mentioned, each of the **DEFENDANTS**, except as otherwise alleged, was the agent, servant, employee and/or joint venturer of the other **DEFENDANTS**, and each of them, and at all said times, each of the **DEFENDANTS** was acting

in the full course and scope of said agency, service, employment and/or joint venture.

39.    Upon information and belief, the **DEFENDANTS** committed the wrongful tortious acts alleged herein individually and agreed to and did commit the wrongful, tortious acts alleged herein in concert with one another, *i.e.*, the other **DEFENDANTS**, and/or pursuant to a common design with the other **DEFENDANTS** and/or with the knowledge that the conduct of one or more of the other **DEFENDANTS** constituted a breach of a duty and gave substantial assistance or encouragement to said others to engage in such conduct, and/or gave substantial assistance to the others in accomplishing a tortious result with each of the other **DEFENDANTS'** individual conduct which, separately considered, constitutes breach of duty to the Plaintiffs. As such, the **DEFENDANTS**, in pursuing a common plan or design to commit a tortious act, in actively participating in a tortious act, and in lending aid or encouragement to the wrongdoing, and/or in cooperating with the wrongdoer, thereby ratified or adopted the other **DEFENDANTS'** acts done for their collective benefit, and as such is equally liable for each of the named other **DEFENDANTS'** tortious acts or failures to act.

### ***Defendant Epic Games, Inc.***

40.     Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business at 620 Crossroads Blvd, Cary, North Carolina 27518.

41.     Epic Games is a video game and software developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Fortnite video gaming products here at, either directly or indirectly, to members of the general public within the State of Florida, including to Plaintiffs.

42.     At all relevant times, Epic Games acted in concert with Defendants Microsoft Corporation and Nintendo of America, Inc. to distribute, market, supply, and/or sell the Fortnite video gaming products here at issue, and all in-game downloadable products and upgrades and in-game purchases contained therein, in an effort to increase its and the other **DEFENDANTS**' revenue at the expense of consumers, including Plaintiffs.

### ***Defendant Microsoft Corporation***

43.     Defendant Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business in the State of Washington. Microsoft is authorized to do business in the State of Florida, and does business in the State of Florida, and its registered agent for service of process

is Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301.

44.    At all times material hereto, Microsoft (independently and/or in collaboration with its video game design and development studio division, Xbox Game Studios and/or Defendant Mojang AB,) designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, published, distributed, marketed, supplied, and/or sold the Minecraft video game series, either directly or indirectly, to members of the general public within the State of Florida, including to Plaintiffs.

45.    At all relevant times, Microsoft acted in concert with Defendants Mojang AB, Nintendo of America, Inc., and Google, LLC to distribute, market, supply, and/or sell the Minecraft video gaming products here at issue, and all in-game downloadable products and upgrades and in-game purchases contained therein, in an effort to increase its and the other **DEFENDANTS**' revenue at the expense of consumers, including Plaintiffs.

46.    At all times material hereto, Microsoft designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Xbox video game consoles, including the Xbox One and Xbox One S products used by O.A., either directly or indirectly, to members of the general public within the State of Florida, including to Plaintiffs. Microsoft, in addition, and at all times

material hereto, designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied the Xbox Network (formerly known as Xbox Live), Xbox Game Pass, Xbox Store, and Xbox Cloud Gaming, which are available product features designed for use with the Xbox gaming console system or with personal computers and mobile devices operating a Microsoft Windows system, including to members of the general public within the State of Florida, including to Plaintiffs.

### ***Defendant Mojang AB***

47.    Defendant Mojang AB ("Mojang") is a Swedish Company with its principal place of business in Stockholm, Sweden. Mojang is a wholly owned subsidiary of Microsoft, who acquired Mojang and the Minecraft intellectual property for $2.5 billion in September 2014, and Microsoft is responsible for any damages that may be assessed based on Mojang's wrongdoing in connection with Minecraft.

48.    At all times material hereto, Mojang designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video series either directly or indirectly to members of the general public within the State of Florida, including to Plaintiffs.

49.   At all times relevant hereto, Mojang acted in concert with Microsoft in designing, developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, supplying, and/or selling the Minecraft for use and play by consumers with addictive features and technologies included therein as alleged herein.

50.   At all times relevant hereto, Mojang acted in concert with Defendants Microsoft, Nintendo of America, Inc., and Google, LLC to distribute, market, supply, and/or sell its Minecraft video gaming products here at issue, and all downloadable products and in-game purchases contained therein, in an effort to increase its and the other **DEFENDANTS**' revenue at the expense of consumers, including Plaintiffs.

### ***Defendant Roblox Corporation***

51.   Defendant Roblox Corporation ("Roblox Corp.") is a Delaware corporation with its principal place of business at 910 Park Pl., San Mateo, CA 94403.

52.   Roblox Corp. is a video game developer and publisher[2] who, at

---

[2] A video game publisher is a company that publishes and distributes video games that have been developed either internally by the publisher or externally by a video game developer; often the financier behind the development of the video game, video game publishers pay third-party developers to externally develop a video game product, pay an internal staff

all times material hereto, designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold its video gaming product, Roblox, either directly or indirectly, to members of the general public within the State of Florida, including to Plaintiffs.

53.    At all relevant times, Roblox Corp. acted in concert with Defendant Google LLC to distribute, market, supply, and/or sell the Roblox video gaming product here at issue, and all in-game downloadable products and upgrades and in-game purchases contained therein, in an effort to increase its and the other **DEFENDANTS**' revenue at the expense of consumers, including Plaintiffs.

### *Defendant Nintendo of America, Inc.*

54.    Defendant Nintendo of America, Inc. ("Nintendo") is a Washington corporation with its principal place of business located in Washington. Nintendo is a wholly owned subsidiary of Nintendo Co. Ltd., a Japanese company with its principal place of business in Kyoto, Japan.

55.    At all times material hereto, Nintendo designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared,

---

of developers and/or internal studio team to develop the video game for the video game publisher.

distributed, marketed, supplied, and/or sold the Nintendo Switch console, the Nintendo eShop, and Nintendo Switch Online, either directly or indirectly, to members of the general public within the State of Florida, including Plaintiffs herein.

56.     Nintendo    acted    in    concert    with    Epic    Games    and Microsoft/Mojang to distribute, market, supply and/or sell the Products, including Fortnite and Minecraft, all in-game downloadable products, and in-game purchases contained therein, to increase the **DEFENDANTS'** revenue at the expense of Florida consumers, including to Plaintiffs herein.

57.     Nintendo acted in concert with Google to distribute, market, supply, and/or sell its Nintendo Switch Products here at issue, all downloadable products, and in-game purchases contained therein, via Google Play, in an effort to increase its and the other **DEFENDANTS'** revenue at the expense of consumers, including Plaintiffs.

### ***Defendant Google, LLC***

58.     Defendant Google LLC ("Google") is a Delaware limited liability company with its principal place of business in Mountain View, California. The sole member of Google is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California, and Google is a wholly owned subsidiary of the publicly traded company Alphabet Inc.

Google is the primary operating subsidiary of Alphabet Inc.

59.    At all times material hereto, Google designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied Google Play, either directly or indirectly, to members of the public within the State of Florida, including to Plaintiffs herein.

60.    Google, at all times material hereto, acted in concert with Roblox Corp., Microsoft/Mojang, and/or Nintendo to distribute, market, supply, and/or sell Roblox, Fortnite, Minecraft, and/or Nintendo Switch Online – which includes the distribution, marketing, supply, and sale of each Product's defective systems, associated gaming products, and all in-game downloadable products and upgrades contained therein -- to increase the **DEFENDANTS'** revenue at the expense of Florida consumers, including to Plaintiffs herein.

61.    The **DEFENDANTS**, individually and in concert with one another, participated, whether negligently or intentionally, in placing into the stream of commerce and to members of the general public within the State of Florida, and into the hands of the Plaintiffs, the defectively designed Products as herein alleged.

### ***The Plaintiffs***

### ***Plaintiff Shane Ayers***

62.    Plaintiff Shane Ayers is, and at all times relevant to this action was, a citizen and resident of the State of Florida whose principal place of residence is in Dixie County, Florida.

63.    Shane Ayers is the father of O.A. and he represents O.A.'s interests in this lawsuit.

64.    Shane Ayers also seeks redress on his own behalf for mental anguish, emotional distress, and loss of society and companionship Shane Ayers personally sustained as a result of **DEFENDANTS**' deceptive, outrageous, fraudulent, and negligent acts, as well as for economic injuries and losses sustained as a result of **DEFENDANTS**' deceptive conduct and the injuries and damages sustained by O.A. which were proximately caused by **DEFENDANTS**' intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts.

### ***Plaintiff O.A.***

65.    O.A., a minor, is and at all times relevant to this action, was a citizen and resident of the State of Florida with a principal place of residence located in Dixie County, Florida. O.A. is eleven (11) years old at the time of filing of this lawsuit.

66.    O.A. began playing video games and using **DEFENDANTS'**

gateway Products at approximately two (2) years old, and, since that time, used and/or continues to use the Products at an increasing, uncontrollable, compulsive, and/or addictive pace. O.A. has been injured and damaged—and continues to be injured and damaged—as a result of O.A.'s use and the addiction caused by O.A.'s use of **DEFENDANTS**' defective Products (i.e. Minecraft, Roblox, Fortnite, Xbox One, Xbox One X,  Xbox Game Pass, Switch, and Google Play).

## JURISDICTION AND VENUE

67.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

68.    This *Amended and Supplemental Complaint and Demand for Jury Trial* brings forth claims for relief arising under the laws of the State of Florida, including but not limited to allegations that as a direct and proximate result of **DEFENDANTS** placing the defective gaming products into the stream of commerce, Plaintiffs have suffered and continue to suffer both injuries and damages, as described herein, within the State of Florida that exceed the sum or value of $75,000, exclusive of interest and costs.

69.    This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states.

70.     This Court has personal jurisdiction over each Defendant because each routinely conducts business in Florida and has sufficient minimum contacts in Florida to have intentionally availed itself to this jurisdiction by marketing Products and transacting business in the State of Florida.

71.     At all relevant times, each Defendant was present and transacted, solicited, and substantially conducted business in the State of Florida through their employees, agents and/or sales representatives, and derived substantial revenue from such business.

72.     At all times material hereto, each Defendant targeted consumers, including Plaintiffs, to (1) purchase, play and/or use its Products and (2) to purchase in-game items or perks in exchange for real money by using operant conditioning, in-game advertising, "fake" avatar friends, and other deceptive tactics and systems.

73.     Each Defendant—with knowledge of O.A.'s age and Florida residency—targeted each minor Plaintiff to use **DEFENDANTS**' Products, utilized deceptive and addictive mechanisms within the **DEFENDANTS**' video gaming product design to create addictive use in minors based on personal metrics and data obtained from minors including O.A., and induced O.A. to enter into microtransactions or otherwise stay engaged in using the

Products, including but not limited to using artificial intelligence and other matchmaking mechanisms in their product design to put the user in a situation whereby they will use the product longer and/or spend real money to continue using the product as intended.

74.    Upon information and belief, and at all relevant times, each Defendant—with knowledge of O.A.'s age and Florida residency—provided third parties with product development tools, allowed third parties access to data obtained through consumers use of **DEFENDANTS**' Products. allowed third parties to target each minor Plaintiff to use **DEFENDANTS**' Products with deceptive and addictive mechanisms within the **DEFENDANTS**' video gaming product design to create addictive use in minors based on personal metrics and data obtained from minors including O.A., and induced O.A. to enter into microtransactions or otherwise stay engaged in using the Products, including but not limited to using artificial intelligence and other matchmaking mechanisms in their product design to put the user in a situation whereby they will use the product longer and/or spend real money to continue using the product as intended.

75.    **DEFENDANTS** are conclusively presumed to have been doing business in this State and are subject to Florida's long arm jurisdiction.

76.    At all relevant times, **DEFENDANTS** expected or should have

expected that their acts and omissions would have consequences within Florida and throughout the United States.

77.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things: (a) Plaintiffs are all residents of this District and citizens of this State; (b) each Defendant directed its activities at residents in this District; (c) each Defendant conducted substantial business in this District; (d) each Defendant directed its activities and services at residents in this District; and (e) many of the acts and omissions that give rise to this action took place in this District.

## GENERAL ALLEGATIONS

78.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

### *The Video Gaming Industry*

79.    The video gaming industry began slowly, taking more than 35 years to reach $35 billion; between 2007 and 2018, the industry grew significantly to $137.9 billion, and by 2023, the industry's revenue was $365.6 billion globally.

80.    A "video game" is an electronic device or system that engages users in interaction with an interface or input device that generates visual feedback from a display device. The system presents a form of structured

conflict and resolves its uncertainty in unequal outcome. The system is "closed": once engaged in the game, the user sets aside their rules for daily life and accepts the rules of the game as the status quo. A "video game" is a device or system that stores recorded data or instructions generated by the user and, by processing that data and instructions, creates an interactive game capable of being used, played, and viewed via systems such as computers, consoles, or other technologies; this definition of a "video game" applies to the **DEFENDANTS'** products.

81.     Gaming consoles, smartphones, tablets, and personal computers are designed and developed to work in conjunction with and to enhance the design mechanics of the video games being played thereon.

82.     A "video game" is a device or system that engages users in interaction with an interface or input device that generates visual feedback from a display device, and which stores recorded data or instructions generated by the user and, by processing that data and instructions, creates an interactive game capable of being used, played, and viewed via systems such as computers, consoles, or other technologies; this definition of a "video game" applies to the **DEFENDANTS'** products.

83.     The video gaming industry began slowly, taking more than 35 years to reach $35 billion; between 2007 and 2018, the industry grew

significantly to $137.9 billion, and by 2023, the industry's revenue was $365.6 billion globally.

84.    Early video game companies created games and sold them mostly through cartridges,  discs, or other "physical" or "hard copy" formats to be played on devices like a gaming console or computer. The costs of developing the game, and generating profits therefrom, were realized through the sale of the games over a period of time, and it was a long and slow method of generating profit.

85.    Today, video games, like Roblox, Fortnite, and Minecraft, are available for purchase in hard copy formats and are also accessible via digital download through "app stores" and online gaming networks and cloud gaming servers for use gaming consoles, computers, mobile phones, and tablets.[3] Each video game utilizes the same gameplay mechanisms, designs, and technologies in its development and design regardless of whether the product is used via physical disc, digital download, online gaming network, and/or through a cloud gaming service.

86.    Cloud gaming, or gaming on demand, is a type of online video gaming product that allows users to download and/or stream video games

---

[3] For example: Xbox, PlayStation, Switch, iPhone, Chromebook, Google Pixel, Android-based phone, Amazon Fire Stick, PC running Windows Operating System or MacOS system.

for use on a user's console, smartphone, tablet, or personal computer without need for the physical disc; to wit, cloud gaming provides users unfettered access to an unlimited number of video games and allows users to play a single video game (e.g., Roblox, Minecraft, or Fortnite) across multiple devices.

87.    Unlike early video games that were used and accessed (like traditional arcade video games) via a one-time, one-purchase and/or intermittent, non-continuous format, the more sophisticated high-tech video games of today —games that are designed to be used in conjunction with gaming consoles, mobile devices, computers, and tablets, —necessitate, if not require, a lengthy and ongoing if not continuous active participation during which time users are exposed to psychological techniques intentionally designed to control, manipulate and exploit the user's brain, and a minor's developing brain, to trigger an intense desire to engage in increased game usage time and, therewith, in-game downloads and purchases.

88.    Upon information and belief, Roblox Corp., Epic Games, Microsoft/Mojang incorporate and utilize the same gameplay mechanisms, designs, AI, systems, and technologies in each Product's development and design regardless of what device is being used and regardless of whether a user obtains and/or accesses the product for use via a physical disc, digital

download, online gaming network, and/or through a cloud gaming service.

89.    Gaming consoles (e.g., Xbox, PlayStation, Switch), personal computers (e.g. Mac desktop, iMac, Chromebook), mobile phones (e.g., iPhone, Google Pixel, Android-based phone), and tablets (e.g. iPad)—and each device's associated Products as described herein—are designed and developed to work in conjunction with and to enhance the design mechanics of the video games being played thereon.

90.    Upon information and belief, Microsoft, Nintendo, and Google incorporate and utilize the same gameplay mechanisms, designs, AI, systems, and technologies in their Product's development and design as Roblox Corp., Epic Games, Microsoft/Mojang. Microsoft; to wit, Microsoft, Nintendo, and Google providing third-parties (e.g., Roblox Corp., Epic Games, and Microsoft/Mojang) with the tools, specifications, and requirements of compatibility and integration of those alternate entities video game products with Microsoft, Nintendo, and/or Google's devices.

### *Monetization Schemes: Operant Conditioning and Microtransactions*

91.    Microtransactions are a critically important part of the patented technologies of design features used in the **DEFENDANTS'** Products: microtransactions are intended to generate profit at the expense of the health of the users.

92.    Microtransactions are intentionally inextricably tethered to the operant conditioning mechanisms and design incorporated into the Products that create, cause, trigger and reinforce a disordered, addictive, and compulsive use of the products at an increasing rate; to wit, the more someone, particularly a minor, uses **DEFENDANTS**' Products that include addictive design features borne from operant conditioning systems, the more that user engages in microtransactions which generates real revenue for the **DEFENDANTS.**

93.    The tremendous growth of the video gaming industry is in large part due to the advent of in-game purchasing microtransactions and monetization schemes that work in tandem with addictive operant conditioning design features. The latter is intended to and does cause compulsive, addictive use of the Products, and the former capitalizes upon the user's addicted or disordered use of the products to generate money for the **DEFENDANTS**.

94.    The **DEFENDANTS'** placed into the stream of commerce Products designed to allow, encourage, and target people to use the products. Those products were incorporated with psychologically addictive features, properties, and technologies, including but not limited to operant conditioning, ever-changing gameplay, microtransactions, social aspects,

patented systems, illegally and/or improperly obtained personal information, and the use of algorithms to target users to purchase in-game downloads and other in-game products.

95.     There is no meaningful disclosure of the inclusion of addictive mechanisms and microtransactions in the **DEFENDANTS'** Products at the time they are purchased so as to allow prospective users or their caregivers to make informed decisions as to whether using the products is desirable, appropriate, safe, or worth the potential risk.

96.     Microtransactions first appeared in 2006 but did not prove to be a good profit-making model until devices, particularly mobile devices, became more powerful and access to the internet became more readily available such that users could access video games almost anywhere.

97.     Microtransactions may be presented to users during gameplay through a custom store interface placed inside the game for which the items are being sold, in a device's "app store", or otherwise marketed by the **DEFENDANTS** as an upgrade, reward, or special event related to a video gaming product.

98.     Microtransactions, unlike patches or updates, which are essential to remove bugs and enhance in-game experiences, microtransactions are a non-essential component of Products. The

**DEFENDANTS** plan microtransactions with great intention.

99.    The **DEFENDANTS'** design and marketing strategy is rooted, in part, in the theory that the revenue from a microtransaction system will outweigh the revenue from a one-time-purchase game. That is because microtransaction spending can easily add up to hundreds, or even thousands, of dollars from an individual user. The microtransaction model is rooted in if not dependent upon the patented technologies of addictive design features that are incorporated into the Products, all of which are concealed from users to ensure revenue earned by the Products remain recurring for as long as the product is available for use. When the user has an addiction or disordered compulsion to using the products, the reoccurrence of revenue via microtransactions from the products is all but assured. The **DEFENDANTS** did or do license or own patented technologies of addictive design features incorporated into their Products.

100.    Microtransactions were intentionally and specifically designed to work in tandem with the design of operant conditioning methodology, technique, and strategy, ensure and compound the impulsive behavior of users within the closed gaming environment and the pressure that drives in-game purchases. For example, placing a time limitation on a microtransaction offer may push a user to impulsively buy an item. Similarly,

a user's desire to be the first among a group of friends to buy an in-game premium item or achieve a ranking may drive a user to make microtransaction purchases.

101.  Microtransactions in video games are predatory monetization schemes that are essentially purchasing systems within the games that disguise or withhold the long-term cost of an activity until users are committed, both psychologically and financially. Those schemes—all of which the **DEFENDANTS** knowingly incorporate into the design features of their Products—use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated use and increased spending by users, especially in populations like minor children who are especially vulnerable to these tactics and which serve to deepen their disordered or addicted use. Such tactics may involve, either singularly or in combination, limited disclosure of the products, intrusive and unavoidable solicitations, and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.

102.  The **DEFENDANTS** utilize many strategies to enhance and exploit the already predatory monetization tactics incorporated into the Products. Such strategies include: (a) The "near miss": convincing players via exciting animation, for instance, that they were very close to winning; (b)

"Chasing": encouraging players to keep playing to get back any money they just lost; (c) "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window; (d) "Exclusivity": suggesting that only a small number of a special prize are available so it must be obtained immediately; (e) "Entrapment": convincing players they are about to win, or they have invested enough to win, but if they stop playing they will miss out on the win; and (f) The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

103. An additional aspect of the predatory monetization of the **DEFENDANTS**' Products is the collection and use of individual user data to manipulate the nature and presentation of in-game purchasing offers in ways that maximize the likelihood of the user spending money.

104. The **DEFENDANTS**' Products are designed to be and are capable of tracking various user metrics and adjusting their design in automated ways to elicit in-game purchasing, including utilizing a minor user's illegally obtained and improperly retained personal information and biometric data to target the user and exploit their personal data.

105. Such schemes exploit an information asymmetry between user and the **DEFENDANTS'** Products in that the game system knows more

about the user of the products than the user can know about the Products. This allows the gaming industry, including the **DEFENDANTS**, to use its knowledge of the user's game-related preferences, available funds, and/or playing and spending habits to present in-game downloads and purchase offers that are predetermined to maximize the likelihood of eliciting the expenditure of real money.

106. When use of the **DEFENDANTS'** Products is linked to a user's social network pages, the **DEFENDANTS** are able to and do gather additional information about the user and then employ that information to target products and microtransactions to those users based upon their interests and preferences. The prices of in-game items may be determined by factors that are not disclosed to the users because the algorithm used is capable of considering an individual user's available funds and cost sensitivity as to certain items. In this way, the products incentivize continuous spending by the user.

107. The **DEFENDANTS** and third parties use information collected from users, including Plaintiff O.A. and other minors like them), in their video gaming product design and in the marketing of their Products—yet **DEFENDANTS** do not disclose and conceal these acts from those consumers, including Plaintiffs.

108.  Systems that dynamically adjust in-game item prices and value based on such individual user analytics, which were implemented by product developers to, primarily, serve monetary goals and which lack basic transparency to the user, may also have the potential to exploit certain types of vulnerable players under certain conditions. Critical to the **DEFENDANTS'** revenue, such continued schemes with little to no restriction on the amount of spending in the payment interface also makes it easy for users who are minor children to fail to understand the value of the actual money being spent which allows for more easeful and further if not continuous and chronic spending of real money.

109.  A few specific examples of such predatory monetization schemes incorporated into the **DEFENDANTS'** Products include but are not limited to loot boxes, rubber-banding, pay-to-win models, reward systems, fear-of-missing-out or timed events, artificial intelligence and bots, and dark patterns embedded in the product design.

110.  A "loot box" is an in-game reward system that can be purchased repeatedly—with real money, of course—to obtain a random selection of virtual items. Loot boxes could contain items that give users an advantage in the game, or cosmetic or aesthetic items that can be used to customize characters or weapons. Loot boxes are essentially a lottery that provides a

way for gaming developers to increase revenue through underage gambling.

It is common knowledge that gambling addiction is a severe issue that carries

big risk in playing lottery-style games, so combining such gambling aspects

with the psychologically addictive traits of video games makes for a highly

dangerous scheme to which users are highly susceptible and will easily

succumb. Loot boxes are ultimately controlled by the gaming developers as

well as the **DEFENDANTS** herein, meaning that the "prizes" obtained from

such boxes are likely to be determined by algorithms and other factors

considered in the design of the video games. Loot boxes result in high

revenues for the **DEFENDANTS** because instead of a one-time purchase for

the desired item, users may and typically do buy multiple boxes.

111.  Rubber-banding is a monetization scheme used to ensure

dynamic difficulty, or a consistently challenging experience, irrespective of

the user's skill level by, for example, matching computer opponents to a

given user's skill level. The **DEFENDANTS** rely upon the principle of

rubber-banding with microtransactions to ensure that the products'

financial requirements are adjusted to match the user's desire and capacity

to use. If an item costs too much, the users of monetized games cannot

strategize to win and instead must decide between making in-game

purchases or not using the products at all, or potentially playing without

paying, but doing so with significantly diminished in-game capability, all of which generate feelings of frustration in the user, particularly a person with disordered or addicted use; such technical sophistication in these purchasing systems aims to reduce the user's uncertainty or reluctance when faced with purchasing decisions.

112. Pay-To-Win is a monetization scheme that is intended to and does incentivize users to use the Products more. Users who are willing to shell out more money get a disproportionate advantage over other users, particularly if the items cannot be obtained for free. For example, users who pay money in microtransactions may get access to certain capabilities such as access to shortcuts, special characters with unique skills, or even special items. Such capabilities may make the games impossible to beat by non-paying users. Games with such imbalances may prevent the non-paying users from progressing or remaining competitive.

113. Dark patterns describe the deceptive and manipulative design practices used to trick consumers into making choices that could or may cause them harm—and that they would or may not have otherwise made. The purpose behind "dark patterns' is to take advantage of consumers' cognitive biases and steer their conduct or delay access to information needed to make fully informed decisions; therefore, the use of "dark patterns" in product

design and marketing are highly effective at influencing consumer behavior.

114.    The use of manipulative design techniques, including "dark patterns," in the digital world pose heightened risks to consumers, particularly minors. For example, the pervasive nature of **DEFENDANTS**' data collection techniques allows them to gather massive amounts of information about consumers' identities and online behavior, enabling them to adapt their product design and leverage advertisements to target a particular demographic or even a particular consumer's interests. Likewise, dark patterns manipulate consumer choice by inducing false beliefs such as a minor's belief that a skin or other in-game purchase means the child will actually obtain the desired object or game skill level, while other dark patterns operate by hiding or obscuring material information from consumers, such as burying key limitations of the product or service in dense Terms of Service documents that consumers do not see before purchase. Free-to-play or "freemium" games are another example of the use of dark pattern mechanisms in **DEFENDANTS**' product design because **DEFENDANTS** do not disclose to consumers that to experience the video gaming product as intended the user will need to purchase or earn (through extended game play) product upgrades.

115.    Another variation on the hidden-fee dark pattern is "drip

pricing," in which companies advertise only part of a product's total price to lure in consumers, and do not mention other mandatory charges until late in the buying process. Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction. Microtransactions built into many video games by design are a form of drip-pricing.

116. Each Defendant uses, or has used at relevant times, "dark patterns in the design, development, manufacture, advertising, marketing, promotion, supply, and sale of the **DEFENDANTS**' Products.

117. The **DEFENDANTS**' use of microtransactions, individually and in concert with one another, is carried out with such efficiency that it resembles a choreographed collaboration. The **DEFENDANTS**' target users with in-game downloadable content to purchase by using algorithms and design features incorporated into the Products which, in turn, results in profit to the game developers, product publishers/distributors, and/or entities manufacturing Products intended for use with the defective video games, likewise **DEFENDANTS** herein. In addition, and simultaneously, **DEFENDANTS** herein collect data from users to target the additional video gaming products based on the user's gameplay and personal preferences inside and outside the game, to wit the user's game play, social interactions,

age, name, image, likeness and other biometric data, and the like, are relied upon.

118.   The human population most vulnerable to the combination of **DEFENDANTS'** microtransaction methodology and addictive operant conditioning design features are users who are minor children and/or neurodivergent. The **DEFENDANTS** know this, purposefully designed the Products to exploit that vulnerable population, to their extreme injury and detriment, including Plaintiff O.A.. Doing so has yielded the intended results: the **DEFENDANTS** have earned extraordinary financial revenue from this group of users as a result of placing their addictive products targeted to children into the stream of commerce.

119.   The **DEFENDANTS** knew or were aware, or should have known and should have been aware, that the Products were dangerous and harmful to users, particularly minor children, when used as intended and in a reasonably foreseeable manner. In fact, the **DEFENDANTS** intentionally caused and designed the Products to most effectively cause users with still developing brains to become addicted or disordered in their desire to use the products. To that avail, upon information and belief, the **DEFENDANTS** employed behavioral psychologists and/or neuroscientists to develop products that incorporated design features premised upon psychological

tactics engineered to keep users engaged in using the products for longer and longer periods of time.

120.   The microtransactions and other technologies, designs, features, mechanisms, algorithms, and artificial systems and other systems the **DEFENDANTS** incorporated into the Products was done so in a manner such that users (and, when users are minor children, their caretakers) do not understand and have no way of understanding that their use of the products involves engagement with intentionally addictive design features that are physically damaging to their brains and bodies, and financially rewarding to the **DEFENDANTS**.

### *Patented Technology: Ideas and Inventions of Addictive Design Features Used in the Products*

121.   In previous years, lopsided consumer video game monetization-related inventions, such as those identified herein, were patent ineligible. That period of time has since passed. There are now patents that protect ideas and inventions of designs features that are incorporated into video games that are intentionally designed to cause addictive and disordered use of the products that specifically target one's brains, and particularly the brains of minor children.

122.   The **DEFENDANTS** agreed to and did develop, individually and in concert with one another, and/or made available for or did purchase or

license, or otherwise caused to be incorporated into their Products one or more of this type of patented addictive design feature.

123.  The addictive design features incorporated into **DEFENDANTS**' products causes severe and irreversible injuries, harm, and damages to our society's most vulnerable members, *i.e.*, minor children, all the while lining the **DEFENDANTS'** pockets with outrageous financial profit.

124.  Several video gaming product developers have been granted patents of inventions and ideas that are designs that include addictive features and qualities which the **DEFENDANTS** intentionally incorporated into their Products which contribute to high-risk consumer behavior as alleged herein.

125.  The **DEFENDANTS'** individual and/or collective agreement—whether tacit, implicit, or explicit—to place into the stream of commerce Products that are mass-marketed to consumers, and particularly to minor children, that incorporate patented technologies of addictive design features engineered to specifically target the brains of users, serves as the ground zero through which the **DEFENDANTS'** participation in placing the Products into the stream of commerce causes users to develop an addiction or disordered use of their products, a use which generates more and more real

money for the **DEFENDANTS**. In so doing, the **DEFENDANTS** have engineered a process that allows them to generate gross amounts of money from users, specifically including children, who have developed an addicted or disordered use that the **DEFENDANTS** intended to cause, all to the severe harm to the user and the user's inner circle.

126.  The fact that one entity may "hold" a patent on a certain or specific idea or invention of monetized technology, *i.e.*, here the addictive design features of operant conditioning combined with microtransactions, does not mean that said design or a similar design or scheme cannot be incorporated into the Products of another entity, including the **DEFENDANTS'** Products. It is common practice for gaming developers, specifically including **DEFENDANTS**, to utilize technology patented by other entities by entering into licensing agreements with the entity holding the patent, or to buy the rights to the patent outright.

127.  The patented addictive design features incorporated into the **DEFENDANTS'** Products makes those products progressively more stimulative which significantly maximizes usage time and, consequently, increases a user's disordered use and/or addiction to using the products. For instance, feedback loops continuously add new in-game downloadable products and upgrades and use tactics to ensure users are creating habits in

their gameplay such as by incorporating systems that allow the product to react to how well the user is using it in order to make the products more rewarding, or for the products that are more difficult in skill level to use, more challenging. In this way, a user's successes are reinforced through positive feedback loops, while their increasing ability to overcome the core challenges presented by using the product is curtailed by negative feedback loops.

128.   By using feedback loops and other addictive mechanisms in their product design, **DEFENDANTS** enhance the user's experience by maintaining a consistent level of challenge throughout one's use of the Products while still rewarding the user for their achievements, thereby making the user desire to use the products more and more until they develop an addicted or disordered compulsion to so use and, naturally and inevitably, to spend more and more money as they continue their use.

129.   The feedback loops, in addition to other the psychological properties and operant conditioning features and methodologies, artificial intelligence, algorithms and other systems that are used by the **DEFENDANTS** in their product design and/or at play when the user uses the Products are designed to keep users continuously engaged. Those patented addicted invention and ideas of addictive design features and other

systems that are incorporated into or otherwise working in conjunction with the Products are able to study the skill level and behavior of the user, including and even across social media platforms and website use outside of the Products. This results in the user being bombarded with solicitations to purchase additional, downloadable game components, in-game features or events, loot boxes, or other video gaming product upgrades based upon psychological behavioral analyses that employ addiction methodology to seduce the user, particularly minors, to increase usage time and stay using. In that way, the feedback loops, and other operant conditioning techniques and predatory monetization schemes, work together with the user's engagement and use of the Products and other online services and platforms to cause more and more use by users, all to the user's own detriment, and to the financial benefit to the **DEFENDANTS**.

130.   The **DEFENDANTS**' decision and participation, individually and in concert, to place into the stream of commerce their intentionally addictive products has resulted in an extreme uptick of video gaming addicts and extreme gamers. For example, in 2008, the American National Purchase Diary ("NPD") group reported that 3% of the 174 million players using PC, MAC, or game consoles were extreme gamers who are playing an average of 45 hours a week. NPD reported that the percentage of extreme gamers had

increased to 4% by 2010.[4]

131.    The **DEFENDANTS**' participation in placing into the stream of commerce the Products that incorporate patented addictive design features are intended to and do contribute to high-risk consumer behavior. Entities that hold, develop, license or otherwise have an ability to incorporate patented technologies of addictive design features into the Products, including **DEFENDANTS** herein, often seek to keep their intellectual property and/or the use of such intellectual property confidential. There are thus very few objective, transparent, or complete accounts of the precise nature of the monetization schemes employed in their Products. Nevertheless, several patents shed light on the innovative video game monetization inventions and ideas intended to lure and addict users of Products, and which are upon information and belief incorporated into the design and development of **DEFENDANTS'** products. By way of example:

    a.    U.S. Patent No. 8,360,866 B2, assigned to Leviathan Entertainment, LLC, describes an invention that targets users unable to complete a game scenario and encourages the user to make in-game purchases when they face such a difficult scenario.

---

[4] Hosseini et al., *Computer Gaming and Physiological Changes in the Brain: An Insight from QEEG Complexity Analysis.* 46(3) APPLIED PSYCHOPHYSIOLOGY AND Biofeedback 301 (2021).

This patented design mechanism is an "upsell message" and "can be, for example, for an item that is useful in overcoming the difficulty the player has encountered" Or "kill[ing] a particular monster ... or player character."

b.   U.S. Patent No. 20160005270-A1, assigned to Activision Publishing, Inc., is a "matchmaking" patent that uses historical player data and analytics to create a system for driving microtransactions in a multi-player game. This "matchmaking" patent is used in video gaming products, like **DEFENDANTS** at issue here, and can be summarized as a "system and method ... that drives microtransactions in multiplayer video games. The system may include a "microtransaction arrange match" to influence game-related purchases. For instance, the system may match a more expert/marquee player with a junior player to encourage the junior player to make game-related purchases of items possessed/used by the marquee player. A junior player may wish to emulate the marquee player by obtaining weapons or other items used by the marquee player." The system for driving microtransactions comprises of a host computer having one or more physical processors programmed with computer

program instructions that, when executed by the one or more physical processors, cause the host computer to: identify an in-game item that is relevant to a first player, but not yet possessed by the first player for gameplay in a multi-player game; identify a second player that possesses the in-game item; and match the first player and the second player to play in a gameplay session to encourage purchase of the in- game item by the first player, wherein the matching is based on: (i) the relevance of the in-game item to the first player, and (ii) the possession of the in-game item by the second player. This system is further programmed to determine that the first player has purchased the in-game item in relation to the gameplay session; determine a subsequent gameplay session that caters to use of the in-game item; and match the first player to play in the subsequent gameplay session to encourage future purchases.

c.    U.S. Patent No. 10,099,140 B2, assigned to Activision Publishing, Inc., describes a "customized messaging campaign for [a game] player" and allows messages to be "customized for a gamer based on their or her behavioral data" such as "level of interest or satisfaction with a game." Triggers for such messages

may include "a player winning or losing a predetermined number of games in a row" and may include "promotions relating to microtransactions or downloadable content."

d.  U.S. Patent No. 9,789,406 B2, assigned to Activision Publishing, Inc., modifies the difficulty of multiplayer matches to encourage microtransaction purchases. Specifically, the game identifies "an in-game item that may be relevant for (*i.e.*, of interest to) a first player," then locates "a second user that has acquired (*i.e.*, purchased), used, or otherwise possesses the in-game item." Matchmaking variables are then tuned such that the first player and second user are matched in a gameplay session.

e.  U.S. Patent No. 9,623,335 B1, assigned to Kabam, Inc., utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

f.  U.S. Patent No. 9,138,639 B1, assigned to Kabam, Inc., describes a system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the

game." In this way, "while all players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

g.  U.S. Patent No. 8,702,523 B2, assigned to Microsoft, was created to capitalize on a player's tendency to commit to a purchase after investing significant time into a trial version of a game. In short, a user is made "aware of an opportunity to add an achievement to their collection by downloading and playing a demo or trial version of a particular game," but "[i]nstead of recording the achievement" upon completion, the game "initiates a notification to the user . . . that the achievement will not be recorded unless they purchase the full version of the game at that time." More specifically, with Microsoft's patent:

i.  Game play achievements for a free trial version are tracked and maintained even if the console is not connected via a network to the server so that when, and if, the console is eventually connected to the server, the achievements saved locally (e.g., on the console hard drive, on an associated memory unit, etc.) are uploaded and become automatically discoverable to other online

users playing the game on different consoles.

ii.    The machine license, a component of the patent, allows any user on the console access to the downloaded game product, including all game components and product-content, regardless of the console's connection to the internet or the existence of parental controls.

h.    U.S. Patent No. 9,795,886 B1, assigned to Electronic Arts, Inc., allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

i.    U.S. Patent No. 10,252,170 B2, assigned to Hasbro, Inc., encourages players to make purchases outside of a game to receive in-game benefits and allows players can earn in-game points for scanning codes that come with separately purchased physical toys. For instance, the patent allows the developer using the patent in their video game design to stay connected with the user by requiring a user to keep their "avatar" charged by earning

points by scanning codes on toys, through continued game use, or engaging in real world activities, thereby creating an endless video game running on a mobile electronic device that allows a player to use continuously as long as the user earns points playing the game, which is enhanced to allow the user to earn points by creating input from real environment activities, such as by scanning a code on a physical object or by producing activity related data from athletic activity.

j.     U.S. Patent No. 10,569,171 B2, assigned to Disney Enterprises, Inc., associates a gaming device with a "video game application that is associated with media content, such as a television show broadcast by a television network and displayed on a television." Such device "captures, e.g., from a microphone of the gaming device, an audio signal from the media content being played concurrently with the video game application" and "uses content recognition techniques to identify the media content, unlocks 'premium' in-game content that augment gameplay of the video game application."

k.     U.S. Patent No. 9,582,965 B1, assigned to Kabam, Inc., incentivizes users to alter virtual item balances in an online

game. A game may specify "target balances of virtual items to be reached in user inventories" and may specify "a time by which such target balances must be reached." For instance, the player may be given a goal of reaching a target balance of 3,000 gems within 48 hours to receive a premium virtual item. The player has the option to use real-world money to buy gems to earn that goal. After the 48-hour time period passes, another goal may be set that specifies a target maximum balance of 1,000 gems, encouraging users to spend the newly acquired gems that were just purchased.

l.   U.S. Patent No. 9,403,093 B2, assigned to Kabam, Inc., encourages users to make purchases on multiple game platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating the play the game."

m.   U.S. Patent No. 9,626,475 B1, assigned to Kabam, Inc., facilitates a time-limited event-based currency. During such an event, players may acquire a second type of virtual currency in addition

to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

n.  U.S. Patent No. 9,666,026 B1, assigned to Aftershock Services, Inc., provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers provided "may include a first offer having a first value that progressively decreases based on an amount of users that have previously accepted the first offer in order to incentivize early acceptance of the offer."

o.  U.S. Patent No. 9,808,708 B1, assigned to Kabam, Inc., adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

p.  U.S. Patent App. No. 20160346677 A1, assigned to Electronic Arts, Inc., but currently abandoned, describes a system which provides "[a]pproaches to facilitating chance-based wait time reductions." Essentially, such a system would allow users to

spend money to reduce waiting periods that may or may not be disclosed at the time of sale.

q.  International Application No. PCT/US2019/042697, a pending patent application filed by Sony Interactive Entertainment, LLC, would patent technology that suggests microtransactions to players who are stuck in the game to keep them engaging and playing the video game. More specifically, this patent would collect and "process[] game data of the player for determining a current state and process[] game data of other players that have completed the objective" in order to suggest to the player what "downloadable content (DLC), add-ons, upgrades, items, tips, strategy, communal data" or otherwise would be useful to the player to complete their objective. The patented method further includes operations for identifying successful attempts of completing the objective by other players and the resources used in doing so, selects a resource that is usable by the player to complete the objective based on those resources by the other players in the successful attempts and presents the resource to the player for immediate use. *See also* US 202000030702A1, filed July 24, 2020.

132.   In addition to the above, each Product's functionality and performance based in part upon algorithms intended to and which do manipulate the type of use a person using the product has. For instance, video game developers hold patents, which the **DEFENDANTS** license to use and incorporate into the Products, that provide a framework of artificial intelligence to monitor, analyze, and control the usage and to increase usage time and to fuel microtransactions.[5]

133.   Upon information and belief, the **DEFENDANTS**, and each of them, own and/or license one or more of the above technology patents, and/or others patents similar thereto, and incorporated said technology into the Products with the intention of causing that patented technology to work as intended: to wit, to incorporate design features that cause addictive or disordered use of the Products to cause the user to want to use more and more in a disordered compulsive unhealthful manner and to drive the microtransaction engagement that inevitably occurs with that use.

134. At all times material hereto, the **DEFENDANTS** targeted consumers/purchasers, including minor children and specifically including Plaintiffs herein, to use the Products and to engage via microtransactions

---

[5] By way of example, see Patents assigned to Activision publishing, JUSITIA, https://patents.justia.com/assignee/activision-publishing-inc (last accessed Oct. 29, 2023).

whereby in-game perks are exchanged for real money through in-game targeted solicitations.

135. It is common practice for manufacturers, developers, and suppliers of Products, like **DEFENDANTS**, to utilize technology patented by other companies by entering into licensing agreements with the company holding the patent—or buying the rights to the patent outright.

136. Users and parents, including Plaintiffs, do not know or understand that their video gaming experience is not accidental but carefully engineered by the game manufacturers, designers, developers, and suppliers to effect, impact, and addict users regardless of the substance of the content of the video game being played.

137. Companies employ tactics and mechanism embedded in the product design to track users spending and usage habits, and to induce them into spending money on microtransactions. For instance, when a targeted user gets stuck in the game, they are given a bonus to continue because it is better for **DEFENDANTS** to occasionally give users free things than for the players to stop paying to continue using the video gaming product.

138. Video gaming product manufacturers, developers, and suppliers (e.g. **DEFENDANTS**) monitor users and collect user information based on game play, product usage, and the user's social networks. **DEFENDANTS**

and third-parties target these users with advertisements or offers in an effort to increase their revenue at the expense of the user.

139.   Microtransactions, many of which are generated as a result of the incorporation of addictive monetization schemes contained and incorporated in the design of the **DEFENDANTS'** Products, make up 30% of the total revenue earned across the video gaming industry. The revenue is split between the developer of the game itself (e.g., Roblox Corp., Epic Games, and Microsoft/Mojang) and the developer of the systems, devices, and mechanisms which allow users to access and play the Products (e.g., Google, Microsoft, and/or Nintendo) pursuant to licensing or other contractual agreements.

140.  In addition to microtransactions, **DEFENDANTS'** Products include several additional features to keep players engaged and playing longer, including the use of artificial intelligence, algorithms, feedback loops, reward systems, dark patterns, rubber banding, skinner boxes, loot boxes, drip-pricing, and other operant conditioning systems and mechanisms, including the patented technologies identified herein and shared technologies of other **DEFENDANTS** and other video gaming product developers to control the users experience and cause addictive behavior in users.

141.   The operant conditioning mechanisms, artificial intelligence, algorithms, feedback loops, and cloud-based gaming products are designed to keep users continuously engaged, while the game patents are designed to study the skill level and behavior of the minor, even across social media platforms outside the video gaming product being used, so the game can bombard the minor with solicitations and campaigns to engage in microtransactions and to download and/or purchase additional addictive Products.

142.   Each of the **DEFENDANTS**, with knowledge of each minor Plaintiff's age and Florida residency, targeted O.A. and induced them into microtransactions during their use of the Products via and as a result of the addicted design features incorporated into the products. As a result of O.A.'s use of the **DEFENDANTS'** Products, each Plaintiff was injured and damaged as herein alleged.

### ***The Products at Issue Here***

143.   The purpose and functionality of Products is to provide a tangible mechanism for digital, interactive play, skill building, and amusement, and thus consumption, just like any other toy, game, or gadget used or played by humans.

144.   The purpose and functionality of the patented technologies of

addictive design features incorporated into the **DEFENDANTS'** Products—*i.e.*, an invention or idea of addictive design culminating in the design features incorporated in the Products—is to allow the **DEFENDANTS** to develop and place into the stream of commerce Products that cause a user to develop an addictive or compulsive need to use the products which, in turn, generates revenue for the **DEFENDANTS**.

145.   The **DEFENDANTS** participated in placing into the stream of commerce, individually and in concert with one another, the defective, unreasonably dangerous Products. The **DEFENDANTS** participated by designing, developing, marketing, manufacturing, selling, failing to warn about, failing to instruct about, distributing, testing, patenting, licensing, assembling, packaging, labeling, preparing, and suppling and otherwise providing accessibility to consumers to use (hereinafter generally referred to as "placing into the stream of commerce") the Products.

146.   In this action, the defective, unreasonably dangerous Products include Roblox, Minecraft and Fortnite, the patent-protected technologies of addictive designs features incorporated to each, as well as the mechanisms, systems, and/or devices through which users access and consume those products, including by way of example, consoles, personal computer, and mobile devices primarily via these products' online app stores and the

products online cloud gaming networks. Thus, the defective, unreasonably dangerous Products in this action also include Xbox One consoles and related Xbox and Microsoft video gaming products, the Switch console and related Nintendo Switch video gaming products, and Google Play, all of which use and include the patent-protected technologies of addictive design features, as well as mechanisms and systems of operant conditioning (along with illegally retained and/or obtained personal information of the players) to work in conjunction with the video games being played thereon and/or to market video gaming products (e.g., video games, virtual currency for use in video games).

147.   **DEFENDANTS**' Products, as identified herein, served as O.A.'s "gateway" video gaming products: the first games and video gaming products that they used, and, as such, their entry into the world of using video gaming products.

148.   None of the Plaintiffs knew that **DEFENDANTS**' Products were and are designed to be addictive and would likely harm their children if used as intended by **DEFENDANTS**; no Plaintiff ever agreed for O.A. to be harmed or exposed to addictive products; no Plaintiff entered into a contract with any of the **DEFENDANTS** and/or to the extent any Defendant claims O.A. attempted to accept an electronic term and condition clause by clicking

buttons on a screen that reflected language O.A. did understand, read, or which were unconscionable, it has since been made voided by virtue of its unconscionability and the power of disaffirmance which is demonstrated and secured by the filing of the instant *Amended and Supplemental Complaint and Demand for Jury Trial.*

149.  O.A.'s continued use of the **DEFENDANTS'** Products, even after the filing of the instant *Amended and Supplemental Complaint and Demand for Jury Trial*, to the extent there is such use, is compulsive and due to O.A.'s disordered compulsion and addiction to using the products and cannot and does not serve as an affirmation of any contract, however hypothetical, between the Parties.

150.  Moreover, each of the **DEFENDANTS'** terms of services or terms and conditions document is a contract of adhesion that has no variation or negotiable terms prior to requiring signing between and by the parties. Said terms of services and conditions unilaterally hinge the user's access to the Products on accepting the terms and conditions such that failure or refusal by users to accept and to continue to accept any new terms and conditions during the course of using the products results in a loss of access to the purchased products. Accordingly, any terms to which Plaintiffs may have agreed prior to using any of the **DEFENDANTS'** Products are

void and unenforceable. Moreover, because the **DEFENDANTS'** products were designed to and did cause O.A. to develop an addiction or disordered compulsion to using the products, which in turn proximately caused their mental and physical injuries and damages as herein alleged, any such terms and conditions and any other purported contract or agreement between the parties to this Complaint are void as against public policy as an individual cannot consent to harming a minor.

### *Roblox: Roblox Corp.*

151.   Roblox is an online video game, designed, developed and published by Roblox Corp., formally released for use by consumers in September of 2006.

152.   Roblox Corp.'s "mission" for Roblox is to have a billion people actively using its video gaming products each day.

153.   Between its 2006 release and 2015, Roblox was only available for play on personal computers and mobile phones; with the release of Roblox for use on Microsoft's Xbox One gaming console in November of 2015 and the Oculus Rift virtual reality gaming headset in April 2016, the numbers of Roblox users (particularly minors) grew exponentially.

154.   Roblox Corp. saw an accelerated increase in the numbers of consumers who downloaded and used Roblox during the onset of the Covid-

19 pandemic. As of August of 2020, Roblox Corp. had over 164 million monthly active users. More than half of those users were American children under age 16.

155.   The numbers of consumers, particularly minors, using Roblox continues to grow as Roblox Corp. makes its products available for use on more devices. For example, in 2023, when Roblox Corp. released versions of its Roblox product for use on Sony's PlayStation 4 and the virtual reality gaming headsets, Meta Quest 2 and Meta Quest Pro. Currently, Roblox Corp. has over 66 million daily active users and over 217 million monthly active users; more than 50% of consumers playing Roblox are under age 13.

156.   Roblox Corp. markets Roblox use on any device:[6]



157.   While Roblox Corp. has not released a version of Roblox for download and play on Nintendo Switch, Switch users can access and play Roblox using the gaming console's built-in web browser.

---

[6] https://corp.roblox.com/

158. Roblox Corp. describes Roblox as an online social gaming platform and game creation system that allows users to use games (or "experiences") built within Roblox and to program their own games (or "experiences") using Roblox Corp.'s proprietary engine, Roblox Studio, such that Roblox Corp. provides users all tools necessary to "experience" and "build" their gameplay. Roblox Corp. also provides users video and written tutorials and instructions on how to use Roblox Corp.'s software, systems, tools, and a variety of "building" topics, including the use of monetization strategies and other proprietary game development mechanisms, to create and program the games that become part of Roblox.

159. Roblox Corp. designed the game-creation aspect of its product to allow users to create their own Roblox video games, as well as to allow users to engage in purchasable, one-time "game passes" and "developer products" microtransactions, for use and purchase by other Roblox users, including, of course, minor children.

160. Roblox Corp. profits off of each user-created game generated and developed using Roblox Corp.'s Roblox Studio and other developer tools containing the addictive mechanisms and AI described herein, by supplying them to consumers, including minor children like O.A., as a single video gaming product.

161.   Roblox Corp. designed the social-gaming aspect of its product to allow users to use Roblox games created by other users, which includes allowing users to buy, sell, and create virtual items, accessories, and limited-availability products for use in gameplay.

162.   Roblox Corp. is free to use, but by design encourages in-game purchases and product upgrade microtransactions which are purchased using "Robux", the product's virtual currency. Robux can be obtained in several ways: (a) purchased with real currency; (b) received as part of a recurring stipend that users with a Roblox Premium membership receive; and (c) earned from selling "game passes" or developer products" to other Roblox users.[7] Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increase. For instance, corresponding with the Covid-19 pandemic triggered increase of Roblox users, Roblox Corp. earned $2.2 billion in revenue from Roblox in 2022—a 16% increase from 2021 earnings, which had already increased by 107% from 2020, and which had been an 111% increase over 2019.

163.  Roblox Corp. markets the sale of Robux directly to the consuming public, both digitally and as physical gift cards to be purchased

---

[7] In the latter instance, should the user choose to exchange Robux acquired from purchases made by other Roblox players for real world currency, Roblox Corp. retains a percentage of the revenue.

using real money.

164.   Roblox Corp. designed Roblox to include addictive features rooted in operant conditioning and microtransactions —at the risk of children's mental and physical health—to profit from the user's extended, long-term gameplay and corresponding in-game spending.

165.   Roblox Corp. hired psychologists and scientists to work with software engineers and game developers to ensure that their products included the best psychological traits and technologies for user retention and addiction.

166.   Roblox Corp. used numerous addictive principles and technologies in Roblox's design. For example, in Roblox, users can create games and maps for other users to try and use, a challenge in and of its own. Through research and product development, Roblox Corp. learned that when using games and completing challenges like this, a user's brain releases dopamine—the neurotransmitter in the brain that enables an individual to feel happiness and pleasure—and triggers the user's brain to seek those dopamine hits on a more regular and then compulsive basis that leads directly into abuse, addictive behavior, and addicted and/or disordered use of video gaming products.

167.   The variety within Roblox ensures that users are never bored nor

grow tired of the product because that might cause users to want to stop using the product; there are always new challenges, maps, and characters to try out, which makes using the product feel like an ever-evolving entity that never stops providing entertainment.

168.  The ability for users to create their own games and challenges, combined with users' ability to spend real-world money to change their avatar's image and abilities, ensures that using the product / playing the game feels different for users each time they use. Such constant variety in the experience felt by the user keeps users "hooked," coming back daily to use the product for hours.

169.  Roblox Corp.'s "social gaming" design allows users to interact with friends or other users within the game—and creates a competitive environment whereby players are presented with microtransactions and in-game product purchases and pressured to spend money to keep up with their Roblox friends and competitors.

170.  Roblox Corp. makes in-game spending as easy as possible, and designed Roblox with addictive features to target minors and encourage them to engage in microtransactions in order to advance in the game, resulting in addicted users quickly spend large sums of money inside the game without their parents, guardians, or other family members' knowledge

or consent.

171.   Roblox Corp. does not adequately inform users of the inherent risks involved with using and playing Roblox or that the product was designed to make users play more and more to their potential harm.

172.   Roblox Corp. knew its product incorporated addictive designs that posed risks of causing users to develop dangerous and disordered use and overuse of the product, to the detriment and harm to the user, and chose to not inform the consuming public at large, users, or parents of minor children who are users, of such risks.

173.   Roblox Corp. describes and markets its product as an educational tool for children: "Roblox provides a fun, supportive, and educational space where your child's imagination can thrive."[8] Roblox Corp. even markets itself to educators, encouraging the use of Roblox in learning environments:

---

[8] https://corporate.roblox.com/faq/



174.   While marketing its product as an educational tool beneficial to minor children and neurodivergent individuals, Roblox Corp. at no point discloses the harms posed by its product or the psychology and addictive characteristics and design features of Roblox's design or that Roblox contains numerous addictive principles that can negatively impact minors' and young adults' livelihoods, including their ability to learn and engage in critical thinking.

175.   Roblox Corp., in connection with its Roblox video gaming system, engages in the following conduct:

a.   Uses a "voice chat" feature that requires users, including minors, to submit uniquely identifying scans of their face to utilize the feature under the guise of "age verification" when Roblox Corp. is using sophisticated artificial intelligence to create faceprints—

---

9 https://education.roblox.com/

as uniquely identifying as a fingerprint—to track the user and
their gaming patterns;

b.  Allows first-party and third-party advertising to be
surreptitiously interlaced with organic content in a multitude of
ways, while knowing millions of young children are exposed to
that advertising daily;

c.  Fails to adequately disclose to children when advertising is
present with experiences and videos on Roblox; and

d.  Fails to ensure that social media influencers clearly and
conspicuously disclose their material connections to Roblox in a
manner that is understandable to children.

176.  Roblox Corp., independently and in concert with third-parties,
engaged in the aforementioned deceptive, negligent, and intentional privacy
violations and used the information garnered therefrom to analyze the
gaming and purchasing behavior of minors and design game releases
tailored to prey on the minors to trick minors into buying microtransactions
or unknowingly make in-game purchases using the game patents and other
illegal dark patterns.

177.  Roblox Corp. designed Roblox in conjunction with psychologists,
neuroscientists, and other behavioral experts to ensure the addiction of

minor and neurodivergent users;

178.   Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

179.   Roblox Corp. did not inform the public that it designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to injury.

180.  Roblox Corp. designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to brain damage and injuries, but concealed this information from the public and product users, including Plaintiffs.

181.   Roblox Corp. misrepresented Roblox as safe for use by minors, young adults and neurodivergent individuals, while knowing they had been designed and developed with addictive psychological features to keep users

playing Roblox more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that Roblox poses significant risk of harm to users.

182.   Roblox Corp. marketed Roblox as safe for all ages and as an educational tool without warning of the addictive design and risk of injury associated with its video gaming product and foreseeable use thereof, despite knowing that Roblox contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by minors, including O.A.

### ***Minecraft: Mojang and Microsoft***

183.   Minecraft is a 3D sandbox video game first developed and published by Mojang, who made the video game available to the public in 2009, prior to a full release on November 18, 2011.

184.   Minecraft can be played on PC, various gaming consoles, and mobile devices.

185.   Since the first full release of Minecraft in 2011, the video game has been continuously updated with many major and minor product update, including but not limited to gameplay-altering mechanics, new product content and items, microtransactions, and tweaks to existing product features, which are available free to users who have purchased the game.

186.   In May of 2012, Mojang Studios and Microsoft, acting through its video game design and publishing studio, Xbox Game Studios, released Minecraft for play on Xbox 360 and as the flagship game to play with friends via Microsoft's new Xbox Live feature.

187.   The Xbox 360 version of Minecraft, like the product versions that came later for play on other gaming consoles or updated Xbox consoles, differed from the personal computer version of Minecraft in many ways, including but not limited to a newly designed crafting system, the control interface, in-game tutorials, split-screen multiplayer, and the ability to play with friends over the internet.

188.   With the introduction of Minecraft as a video gaming product for play on gaming consoles like Xbox 360, Mojang and Microsoft introduced microtransactions and made in-product downloadable content available for purchase.

189.   All Minecraft versions since 2012 have been designed to include microtransactions and on-going product updates to enhance game play and keep players engaged in the product.

190.   In December of 2013, Mojang Studios and Sony Interactive Entertainment, LLC released Minecraft for play on PlayStation 3.

191.   Microsoft acquired Mojang Studios and all product rights to

Minecraft in 2014. That same year, Minecraft was made available for play on Xbox One and PlayStation 4.

192.   In 2015, Minecraft was made available for play on the Wii U, which is a gaming console product designed, manufactured, and sold by Nintendo of America, Inc. In May of 2017, Minecraft was made available to play on the Nintendo Switch, and then in September of 2017 for Nintendo 3DS.

193.   On September 20, 2017, Mojang and Microsoft released a *Better Together Update* for Xbox One, Windows 10, VR, and mobile versions, which enabled cross-platform play between those products and became known as the *Bedrock Edition* of Minecraft. The *Bedrock Edition* was also provided as a product update to the Nintendo Switch version of Minecraft in 2017, thereby enabling cross-platform use between the Nintendo Switch, Xbox One, virtual reality gaming headsets, mobile devices, and personal computers. In December of 2019, the PlayStation 4 version of Minecraft was updated to become part of the *Bedrock Edition*, thereby enabling cross-platform user for persons with Xbox Live accounts.

194.  The *Bedrock Edition* of Minecraft is the most commonly available and played version of the product, allowing cross-platform play with Microsoft's Xbox One and Xbox Series X/S, Sony's PlayStation 4 and

PlayStation 5, Nintendo's Switch, personal computers, mobile phones, and virtual reality gaming headsets.

195.   Minecraft is the best-selling video game to date, with over 300 million copies of its games sold, and with over 163 million monthly active players.

196.   Regardless of version or platform, Minecraft gameplay is designed with no required goals to accomplish thereby allowing players extensive freedom in exploring virtually infinite terrain within a blocky, procedurally generated, three-dimensional world.

197.   While there are no set goals, Minecraft does include an achievement system and can earn "advancements" in the *Java Edition,* "trophies" when playing on PlayStation consoles, and "achievements" in *Bedrock Edition* and when playing on Xbox consoles.

198.   Minecraft players can discover and extract raw materials, craft tools and items, and build structures and machines; however, the core gameplay revolves around picking up and placing block-objects in a 3D grid.

199.   In Minecraft, the game world is virtually infinite on a horizontal plane and procedurally generated based on a players' exploration, using a map seed that is obtained from the system clock at the time of world creation.

200. Minecraft includes multiple game modes for a variety of

gameplay, including but not limited to, survival mode, in which players must acquire resources to build in the world and maintain health, and creative mode, in which players have unlimited resources and access to flight. Depending on the chosen game mode, players can fight hostile mobs or cooperate or compete against other players in the same world. When starting a new world, players must choose one of five game modes, as well as one of four difficulties, ranging from "Peaceful" to "Hard." Thus, although a single video gaming product, Minecraft gameplay can be different each and every time a player logs in to play.

201.  The main task in Minecraft is to survive all the problems using specific resources. When a player uses the given resources to protect their territory and advance in the game, the player feels like they have accomplished something and can easily get addicted to that feeling. Because of this basic game design, Minecraft is easy for any player to play because it does not have a lengthy instruction manual or demo of the game to learn how to play, and therefore is a video game marketed to users from a very young age.

202. Mojang and Microsoft designed Minecraft with multiplayer options, allowing players to interact and communicate with each other in the game world, which combined with the technologies and algorithms built into

the game product prays upon the chemical reward receptors of user's brains to create addictive engagement. These versions also allow children to enter and engage with others in dangerous "chat room" features throughout the game.

203. Minecraft's interactive features serve only to lure players to spend more time in the game. For example, on certain devices, Minecraft pushes constant notifications about new features, skins for avatars, and new objects in the games. These notifications pop up on screen whether players are already playing Minecraft or not.

204. Because of its game design, Minecraft can last for eternity if the player is not strong-willed enough to stop playing; to wit, once a player succeeds with one stage, they move on to the next one.

205. Minors and players with neurodivergent diagnoses, such as ADHD, can become easily hyper focused and addicted to building worlds within Minecraft.

206. Mojang and Microsoft were aware of these propensities, and specifically developed their games along with psychologists and neuroscientists, to include addictive psychological traits.

207. At the expense of users' mental and physical well-being, Mojang and Microsoft fail to inform the public, users, or parents about the risk of

addiction and other negative consequences that can arise from gameplay.

208. Mojang and Microsoft market the game as educational and market it to educators for use in the classroom:



209. Mojang and Microsoft offer teachers ready-built lessons and curriculums centered around their game:



210. The Minecraft educational game products offered by Mojang and Microsoft to teachers and parents are built of the *Bedrock Edition* codebase and can be played on personal computers and tablets.

211. Mojang and Microsoft fail to adequately inform users of the

---

[10] https://education.minecraft.net/en-us

[11] https://education.minecraft.net/en-us

inherent risks involved with using and playing Minecraft or that the game was designed to addict and harm users.

212.   Mojang and Microsoft are aware that the more time a user plays the game, the more likely they are to continue purchasing in-game product upgrades.

213.   Mojang and Microsoft intend to introduce and addict as many users as possible to increase their own profits as these users continue playing—and spending—as they grow.

214.   Mojang and Microsoft have profited from the release of their addictive video gaming product to the public. For instance, in 2021, Minecraft generated approximately $380 million across all different gaming platforms.

215.   Mojang and Microsoft in connection with Minecraft, engaged in the following conduct:

    a.    Collecting and maintaining personal information from minors without parental consent. For example, when learned that certain users were children after they provided their birthdates in the first step of the account creation process but went on to request phone numbers from the children, before seeking to involve a parent;

b.    Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

c.    Utilizing a deficient post-collection notice and verifiable parental consent process, including but not limited to:

     i.    Collecting personal information, from the children in violation of state and federal law, and then suggesting that the children seek parental involvement—this limited notice of Mojang and Microsoft's information practices failed to ensure parents received adequate notice about **DEFENDANTS**' collection, use, and disclosure practices concerning children's personal information;

    ii.    Failing to include the information required by 16 C.F.R. § 312.4(b);

   iii.    Failing in the direct notice to describe **DEFENDANTS**' collection and use practices with regard to personal information collected from children and instead directed parents to the company's online notice of its information practices (the "Privacy Statement"); and

   iv.    Not disclosing in the direct notice to parents that Mojang and Microsoft intended to collect such personal

information as images that could contain a child's likeness;

d.   Failing to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that Mojang, Microsoft, alternate entities, and other third parties collect personal information from children;

e.   Failing to include a complete Privacy Statement was incomplete. More specifically, until at least 2019, the Minecraft Privacy Statement contained a section entitled "Collection of data from children"; however, this section did not describe what personal information was collected from children or Mojang's, Microsoft's, alternate entities', and other third parties' use and disclosure practices for personal information collected from children as required---and instead the section discussed Microsoft's information practices regarding Microsoft products and children generically.

216.  Mojang and Microsoft have independently and in concert with each other and third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of

minors and design game releases tailored to prey on and to trick minors, like O.A. into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

217.   Mojang and Microsoft designed Minecraft to take advantage of the chemical receptors in product user's brains and with addictive psychological features and traits to make the video game as addictive as possible, including, but not limited to, designing and developing a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects.

218.   Mojang and Microsoft designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

219.   Mojang and Microsoft designed Minecraft with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

220. Mojang and Microsoft failed to disclose that they designed Minecraft to include addictive features and psychological tactics to increase gameplay and product use, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage injury and, as such, the products pose significant risk of harm.

221. Mojang and Microsoft knew that Minecraft contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, Microsoft and Mojang marketed Minecraft as "educational" and safe for use and play by minors (inside and outside the classroom).

222. Mojang and Microsoft misrepresented the Minecraft games as safe for use by minors and young adults, while knowing they had been designed and developed with addictive psychological features to keep users playing Minecraft more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by youth can lead to brain damage and injury, such that Minecraft poses significant risk of harm to users.

223. Mojang and Microsoft did not inform, did not warn, and concealed from the public that they designed Minecraft games with addictive

psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to brain damage and injury.

### ***Fortnite: Epic Games***

224.  Fortnite, a video game designed, developed, and supplied to the general public by Epic Games, was first released in 2017.

225.  In less than two years after the product's release in 2017, Fortnite had generated over $9 billion in revenue through microtransactions and in-game purchases. In 2021 alone, Fortnite generated $5.8 billion in revenue. On average, Fortnite has 239 million monthly users and, at peak usage or during "event" product releases, Fortnite has averaged approximately 15 million players in a day.

226.  Fortnite is available for use in three distinct game mode versions, all of which share and utilize the same general game design, software engine, AI, algorithms, and proprietary systems, along with using similar graphics, art assets, and game mechanics.

227.  Fortnite: Battle Royale is a free-to-play battle royale game in which up to 100 users fight to be the last person standing. Users can use alone, in a duo, or in a "squad" of 3-4 players. When users land "inside the game," the user must scavenge for weapons, items, resources, and vehicles

while trying to stay alive and attack and eliminate other users.

228.  Fortnite: Save the World is a cooperative hybrid tower defense-shooter and survival game in which up to four users fight off zombie-like creatures and defend objects with traps and fortifications they can build. Users are awarded a number of in-game items from and during missions, including hero characters, weapon and trap schematics, and survivors, all of which can be leveled up through gained experience to improve their attributes. Save the World is the only pay-to-play game mode of the Fortnite franchise.

229.  Fortnite Creative is a sandbox game mode in which users are given complete freedom to create worlds by spawning any item from Battle Royale on a personal island and can create games such as battle arenas, racecourses, platforming challenges, and more.

230.  Battle Royale and Save the World are rated T for Teen—*i.e.,* recommended for individuals aged 13 and above. This does not mean Epic Games prohibits younger children from using its product, that cannot or do play Fortnite, or that Epic Games does not know that children under 13 are using its Fortnite video gaming products. Rather, Epic Games is aware and markets Fortnite to consumers of all ages, and particularly to children under age 13.

231.  Fortnite can be played through Microsoft's Xbox Cloud Gaming with or without a subscription to Microsoft's Xbox Game Pass and/or on with cloud gaming on the Xbox Network:



YOU DO NOT NEED AN XBOX GAME PASS PAID SUBSCRIPTION TO PLAY FORTNITE THROUGH XBOX CLOUD GAMING. ALL YOU NEED IS A FREE MICROSOFT ACCOUNT, HIGH-SPEED INTERNET CONNECTION, AND COMPATIBLE DEVICE. ONCE YOU'RE READY, GO TO XBOX.COM/PLAY TO START PLAYING WITH MOBILE TOUCH CONTROLS OR A SUPPORTED CONTROLLER. SEE OUR FAQ BELOW FOR MORE DETAILS. [12]

232.  Fortnite is also available for free download on multiple other devices, including Switch, and can be played through Epic Games own cloud gaming network, among others.

233.  Fortnite is monetized through the use of V-Bucks: in-game currency that can be purchased with real-world funds or earned through completing missions and other achievements in Save the World.

234. Epic Games markets the sale of V-Bucks directly to the consuming public, both digitally and as physical gift cards to be purchased using real money.

---

[12] https://www.fortnite.com/mobile/xbox-cloud-gaming

235.  V-Bucks in Save the World can be used to buy loot boxes, in the form of llama-shaped pinatas, to gain a "random" assortment of items.

236.  V-Bucks in Battle Royale can be used to buy cosmetic items like character models or the game's battle pass: a tiered progression of customization rewards for gaining experience and completing certain objectives during the course of a Battle Royale season.

237.  The addictive properties and design features, as alleged herein, of the Fortnite game products are so dangerous to users, and especially minor children, that several health and behavioral centers across the country have published resources for parents specifically warning about Fortnite addiction. Several studies have concluded that Fortnite is "more addictive than heroin and other illegal drugs."

238.  Despite these third-party express warnings of the dangers of Fortnite, Epic Games has failed to disclose the risks of harm purposefully built into the Fortnite game products.

239.  Fortnite gained immense popularity because of its clever manipulation of human psychology. Epic Games designed and developed Fortnite games with the use of addictive operant conditioning to make users want to keep using the products more and more.

240. The team that developed Fortnite includes psychologists,

statisticians, analysts, and coordinators who worked for nearly four years to develop products that were addictive as possible.

241.  One tactic Epic Games used with respect to the Fortnite game products is a psychological trick of "lose by a little, win by a lot" or "near miss" effect.

242.  Simplistically explained, this occurs when the user loses a round of the game, the product ensures that user loses by only a slight margin, which compels them to play another round because they were so close to winning before. When users lose, they rationalize their defeat and often tell themselves that what stopped them from winning was the smallest mistake. As a result, users want to use the products more, just one more round, but they end up using the product more and more, not just once more. The "near miss" effect means that when users perceive that they lost by only a slight margin, they do not actually have to win a round to feel the high of a win. This strategy lies in getting users *close* to the feeling of winning, because when the user is close to winning, the user feel the same buzz and release of dopamine and go on to play another and then more and more rounds. And, in addition, when the user does win a round, the user wins a lot of perks, giving them an increase in dopamine and the adrenaline rush to keeping using the product.

243.  In the hopes of increasing their rank in the Fortnite products through wins, users continue to use, often and increasingly without any pause, break, or rest.

244.  Fortnite game products use random reward tactics, including something referred to within the field of psychology as the "variable interval schedule" which is the idea that randomized small wins will continue to draw in users to use the products more and more.

245.  With each small win, the brain is rewarded with a small spurt of dopamine—no matter how random small rewards may be.

246.  The design of the Fortnite game products keep users drawn in. The bright and vibrant colors and cartoonish representation of the game make it more appealing than other bleak multiplayer battle royale type products.

247.  Similarly, the mechanics of the Fortnite game products inject elements of variety, allowing users to find ideal hiding spots, loot drops, explore the entire map, build towers and forts using resources, and more. In designing and incorporating such mechanics and features, Epic Games ensures that users never once get bored while using the Fortnite products.

248.  To keep users even more engaged and using the Fortnite game product, Epic Games often rolls out updates that keep users busy with

engaging and fresh features, new maps, live events, and the latest trends. Such updates can also remove minor glitches that may be problematic to users as well.

249.  Fortnite game products also keep users coming back for more and more use by giving "Daily Quest" assignments that users can complete to earn V-buck.[13]

250.  Users will thus continually log into the Fortnite game product to complete these quests and earn V-bucks for in-game spending.

251.  These features, combined with the ease of accessibility—the game is free to use on multiple gaming consoles and devices—fosters addiction in users and particularly minors and young adults because they draw users in and allows users to use Fortnite nearly anywhere at any time.

252.  Upon information and belief, Epic Games has licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Fortnite games.

253.  Epic Games does not disclose to the public or the users of Fortnite any of the psychological tactics or addictive features it purposefully incorporates into its products. Instead, Epic Games touts its Fortnite game

---

[13] https://fortnite.fandom.com/wiki/Quests_(Battle_Royale)

products as "educational" and markets them for use in the classroom.

254.  On its website, Epic Games even offers "Free Fortnite lesson plans" to educators on subjects ranging from history, geography, and programming:



255.  Engaging—and addicting—users who are children early and in environments such as their classroom increases Epic Games's revenue through continued use of its Fortnite products to young users, at the expense of these users' mental and physical health.

256.  Epic Games does not adequately inform, or inform at all, users of the inherent risks involved with using Fortnite game products, specifically including that Fortnite was designed to addict users to their extreme harm

---

[14]https://dev.epicgames.com/documentation/en-us/fortnite-creative/education-in-fortnite-creative

and detriment.

257.  Epic Games designed Fortnite with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

258.  Epic Games designed Fortnite to be as addictive as possible and with psychologically addictive features and tricks to ensnare game players, including but not limited to, designing the game to include a "near miss" effect, loot boxes, random rewards, bright and vibrant colors, and continual gameplay variety.

259.  Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

260. Epic Games, in connection with its Fortnite video gaming product, engaged and/or engages in the following conduct:

a.    Deploying design tricks, known as dark patterns, to dupe

millions of players (including minors like O.A.) into making unintentional purchases in its Fortnite game;

b.    Failing to notify parents that children had open access to in-game purchases and to obtain consent prior to processing purchases;

c.    Collecting personal data from children, including O.A., without first obtaining parents' verifiable consent despite being aware that many children were playing Fortnite;

d.    Requiring parents who requested that their children's personal information be deleted to jump through unreasonable hoops, and sometimes failed to honor such requests;

e.    Utilizing default settings that enable live on-by-default text and voice communications for users and these default settings harm children and teens—and violate state and federal law because these default settings, along with Epic Games's role in matching children and teens with strangers to play Fortnite together, harmed children and teens, exposing children and teens to bullying, threats, harassment, sexploitation and other dangerous and psychologically traumatizing issues such as suicide while on Fortnite;

f.    Tricking users, including minors like O.A., into making

purchases while playing Fortnite. More specifically, Epic Games has deployed a variety of dark patterns aimed at getting consumers of all ages to make unintended in-game purchases. Fortnite's counterintuitive, inconsistent, and confusing button configuration led players to incur unwanted charges based on the press of a single button. For example, players could be charged while attempting to wake the game from sleep mode, while the game was in a loading screen, or by pressing an adjacent button while attempting simply to preview an item. These tactics led to hundreds of millions of dollars in unauthorized charges for consumers;

g.   Charging account holders, including Plaintiffs, without authorization and allowed minors, including O.A., to make in-game or in-product purchases without parental consent;

h.   Locking the accounts of customers who disputed unauthorized charges with their credit card companies; thereby revoking access to all the content they have purchased, which can total thousands of dollars and, even when Epic Games agreed to unlock an account, consumers were warned that they could be banned for life if they disputed any future charges; and

      i.     Purposefully obscuring cancel and refund features to make them more difficult to find.

261.   Epic Games, independently and in concert with third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on and to trick minors, like O.A. into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

262.   Epic Games failed to disclose that it designed the Fortnite video gaming products with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm.

263. Epic Games knew that its Fortnite video gaming products contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms,

instead Epic Games marketed Fortnite as "educational" and safe for use by minors (inside and outside the classroom).

264.  Epic Games misrepresented Fortnite as educational and safe for use by minors, young adults, and neurodivergent individuals, including O.A., while knowing that abuse, addiction, and compulsive use by such product users can lead to brain damage and injury, and knowing that it had designed and developed Fortnite to be as addictive as possible.

265.  Epic Games did not inform and concealed from the public, including Plaintiffs, that Fortnite video gaming products pose significant risk of harm to users due to Epic Games's decision to design Fortnite to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to brain damage and injury in those individuals.

### ***Xbox and Xbox Products: Microsoft***

266.  Xbox is a video gaming brand, owned and operated by Microsoft, that consists of Xbox gaming consoles, as well as video games and online video gaming through the Xbox network, Xbox Game Pass, and Xbox Cloud Gaming.

267.  Microsoft designs, develops, manufactures, produces, supplies, and sells Xbox video game consoles—and markets all Microsoft video game

products—to consumers across the world, and specifically in California, and to Plaintiffs.

268.    Microsoft has manufactured and released five versions of its Xbox consoles: Xbox (1st Generation), Xbox 360 (2nd Generation), Xbox One (3rd Generation), Xbox Series X (4th Generation), and Xbox Series S (4th Generation).

269.    Microsoft released the original Xbox was released in North America in 2001, and a year later launched its integrated Xbox Live product to allow players to play video games online.

270.    When it was released in 2002, Xbox Live required a subscription for use but was a wild success due to features, including but not limited to, a "buddy list" and access to popular online video games.

271.    Microsoft released Xbox 360 in 2005, and with that release, launched an upgraded Xbox Live product that included, *inter alia*, a limited "Free" or "Silver" tier that allows users to play online video games for free.

272.    Microsoft released upgraded and revised versions of its Xbox 360 console, the Xbox 360 S, and Xbox 360 E, which provided hardware and software updates to the product.

273.    Microsoft released Xbox One in North America in 2015.

274.    In marketing Xbox One, Microsoft emphasized the console's

internet-based features, including but not limited to the ability to record and stream gameplay, and the ability to integrate with a set-top box to watch television.

275.  Microsoft also released upgraded and revised versions of Xbox One, known as Xbox One S and Xbox One X, which provided hardware and software upgrades to the product.

276.  Microsoft released its fourth generation of Xbox consoles—Xbox Series X and Xbox Series S—in North America in 2020, with each model designed to be family playable.

277.  Both the Xbox Series X and Xbox Series S (collectively, "Xbox Series X/S") consoles are fully compatible with all Xbox One games and most hardware, backwards compatible with games playable on Xbox One from the Xbox 360 and original Xbox console.

278.  To help transition Xbox One users to the newer Xbox Series X/S consoles, Microsoft designed and introduced a Smart Delivery system—a product that provides automatic free updates to Xbox One versions of games to the Xbox Series X/S versions for most of Microsoft's first-party games and several of its third-party games.

279.  Each Xbox console provides users the ability to play video games, using a hard copy of the video game, a digital copy downloaded from

Microsoft Store (also known as Xbox Games Store, hereinafter "Xbox Store"), using the Xbox Network (formerly known as Xbox Live) and/or using Xbox Game Pass Cloud Gaming.

280.  Microsoft developed and maintains the Xbox Store— a product-platform through which users can purchase thousands of games to be stored on their console through digital download, and for use with its Xbox consoles.

281.  When a user purchases and downloads a game from either store, regardless of whether that is a first-party video game or third-party video game, all design elements and downloadable content for said games is stored on the users' Xbox console and, if connected to the Internet, will receive product updates released by the game developer.

282.  Microsoft markets the Xbox Store as "safer for the whole family" to use:



283.  Xbox Network is an online multiplayer gaming service created and operated by  Microsoft for use with its Xbox consoles. It includes the Xbox Store and Xbox Game Pass Cloud Gaming. Xbox Network is available as a free and a paid-subscription based product, known as Xbox Game Pass. Xbox Game Pass Core, formerly Xbox Live Gold, is a paid tiered subscription service offered by Microsoft that provides users access to online games, multiplayer abilities, and other features.

284.  Xbox Game Pass Ultimate, the highest tier of paid subscriptions at $17 per month, provides product users the same benefits as the other tiers, but also provides users access to Xbox Game Pass Cloud Gaming (hereinafter "Xbox Cloud Gaming").

285.  Xbox Cloud Gaming is Microsoft's Xbox cloud gaming service. Xbox Cloud Gaming was initially released in beta testing in November of 2019, and launched for Xbox Game Pass Ultimate subscribers on September 15, 2020.

286.  Xbox Cloud Gaming operates by linking the device to a remote server in the cloud. Gameplay is saved in the cloud and can be accessed and used from numerous devices at any given location. In fact, Xbox Cloud Gaming allows for gameplay from a number of devices—no longer is a console required. The thousands of games in the Xbox Cloud Gaming library

are extensive and everchanging, which keeps players coming back to either finish a game before it disappears or check for new and exciting game options to play and use Microsoft's Xbox Products and other Products, including Roblox, Fortnite, and Minecraft, through the Xbox Network and Xbox Cloud Gaming. This means that anyone with an Xbox Cloud Gaming account can access and play any game on their Xbox console, computer, or mobile device.

287.  Once a game is downloaded to the user's Xbox console or made available on the Xbox Network, Microsoft provides video game developers and publishers a framework to initiate and process in-game purchases and microtransactions through the Xbox Store and Xbox Cloud Gaming.

288.  This framework enables game developers to sell microtransactions and/or loot boxes through Microsoft's video game products, described herein.

289.  In exchange, Microsoft keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

290.  Microsoft specifically designed its Xbox video game products to attract users to purchase games and in-game products therein—regardless of the content such games may include.

291.  Xbox Game Pass Ultimate also offers users daily, weekly, and monthly "quests" that can be completed for varying amounts of Microsoft Reward points:

### How it works

Xbox Game Pass Ultimate and Console plan members can earn Microsoft Rewards points by playing games from the Xbox Game Pass library. Here's how to get started.

**1.**

**Browse current Quests**

Check out current Quests on your Xbox console in the Xbox Game Pass section or on your Xbox Game Pass mobile app. New Quests are added every day.

**2.**

**Participate in Quests**

Find the list of Quests in the Xbox Game Pass membership area on your Xbox console or on the Xbox Game Pass mobile app. You will receive an instant notification when your Quest is ready to be turned in.

**3.**

**Claim and track your points**

Go to the Xbox Game Pass area on your Xbox console or on your Xbox Game Pass mobile app to claim and track your points.

**4.**

**Redeem points**

Head to the Microsoft Rewards app to spend your points! Redeem points for Xbox gift cards and use for in-game content, games, devices, movies, apps accessories and more.

292.  The ease of access, quest challenges, and constantly evolving game library draws players in, and keeps them coming back.

293.  Over 20 million people have played video games using Xbox Cloud Gaming.

294. Xbox Cloud Gaming allows these users to connect with each other by including a feature to add and interact with friends, called "Xbox

Social." This social media-akin feature permits users to add friends to a Friends list and then see what games your friends are using and/or invite them to join your game.

295.  The Xbox Network, including but not limited to Xbox Cloud Gaming, is designed to allow Xbox users and video game users to chat with each other individually or in groups.

296.  To find friends, users are encouraged to link to other social media accounts with their Xbox subscription.

297.  Minors and young adults are, therefore, encouraged to log-in more often and for longer periods to keep up with their friends, engage and play with friends, and compete with friends within the games.

298. Upon information and belief, Microsoft hires behavioral psychologists and neuroscientists to design its Xbox consoles, Xbox Network (and all products and features thereof), its video games, and marketing in the best way possible to attract users, especially minors and neurodivergent individuals.

299.  Microsoft is aware that several of the video games available for play on the Xbox, and available for download in the Xbox Store and Xbox Cloud Streaming, are designed to continuously encourage users to purchase

in-game products, to be addictive, and pose unreasonable risk of harm to users, particularly minors and neurodivergent individuals.

300.  Microsoft does not adequately inform users of the inherent risks involved with using its products or that the products—along with the games being played thereon---were designed to addict and harm users.

301.  Microsoft markets its own video game products and video game products manufactured, designed, and developed by third-parties, including the sale of virtual currencies and product upgrades for those products; to wit, Microsoft markets and sells Xbox/Fortnite and Xbox/Minecraft "bundle" products; Robux, V-Bucks, and Minecoins are marketed and sold in both digital and physical gift card forms to be used on and with Xbox products.

302. Microsoft designed its Xbox Products identified herein with addictive features and for use with addictive video game products, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, to take advantage of the chemical reward system of users' brains, and these addictive features include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that

allow users to play with and view the games played by friends and other users.

303.  Microsoft designed its Xbox consoles with addictive features and for use with addictive video game products and designed its Xbox Network and other Xbox Products described herein, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products.

304.  Microsoft targeted users to make purchases of addictive video game products, while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

305.  Microsoft designed its Xbox consoles, Xbox Network, Xbox Store, Xbox Game Pass Ultimate, Xbox Cloud Gaming, and other Xbox Products by employing and/or with the help of and/or in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the minor users continually purchase and use addictive Products.

306.  Microsoft failed to disclose that it designed its Xbox consoles with addictive features and for use with addictive video game products, and designed its Xbox Network and Xbox Products with addictive features to be

used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm.

307.  Microsoft knew that its Xbox consoles and other Xbox Products contained an inherent risk of abuse, addiction, and compulsive use by minors and neurodivergent users—and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its products for play by such users.

308. Microsoft misrepresented that its Xbox Products, including those used by Plaintiff O.A., were safe for use by minors and neurodivergent individuals, while knowing that it was designed and developed with addictive features to keep such users using Microsoft's video game products, playing video games, and purchasing addictive content, and while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injury, such that Microsoft's video game products pose significant risk of harm to users, including Plaintiff O.A.

309.  Microsoft knew that its Xbox consoles and Xbox Products, as well as the Fortnite and Minecraft games, contained an inherent risk of abuse,

addiction, and compulsive use by minors and neurodivergent individuals, and the harms that arise therefrom, but intentionally marketed its products for use by such individuals and directed its misstatements towards users of those games and other games designed, developed and utilizing the patents and technology described herein.

310. Microsoft did not inform the public that it designed its Xbox consoles and its Xbox Products with addictive features, or that these products could be used to download addictive Products, despite knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injury and those products were designed to cause addictive and compulsive use.

311. Microsoft, **in** connection with its Xbox game consoles and Xbox Products, engaged and/or engages in the following conduct:

   a. Collecting personal information from minors who signed up to its Xbox gaming system without notifying their parents or obtaining their parents' consent, and by illegally retaining minors' personal information;

   b. Allowing minors, after creating an account on Xbox, to create a profile that will include their "gamertag," and allowing them to upload a picture or include an avatar,

which is a figure or image that represents the user, which Microsoft then combines with a unique persistent identifier it creates for each account holder, even minors, to share with third-party game and app developers;

c.   Allowing—by default—all users, including minors to play third-party games and apps while using Xbox Game Pass, requiring parents to take additional steps to opt out if they do not want their minors to access them; and

d.   Using the data collected on minors less than 13 years old to use a patented system of analyzing gamer behavior, tracking said minors with their respective gamer tag, and using a deceptive marketing of in-game purchases or prepaid cards to ensure minors remained engaged in the games which proximately caused the addiction and/or internet gaming disorder.

312.  Microsoft has independently and in concert with third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on and to trick minors, like Plaintiff O.A. into buying

microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

### *Switch, eShop and Switch Online: Nintendo*

313.   Nintendo is the manufacturer of the Nintendo Switch and Nintendo Switch Lite video gaming consoles (collectively, "Switch" or "Nintendo's Switch").

314.   The Switch is a hybrid gaming device that can be played on an OLED screen/tv or as a handheld console, offering users the flexibility and convenience of playing games anytime, anywhere:



15

315.   Switch allows users to play video games in hard copy, physical format or from a digital download. Switch is also designed for online gaming

---

15 https://www.nintendo.com/us/switch/

and online game purchases.

316.   In order for users to enable and use Switch as intended, Nintendo designed and provides consumers access to the Nintendo Store or "eShop," one of the systems used by Nintendo to market and sell Products (e.g. Minecraft and Fortnite) for Switch users to download and play:



16

17

---

16 https://www.nintendo.com/us/search/#q=minecraft&p=1&cat=gme&sort=df
17 https://www.nintendo.com/us/store/products/fortnite-switch/

317.  Another video gaming product designed, developed, supplied, and sold by Nintendo for use with Switch is Nintendo Switch Online, which is offered to individuals and families at a base level ($19.99/year) and an "Expansion Pack" level ($49.99/year).  Both options offer online play, access to hundreds of games, and a Nintendo Switch Online App that can be downloaded to a user's smartphone or tablet to access and play supported games like Fortnite and Minecraft.

318.  Upon information and belief, Nintendo utilizes the patented addictive technologies, systems, mechanisms identified herein, and other improper means to collect user data and market Products to consumers, including Plaintiffs.  Further, once a game or other video gaming product is downloaded to a user's Switch and/or a user's Nintendo Switch Online account, the user is exposed to all features of that product (including all addictive mechanisms and systems included therein).

319.  Upon information and belief, Nintendo provides video game developers (e.g. Epic Games, Microsoft/Mojang) a framework to initiate and process in-game purchases and microtransactions through the Nintendo eShop and Nintendo Switch Online. This framework enables game developers to sell microtransactions and/or loot boxes through the eShop and Nintendo Switch Online, and while the consumer is playing the video

game on Switch or on another device through their Nintendo Switch Online account. In exchange, Nintendo keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

320. Nintendo specifically designed Switch, eShop, and Nintendo Switch Online to attract users to use video game products and purchase in-game products therein—regardless of the content such games may include.

321. Nintendo also designed the Switch with a built-in web browser, which allows users (including minors) to access and use games such as Roblox that are not available in the Nintendo eShop or through Nintendo Switch Online.

322. Upon information and belief, Nintendo hires behavioral psychologists and neuroscientists to design its Switch consoles, the Nintendo eShop, Nintendo Switch Online, and its video games, as well as Nintendo's marketing efforts so as to attract potential users, especially minors and neurodivergent individuals.

323. Nintendo is aware that several of the video games that are available to be used via  Switch, and are available for download in the Nintendo eShop or play via Nintendo Switch Online, are designed to continuously encourage users to purchase in-game products and to be addictive, and thereby pose unreasonable risk of harm to users, particularly

minors and neurodivergent individuals.

324.   Nintendo does not adequately inform users of the inherent risks involved with using its Products, nor with using the games being used thereon, were designed to addict and harm users.

325.   Nintendo markets its own video game products and video game products manufactured, designed, and developed by third-parties, including the sale of virtual currencies and product upgrades for those products; to wit, Nintendo markets and sells Switch/Fortnite and Switch/Minecraft "bundle" products; V-Bucks, and Minecoins are marketed and sold in both digital and physical gift card forms to be used on and with Nintendo Products.

326. Nintendo markets Switch to minors and their families as a system that allows users to "Play anytime, anywhere" and to "Play at home or on the go" while knowing such use, and particularly the prolonged exposure, is more likely than not to cause harm and addictive behavior in users due to the design of those products—and without warning any consumer of the dangers and risks associated with such use.

327.   Nintendo designed the Switch, eShop, and Switch Online with addictive features, mechanisms, and systems to take advantage of the chemical reward system in users' brains users.

328. Nintendo designed the Switch, Nintendo eShop, and Switch

Online in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users and neurodivergent individuals continually purchase addictive products for play on the Switch.

329.  Nintendo designed the Switch with addictive features and with the intent that users use the Switch console to play addictive video games, and designed the eShop and Switch Online to sell, supply, store, and play addictive gaming products and, using patented technologies and other operant conditioning mechanisms, pushed users to purchase Products for use and play on the Switch, while knowing that extended play, abuse, and compulsive use by minors and neurodivergent individuals  can lead to addiction, brain damage, and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

330.  Nintendo failed to disclose that it designed Switch, eShop, and Switch Online with addictive features and that Nintendo's Products are designed to be used with and to entice users to purchase addictive products, despite knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to injury and, as such, the products pose significant risk of harm.

331.  Nintendo knew that Switch, eShop, and Switch Online, along

with the products made available thereon, contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom from playing video games available on the Switch, eShop, and Switch Online as described herein, but instead of disclosing such harms, Nintendo marketed its products as safe for use and extended play by all, including minors.

332. Nintendo misrepresented that its Switch, eShop, and Switch Online were safe for use by minors, while knowing that they was designed and developed with addictive features to keep users purchasing addictive products, and while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to injury, such that its products pose significant risk of harm to users, like Plaintiff O.A..

333. Nintendo knew that its Switch, eShop, Switch Online and Minecraft, and Fortnite contained an inherent risk of abuse, addiction, and compulsive use by minors and neurodivergent individuals, and the harms that arise therefrom, but intentionally marketed its products for use by the general public, including minors, and directed its misstatements towards users of these gaming products and other games designed, developed and utilizing the patents and technology described herein.

334. Nintendo, in connection with the Switch, eShop, and Switch

Online, engaged or engages in the following conduct:

    a.    Failing to notify parents that minors had open access to in-game purchases;

    b.    Collecting personal data from minors, including account information, content interaction, purchase information, location information, and health information, despite being aware that numerous minors were playing games through Nintendo Switch;

    c.    Requiring parents who requested that their minors' personal information be deleted to complete a number of steps to make such request; and

    d.    Requiring users or parents to take additional steps to opt out if they do not want unnecessary data collected;

    e.    Sharing personal information of minors with third parties, including service providers, game publishers, and Nintendo business partners, and failing to regulate how those third parties utilize the personal information;

    f.    Utilizing third parties to collect personal information and activity from minors without parental consent**;**

    g.    Using dark patterns to entice minors, including D.G., into

microtransactions without parental consent or consent of the account holder, including but not limited to attracting and enticing minors into microtransactions based on the minor-player's gaming behavior and their personal data (e.g., IP addresses, geolocation, voice) that is illegally collected, not deleted, or gained through passive tracking applications; and

h.  Collecting and retaining minors' voice and audio information.

335.  Nintendo has independently and in concert with third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on and to trick minors, like Plaintiff O.A. into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

336.  Nintendo did not inform and concealed from the public that it designed the Switch and eShop with addictive features, or that these products could be used to download addictive games and products, despite knowing that abuse, addiction, and compulsive use by minors and

neurodivergent individuals can lead to brain damage and injury.

### ***Google Play: Google***

337.  Google designed, developed, published, markets, and supplies the Google Play app, also known as the Google Play Store or Play Store and formerly Android Market, to consumers throughout the world, including in California.

338.  Google Play was launched on March 6, 2012.

339.  Google Play serves as a digital products store and makes applications, including Products, available for to consumers for download either for free or at a cost

340.  Through Google Play, Google provides a product-mechanism for users to download video games (e.g., Roblox, Minecraft) and play them on Android-based smartphones, and tablets, as well as personal computers:



18

---

[18] https://play.google.com/store/search?q=roblox&c=apps



[19]

341. Google makes other Products available to consumers for download and use through Google Play, including Xbox, PlayStation, and Switch products:



[20]

---

[19] https://play.google.com/store/search?q=minecraft&c=apps
[20] https://play.google.com/store/search?q=xbox&c=apps



21

342.  Once a game product (e.g., Roblox, Minecraft) is downloaded to the user's device, Google supplies the video gaming product and provides a framework for "in-app billing" to initiate and process transactions.

343.  To encourage developers to make video games available to consumers on Google Play, Google markets Google Play to game developers as a video game store that supports a variety of monetization strategies, including paid distribution, in-app products, subscriptions, and ad-based models.

344.  Google requires video game developers to use Google Play's payment system for in-game purchases and to comply with Google's Developer Policies.

---

[21] https://play.google.com/store/search?q=Nintendo&c=apps

345.  Google takes a percentage of all revenue generated by in-game microtransactions, in-app purchases, and subscriptions.  More specifically, from 2012-2016, Google took 30% of all revenue generated by in-game microtransactions, in-app purchases, and subscriptions.  From 2016 to the present, Google takes 15% of all such revenue.

346.  This app-monetization framework enables Google to profit from video game developers and publishers use of addictive designs and psychological tactics, including but not limited to the sale of microtransactions, loot boxes, and/or in-app subscription services in games available through Google Play.

347.  Upon information and belief, Google utilizes the patented addictive technologies, systems, and mechanisms identified herein and other improper means to collect user's data and market their Products to consumers, including Plaintiffs.  Further, once a game or other video gaming product is downloaded via Google Play to a user's device, the user is exposed to all features of that product (including all addictive mechanisms and systems included therein).

348.  Upon information and belief, Google provides video game developers (e.g. Roblox Corp., Microsoft/Mojang) a framework to initiate and process in-game purchases and microtransactions through Google Play.

This framework enables game developers to sell microtransactions and/or loot boxes through Google Play, and while the consumer is playing the video game on their device. In exchange, Google keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

349. Google specifically designed Google Play to attract users to purchase games and spend money on in-game microtransactions—regardless of the content or subject matter of the video game.

350. Upon information and belief, Google hires behavioral psychologists and neuroscientists to design Google Play and market its product in the best way possible to attract users, especially minors.

351. Google is aware that several of the games on available on Google Play contain addictive designs that pose an unreasonable risk of harm to users (particularly minors and neurodivergent individuals), yet Google markets these games to and profits from the download by the same users.

352. Google does not adequately inform users of the inherent risks involved with using Google Play or that Google Play—along with the games being played thereon—were designed to addict and harm users.

353. Google receive revenue for in-game purchases made on games downloaded through Google Play, including Roblox, Minecraft, and

Fortnite.[22]

354.   Google designed the Google Play app to house addictive gaming products and take advantage of the chemical reward system in users' brains in order to profit from users' purchases of addictive materials on Google Play.

355.   Google designed the Google Play app in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive video game products.

356.   Google designed, developed, published, marketed, and supplied Google Play to consumers as a product to purchase, download, and house addictive gaming products and pushed users to make purchases through Google Play, while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

357.   Google failed to disclose that it designed the Google Play app as a product for consumers to buy, download, and house addictive Products and, in conjunction therewith, push addictive video game products to users,

---

[22] [Epic Sues Google Over Fortnite's Removal From Play Store | TechRaptor](#) (Fortnite was temporarily removed from the Google Play Store but is now available for use after Epic sued Google over a profit-sharing dispute.)

while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm.

358.  Google designed Google Play as a product for consumers to buy, download, and house addictive Products and to take advantage of the chemical reward system of a user's brain to push users to make purchases through Google Play, and Google targeted video game developers to put their addictive gaming products on Google Play and marketed those products on Google Play as safe for use and without warning of risk of harm, and market Google Play as safe for use by all, including minors.

359.  Google knew that Google Play contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom from playing video games available on Google Play, as described herein, but instead of disclosing such harms, Google targeted video game developers to put their products on Google Play and marketed those products on Google Play as safe for use and without warning of risk of harm, and market Google Play as safe for use by all, including minors.

360.  Google knew that Google Play, as well as the video game products (e.g., Roblox, Minecraft, Fortnite) that it made or makes available to Google Play users, contained an inherent risk of abuse, addiction, and compulsive

use by minors and neurodivergent individuals, and the harms that arise therefrom—but intentionally marketed Google Play for use by the general public, including minors, and directed its misstatements towards users of Roblox, Minecraft, and other games designed, developed and utilizing the patents and technology described herein;

361. Google misrepresented that Google Play was safe for use by minors, while knowing that it was designed and developed with addictive features to keep users purchasing addictive purchase addictive video game products, and while knowing that abuse, addiction, and compulsive use by minors can lead to injury, such that its products pose significant risk of harm to users, like Plaintiff O.A..

362. Google did not inform and concealed from the public, parents, or users, including Plaintiffs, that it designed Google Play with addictive features, or that this product could be used to download addictive games and products, despite knowing that abuse, addiction, and compulsive use of these games and products by minors and neurodivergent individuals can lead to injury

363. Google, in connection with Google Play, engages or engaged in the following conduct:

     a.    Employing dark patterns in Google Play and in marketing

the video gaming products (e.g. Roblox, Minecraft) supplied by Google to the general public through Google Play, including, but not limited to, tricking minors into paying for goods or services that they did not want or intend to buy, whether the transaction involves single charges or recurring charges;

b.    Using dark patterns to entice minors, including O.A., into microtransactions without parental consent or consent of the account holder. For example, once the account holder downloads the app and a minor begins playing the game, purchases are disguised as play money whereby a minor is prompted to use or acquire seemingly fictitious currency. In reality, the minor is making an in-app purchase using real money and, unbeknownst to the account holder or minor, the minor is making multiple real purchases, ranging from $0.99 to $99.99 each, by simply tapping buttons to advance or obtain prizes within the game;

c.    Collecting personal information from minors who created a Google account without notifying their parents or obtaining their parents' consent, and by illegally retaining

minors' personal information;

d.   Automatically collecting and storing information about services used by minors, queries entered by minors, and YouTube videos watched by minors; and

e.   Collecting and retaining minors' voice and audio information.

364. Google, independently and in concert with third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on and to trick minors, like Plaintiff O.A., into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

### *Video Gaming Products that Incorporate Addictive Design Features Effect the User's Brain*

365. Video gaming products, like **DEFENDANTS**, that incorporate addictive design features effect the user's brain.

366. The prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 or 30. The executive control center of

the prefrontal cortex is essential to one's ability to healthfully weigh risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals which is arguably the explanation why young people are more likely to engage in hours of use while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes to draw upon, minor children as well as young adults are less able to weigh potential negative consequences and curb potentially harmful behavior like excessive use of video games, which furthers impact frontal lobe development.

367. Research has shown that prolonged use of video gaming products damages the prefrontal cortex of the user, causing a loss of grey matter, lower cognitive function, and an inability to regulate impulse control. Research has concluded that such use of video gaming products, including **DEFENDANTS'** gateway Products, may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders. Clinical evidence has shown that users addicted to online games experience biopsychological symptoms and complications, including symptoms traditionally associated with substance abuse and addiction, such as hangovers, changes in mood, adaptability, withdrawal, conflict, and recurrence symptoms.

368. Empirical studies indicate that gaming disorder is associated with detrimental health-related outcomes.

369. Brain imaging studies have shown that use of video gaming products, like **DEFENDANTS'** gateway Products, negatively affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

370. Brain imaging studies have shown structural changes in the brain, particularly a reduction in white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and grey-matter volume (associated with emotions, perception, memory, and motor control). Specifically, studies show several regions of the brain showed reduction in grey-matter volume in gaming disorder participants:



23

---

[23] Aviv Weinstein et al., *Neurobiological mechanisms underlying internet gaming disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

371.    Brain activation studies have shown that the use of video games causes changes in the reward and impulse control regions of the brain, and that gaming pictures or images activate regions of the brain in a way that is similar to the way the brain is activated in response to cue-exposure to drugs (whereby addicts are exposed to relevant drug cues to extinguish conditioned responses).

372.    Additional brain activation studies have shown that individuals with gaming disorders have impaired inhibitions, and that video game cues activate craving, attention, and executive function areas of the brain. Those cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain as a result of prolonged of video gaming products, including use of **DEFENDANTS'** gateway Products. Regions that showed activation in response to video game cues in gaming disorder participants in more than two studies are:



373.    Brain structural studies have shown alterations in the volume of

---

[24] *Id.*

the ventral striatum (a critical component of motor and reward systems in the brain) are possible as a result of changes in reward regions of the brain. One comparison study of young adults with a mean age of 24 revealed that individuals who engage in excessive use of video games tend to have lower cognitive function, particularly in areas of verbal ability and working memory.

374.   Other studies have shown that disordered and/or excessive use of video gaming products, like **DEFENDANTS'** gateway Products, leads to negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

375.   Research has shown that a minor child with a diagnosis of ADHD or autism is at a higher risk of developing video game disorder or addiction which can worsen ability to control impulsivity and result in brain damage. Research has shown that while use of video games may foster creativity in children, such potential benefits are outweighed by the negative aspects of the risk of developing addiction or disordered use of video gaming products, like **DEFENDANTS'** Products, which typically develop swiftly in children and neurodivergent individuals who use video gaming products, and particularly **DEFENDANTS'** gateway Products, for extended time periods.

376.   Video game play is associated with dopamine release similar in

magnitude to that of drug abuse and gambling. The increased dopamine releases in the brain can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is made unavailable.

377.   The use of **DEFENDANTS'** Products were designed to and do cause an intense dopamine release in the user that is similar in magnitude to that experienced by drug use or gambling. Dopamine is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages between one's nerve cells in the brain, as well as between one's brain and the rest of the body. Dopamine serves as the brain's all-important "reward center" and, in addition, plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minor children and particularly true in neurodivergent minor children, whose brains are still developing.

378.   The repetitive release of dopamine that was designed to and does occur in minor children who are users of the **DEFENDANTS'** Products, when used as intended, create, reinforce, and strengthen a dysregulated or dopaminergic neural pathway that propels the user to hyperfocus on using the products more and more, first at an increasing rate and then with

compulsive desire until the impulse to use the products develops into a disordered use or addiction. Those dysregulated neural pathways trigger addictive, compulsive, and impulsive behaviors outside of the gaming world consisting of life-altering impulsivity and inhibitory control behaviors that can and do cause a myriad of catastrophic physical, mental, and emotional disorders, symptoms, and injuries, including other addictions, significant withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage and/or negative consequences to cognitive processes, attention disorders, severe depression, morbid obesity, and other harmful effects, all to the severe detriment and damage to the minor child, and to the severe emotional detriment and pecuniary or economic damage to their families and caretakers, specifically including the Plaintiffs herein.

379.  Each Defendant specifically designed its products to addict and prey upon those users' developing brains; therefore, Each Defendant is aware that its Products are addictive and proximately cause harm to minors, young adults, and neurodivergent individuals

380.  Due to the psychological and addictive aspects of the games, many of **DEFENDANTS**' products have been banned in other countries to avoid the harm to children that all **DEFENDANTS** are causing daily in the

United States; however, no bans are in place here, and **DEFENDANTS** continue their pattern of addicting and harming our Nation's youth and their families, including Plaintiffs.

381. Each Defendant is aware that its Products are addictive and proximately cause harm to minors who use those products.

### *Plaintiffs' Injuries and Damages Proximately Caused by DEFENDANTS' Misconduct and Defective Products*

382. Plaintiffs in this matter have each suffered independent personal injuries and sequela thereto as a result of O.A.'s play use of the **DEFENDANTS'** defectively designed Products for their intended purpose and in a reasonably foreseeable manner.

383. Plaintiff O.A. began playing video games and using the **DEFENDANTS'** gateway Products between the ages of two (2) and five (5) years old, and has continued to use the products at an increasing, uncontrollable, compulsive, and addictive pace since that time.  More specifically, O.A. began using **DEFENDANTS'** gateway Products as follows: O.A. began playing Minecraft at approximately two (2) years old and plays or has played Minecraft using Xbox One, Xbox One X, a personal computer via Xbox Game Pass and the Xbox Network, Switch, and smartphones using Google Play and Xbox Game Pass; began playing Roblox at approximately three (3) years old and plays or has played Roblox on smartphones using

Google Play; and began playing Fortnite at approximately five (5) years old and plays or has played Fortnite using Switch, Xbox One, Xbox One X, and smartphones using Google Play.  O.A. is currently eleven (11) years old.

384.  O.A.'s introduction to **DEFENDANTS'** Products was a direct result of **DEFENDANTS'** marketing of those Products to and for use by children.  O.A. used and accessed **DEFENDANTS'** Products via in-store purchases, free and paid subscriptions upon purchase of gaming consoles and via Xbox Store and Xbox Game Pass, which provides access to all games identified herein as well as Microsoft's Xbox cloud gaming network and online servers through which the video gaming products may be used.

385.  Plaintiff O.A.'s use of the defective Products for their intended purpose and in a reasonably foreseeable manner that were negligently and intentionally designed to create disordered and addictive overuse in users, did so create in him a disordered, compulsive, and addictive desire and need to play with and use **DEFENDANTS**' Products at an increasing rate, to O.A.'s extreme detriment and to the exclusion of all other activities that O.A. had previously engaged as a minor child.

386.  Plaintiff O.A. rapidly became addicted to using **DEFENDANTS**' Products and said use was a substantial factor in causing their video game addiction, obsession with gameplay, increased need to play, loss of interest

of other activities, being deceitful in hiding gameplay time or in-game spending, playing video games to escape life, disruption of growth and loss of friendships education or activities, as well as other injuries, including severe withdrawal symptoms, suicidal ideation, sleep deprivation, and gamer's rage/aggression.

387.  O.A. spends approximately four (4) to six (6) hours per day using **DEFENDANTS**' Products, despite the extensive efforts of O.A.'s parent (and particularly Plaintiff Shane Ayers), as well as other family members and adults in O.A.'s life, to limit the time O.A. was and is using Products, a combination of several factors rendered and continue to render those efforts futile in terms of achieving a lifestyle where O.A. is able to stop using the products without severe withdrawal symptoms, and/or for any sustainable period of time or otherwise function as O.A. did prior to when they began using the gateway Products as identified herein. Likewise, despite parental efforts to limit product usage—efforts made astonishingly difficult, if not impossible, by the addictive design of **DEFENDANTS**' Products and the absence of workable or viable parental controls within each **DEFENDANTS**' product.

388.  Among those factors impeding Plaintiff Shane Ayers ability to control his child's Product usage and O.A.'s inability to restrict usage of

**DEFENDANTS'** Products is the fact that Plaintiff O.A. is and was an "video gaming addict" and thus exhibits compulsive, obsessive, and addictive behavior in their use of the products. O.A.'s video game addiction was and is proximately caused by **DEFENDANTS'** defective and dangerous Product design, the absence of parental controls and time-limit restrictions within the Products, the inclusion of cross-play (the ability to use the same video gaming product on and/or via different mechanisms, devices, or systems), design features that gave the false appearance to Plaintiff Shane Ayers that O.A. was playing far less than they actually were, and, finally, the **DEFENDANTS'** deception and resolve to not provide a warning to parents (including Shane Ayers) so as to disclose the addictive operant conditioning design incorporated into the Products so as to given them a meaningful opportunity to make an informed decision regarding the risks of using the products.

389. Plaintiff O.A.'s video game addiction occurred rapidly: within less than three (3) months of when O.A. began using **DEFENDANTS'** Products. Currently, O.A. uses two or more of **DEFENDANTS'** Products approximately ten (10) hours per day and has spent thousands of hours, in total, using **DEFENDANTS'** Products.

390. O.A. spends more time using the **DEFENDANTS'** Products

than they engage in any other activity, including sleeping, socializing or spending time with their family, physically exercising, receiving educational instruction, or playing sports, and it is, because O.A. is an addict, the only activity O.A. desires to do and needs to do in order to avoid withdrawal symptoms. Since beginning to use **DEFENDANTS'** Products, O.A. has been diagnosed with depression and ADHD. Further, as a result of the video gaming addiction and injuries, including the brain damage and slowed cognitive development, caused by O.A.'s use of **DEFENDANTS'** Products, O.A. requires medical treatment, including out-patient counseling, and specialized educational therapy, including private tutoring and an independent education plan ("IEP" or "504" plan) at school.

391.    Plaintiff O.A.'s addiction to using the **DEFENDANTS'** Products is compulsive and disordered and O.A. is incapable of restraining themselves as are others around O.A. incapable of precluding them from using the products, and any attempt on their part to do so was and is met with severe withdrawal symptoms, suicidal ideation, anger and rage that is injurious and harmful to O.A. and their parent, Shane Ayers.

392.    Plaintiff O.A.'s addictive use of the **DEFENDANTS'** Products necessitates their need to chronically spend their parents' money during and throughout the hours O.A. uses the products, at least, on average $1,000.00

per year. O.A. spends their parents' money and money they've been gifted or earned in this way via gift cards to purchase in-game transactions and downloadable products that are available in and accessible through the **DEFENDANTS'** Products as well as through several subscription services through which the products are used (e.g. Xbox Game Pass). Thus, while video gameplay is ostensibly "free", the spending of real money is integral to the ability of a player, like O.A., to use the Products for their full intended purpose and the microtransactions on which that money is spent are an integral part of the inextricable tether between operant conditioning and addictive behaviors that generate revenue for the **DEFENDANTS**.

393.  Plaintiff O.A. has received varied forms of treatment for their disordered and addicted use of the **DEFENDANTS'** Products due to their parents' considerable and consistent care and efforts to help O.A., albeit at a significant financial cost. O.A., to that end, has received intensive psychiatric out-patient care, and may require private tutoring because of their inability to attend traditional school. O.A. suffers physically, mentally, and emotionally from the injuries and harm caused by their use of the **DEFENDANTS'** addictive products.

394. Plaintiff Shane Ayers has been injured and damaged by **DEFENDANTS'** deception and decision to design their Products to be

addictive and, therefore, harmful to children like O.A.; to wit, Shane Ayers has experienced his own mental anguish, emotional distress, pain, and suffering due to **DEFENDANTS'** intentional, deceptive, fraudulent, willful, immoral, reckless, and unlawful facts with respect to the design, manufacture, distribution, marketing, sale, and supply of their Products – and he is reasonably likely to continue experiencing those injuries and damages because of the ongoing harm caused by **DEFENDANTS'** Products and deception.

395.   Because of **DEFENDANTS'** acts and omissions with respect to their Products, as described herein, Shane Ayers has lost his ability to control his child's use of **DEFENDANTS'** Products and, if he is able to restrict O.A.'s usage, he worries about O.A.'s mental and physical condition – and fears for O.A. and his own well-being – when the Products are taken away. Further, because of O.A.'s video game addiction, even if Shane Ayers is successful in restricting Product usage, O.A. will engage in deceptive and furtive actions to obtain access to the Products and play video games.

## **PLAINTIFFS' CLAIMS**

396. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

397.   Through the exercise of reasonable diligence, Plaintiffs could not

have discovered that **DEFENDANTS**' products caused their injuries because, at the time of their injuries, the cause was unknown to Plaintiffs.

398. Plaintiffs did not suspect and had no reason to suspect **DEFENDANTS**' products caused their injuries until within the last year.

399. Due to the highly technical nature of the **DEFENDANTS**' products, Plaintiffs were unable to independently discover that **DEFENDANTS**' products caused their injuries until within the last year.

400. **DEFENDANTS** had exclusive knowledge of the material defects designed and implemented into their products, and they have at all times through the present failed to disclose these designs.

401. **DEFENDANTS**' fraudulent concealment has tolled the running of any statute of limitations.

402. **DEFENDANTS** had a duty to disclose dangerous and defective features of their products that cause foreseeable harm to users—especially children and teens.

403. **DEFENDANTS** knowingly, affirmatively, and actively concealed from Plaintiffs the risks associated with the defects of their products and that these products caused their injuries.

404. **DEFENDANTS**' tortious and fraudulent acts continue to this day; as of the date of this *Amended and Supplemental Complaint and*

*Demand for Jury* Trial, **DEFENDANTS** have not disclosed, and continue to conceal, that they designed and implemented dangerous features into their products.

405.  Despite their knowledge of the defects and their attendant safety risks, **DEFENDANTS** continue to market their products to children and teens—and even their educators—while simultaneously omitting the disclosure of known and foreseeable harms.

406.  Plaintiffs were unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of **DEFENDANTS**' acts and omissions.

407.  For the foregoing reasons, **DEFENDANTS** are estopped from relying on any statutes of limitations or repose as a defense in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by **DEFENDANTS**' active concealment with respect to all claims against **DEFENDANTS**.

**COUNT I**
**STRICT LIABILITY - DEFECTIVE DESIGN**

408. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as though set forth fully herein.

409. At all relevant times, each Defendant was engaged in the

business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and/or otherwise distributing the video gaming products used by O.A..

410. The **DEFENDANTS**, at all relevant times, have marketed and advertised the video gaming products at issue herein throughout the United States, including in Florida, for personal use by end-users/consumers of all ages, including minor children, and specifically Plaintiff herein.

411. The **DEFENDANTS** are, individually and/or in concert with one another, designers, manufacturers, marketers, sellers, developers, licensors, licensees, patent holders, and otherwise participants in placing into the stream of commerce the defective video gaming products, whether in design or in failing to warn about, and each is strictly liable to Plaintiffs herein for the harm and injuries and damages said products caused.

412. Each Product is designed as, and intended to be used for, video gameplay by end-users/consumers of all ages, including minors and young adults, throughout the world, including in Florida.

413. Each Defendant markets and advertises their Products, in Florida and throughout the United States, for personal use and video gameplay by end-users/consumers of all ages, including minors and young

adults.

414. The Products the **DEFENDANTS** placed into the stream of commerce were defectively designed; to wit, designed to cause addictive and compulsive use of the products, including by minor children, and which did in fact and proximately cause addictive, disordered use by O.A. and injuries and damages as a result.

415. Each Defendant defectively designed its Products to addict minors and young adults who were particularly unable to, and did not, appreciate the risks posed by the products and were particularly susceptible to harm from those products.

416. The design defects were present in the **DEFENDANTS'** Products when the products left the hands of the **DEFENDANTS** and, as such, were unreasonably dangerous at the time they were released to the general consuming public to be used in their intended and foreseeable manner.

417. The defects in the design of each Defendant's Products existed prior to the release of these products to O.A. and the public, and there was no substantial change to any of the products between the time of their manufacture (in regard to consoles or physical game copies) and the time of their distribution to O.A. via download or URL access (in regard to digital

game copies and cloud gaming).

418.  O.A. used these products as intended and in a manner reasonably anticipated, and each Defendant knew or, by the exercise of reasonable care, should have known that O.A. would use these products without Plaintiffs inspecting them for and/or being unable to discover their addictive nature.

419.  Each Defendant defectively designed its Products in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users, and to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, and/or neurodivergent user) to create and cause addictive engagement, compulsive use, and additional mental and physical harm.

420. Each Defendant's Products are defective in design and unreasonably dangerous when put to a reasonably anticipated use for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner.

421.  Youth, including O.A., and young adults are among the ordinary consumers of each Defendant's products.

422. Minors and young consumers, and their parents and guardians,

do not expect: (a) **DEFENDANTS**' products to be psychologically and neurologically addictive when the products are used in its intended manner by its intended audience; (b) the patented design strategies and other features embedded by each Defendant in its Products to make them initially and progressively more stimulative, to maximize young consumers' usage time and consequently addict them; or (c) each Defendant's revenues to be directly tied to this addictive mechanism and young consumer spending more time and money in downloadable in-game products and/or microtransactions.

423. Each Defendant's Products are likewise defectively designed such that it creates an inherent and unreasonable risk of danger; specifically, a risk of brain damage in and abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals leading to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

424. The **DEFENDANTS'** Products did cause users to develop a disordered, compulsive, and addictive use of those products, including O.A., to their detriment and harm, and that of their caregiver, Shane Ayers.

425. The **DEFENDANTS**' Products were defective and unreasonably

dangerous when they left the **DEFENDANTS**' video gaming possession and control. The defects continued to exist through the products' distribution to and use by consumers, including O.A., who used the products without any substantial change in the products' condition.

426. Said defective designs of the **DEFENDANTS'** Products was and continues to date to be suppressed and concealed by the **DEFENDANTS** with the purpose and intention of taking advantage of the chemical reward system of the user's brain (especially a minor's brain) to create addictive engagement and compulsive use of the Products, without regard for consequential mental and physical harm. Said series of intentions and conduct of the **DEFENDANTS** resulted in harm and damages to the Plaintiffs as alleged herein.

427. The **DEFENDANTS**' products did not perform as safely as an ordinary consumer would have expected, are more dangerous than other Products because they were intentionally designed to be addictive to those using them, and specifically to minor children users, which causes a myriad of potential injuries and harm and damages, and which here did result from O.A.'s use of **DEFENDANTS**' Products.

428. The risks inherent in the design of each Defendant's Products significantly outweigh any benefit of such design.

429. Each Defendant could have utilized cost-effective, reasonably feasible alternative designs including software design changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to:

a. Choosing not to use "addictive" patents identified herein in the game design;

b. Redesigning gaming software to limit rather than promote addictive engagement;

c. Implementing robust age verification;

d. Implementing effective parental controls;

e. Implementing effective parental notifications;

f. Warning of health effects of use and extended use upon sign-up or log-in;

g. Implementing default protective limits to the length and frequency of gaming sessions;

h. Implementing opt-in restrictions to the length and frequency of gaming sessions;

i. Implementing self-limiting tools, including but not limited to game play time notifications, warnings, or reports;

j. Implementing blocks to use during certain times of day (such as

during school hours or late at night);

k.    Implementing limits on number of games playable per day;

l.    Implementing limits on the strategic timing and clustering of offers and/or assignments and challenges to keep players engaged and playing longer;

m.    Implementing limits on minors' in-game purchases, downloadable content, microtransactions, and total in-game spending per day;

n.    Designing products that did not include the defective features listed in this Complaint while still allowing users to engage with games without addictive engagement; and

o.    Others as set forth herein.

430. Alternative designs were available that would reduce neurodivergent users, young adults, and minors' addictive and compulsive engagement with each Defendant's Products, and which would have effectively served the same purpose of **DEFENDANTS**' products while reducing the gravity and severity of danger posed by those products' defects.

431. O.A. used **DEFENDANTS**' products as intended and/or in reasonably foreseeable ways.

432. As a direct and proximate result of their use of **DEFENDANTS**'

defectively designed products, O.A. sustained physical and mental injuries, emotional distress, pain, suffering, mental anguish, and economic injuries and damages.

433.   O.A.'s injuries and damages were reasonably foreseeable to each Defendant at the time of their Products' development, design, advertising, marketing, promotion, and distribution, especially considering each Defendant's conduct—described herein and including, but not limited to, specifically designing their Products to be addictive.

434.  The defective design of the **DEFENDANTS'** Products used by O.A. was a substantial factor in causing harm to O.A.

435.  As a direct and proximate result of **DEFENDANTS**' Products' defective design, O.A. became a video game addict and  sustained injuries, which include brain damage, loss of cognitive function and ability to regulate impulsivity, decline in ability to learn and be educated, mental harm, emotional distress, pain, suffering, and mental anguish.

436. O.A. were injured as a direct and proximate result of the **DEFENDANTS**' defective Products, as described herein, and Plaintiffs suffered economic damages as a result thereof.

437.  The defective design of **DEFENDANTS**' Products, as identified and described herein, is a proximate cause of the harm and injuries to O.A.

438. Plaintiffs' damages, which were proximately caused by **DEFENDANTS**' defective design, are O.A.'s physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; O.A.'s inability to attend school; economic loss related to expenses incurred as a result of using **DEFENDANTS**' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to O.A.'s physical and mental injuries. O.A.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

439. **DEFENDANTS** are strictly liable due to the defective design of their Products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

440. Each Defendant, in defectively designing their Products, acted with intent, reckless disregard, and a depraved indifference to the consequences of its conduct on end-users/consumers on the health, safety, and welfare of its customers (including minors, young adults, and neurodivergent users).

441. The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

442.  The nature of the intentional and fraudulent acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using **DEFENDANTS**' Products. As a proximate result of **DEFENDANTS**' conduct in making their games addictive, O.A. continue to use **DEFENDANTS**' Products. While O.A. use **DEFENDANTS**' Products, Plaintiffs will not be able to independently verify whether **DEFENDANTS**' Products continue to pose an unreasonable risk or rely on **DEFENDANTS**' respective representations in the future.

## COUNT II
## STRICT LIABILITY – FAILURE TO WARN

443.  Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

444.  At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the Products used by O.A..

445.  Each Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public, in Florida and throughout the United States, for the personal use of the end-user/consumer.

446. Each Defendant's Products are also marketed and advertised to minors, young adults, and neurodivergent individuals in Florida and throughout the United States.

447. None of **DEFENDANTS**' products, as identified herein, contain a warning—nor have **DEFENDANTS** ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors, young adults, and neurodivergent individuals.

448. None of **DEFENDANTS**' products, as identified herein, contain a warning—nor have **DEFENDANTS** ever warned the public—that their products pose a higher risk of addiction, worsening of an ability to control impulsivity, and brain damage in neurodivergent individuals, including individuals with a diagnosis of ADHD, autism, or ODD.

449. Each **DEFENDANTS** sold and distributed its Products to O.A. in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to youth as described herein, including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

450. Each Defendant's Products are dangerous, to an extent beyond

that contemplated by the ordinary user who used **DEFENDANTS**' products, because they cause brain damage and encourage unhealthy, addictive engagement, and compulsive use.

451. Each Defendant knew or, by the exercise of reasonable care, should have known that its Products posed risks of harm to youth, young adults, and neurodivergent users considering its own internal information and knowledge regarding its products at the time of development, design, marketing, promotion, advertising, and distribution.

452. **DEFENDANTS**' Products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things:

    a.    **DEFENDANTS**' Products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries;

    b.    Defendants' Products harvest and utilize user data in such a way that increases a user's risk of addiction to these products and simultaneous physical and mental injuries;

    c.    The feedback loops and strategized patented material in **DEFENDANTS**' Products are designed to promote increasingly stimulative and alarming gameplay to encourage compulsive engagement by the user, raising the risk of mental health harms,

including but not limited to addiction;

d.    New users of **DEFENDANTS**' Products can identify themselves as minors, begin to use the product, and do so indefinitely, without any time or usage limitations, without any spending limitations, without ever receiving a safety warning, and without ever having to provide information so that each Defendant can warn the users' parents or guardians;

e.    The likelihood and severity of harms is greater for minors and young adults, especially those who are neurodivergent; and

f.    The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another and by patented technology and code design, some of which is currently publicly unknown and hidden from users.

453.    Ordinary users could not and/or would not have recognized the potential risks of **DEFENDANTS**' Products when used in a manner reasonably foreseeable to each **DEFENDANT**.

454.    **DEFENDANTS**' Products were defective and unreasonably dangerous when they left the **DEFENDANTS**' possession and control without reasonable instructions and/or warnings regarding the harm outlined herein.

455. Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using **DEFENDANTS**' Products, Plaintiffs would have heeded the warnings and/or instructions.

456. Each Defendant's failure to adequately warn Plaintiffs about the risks of its defective products was a proximate cause and a substantial factor in the injuries sustained by Plaintiffs.

457. Each Defendant, in failing to warn consumers and end-users that their Products were addictive and have a risk of harm (including but not limited to brain damage), acted with intent, reckless disregard, and a depraved indifference to the consequences of its conduct on end-users/consumers on the health, safety, and welfare of its customers (including minors, young adults, and neurodivergent users).

458. As a direct and proximate result of each Defendant's failure to warn, O.A. have required and will require more healthcare and services and did incur medical, health, incidental, and related expenses, as described herein.

459. **DEFENDANTS** are strictly liable due to each Defendant's failure to warn of the risks, dangers, and harm posed by their Products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described

herein.

460.  Plaintiffs' injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

461.  The nature of the fraudulent and unlawful acts that created safety concerns for O.A. are not the type of risks that are immediately apparent from using **DEFENDANTS**' Products. As a proximate result of the **DEFENDANTS**' conduct in making their games addictive, O.A. continue to use **DEFENDANTS**' Products. When O.A. use **DEFENDANTS**' Products, Plaintiffs will not be independently able to verify whether **DEFENDANTS**' Products continue to pose an unreasonable risk or rely on **DEFENDANTS**' representations in the future.

## COUNT III
## NEGLIGENCE – NEGLIGENT DESIGN

462. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

463. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the Products used by O.A..

464. Each Defendant's products are designed and intended to be

gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

465.  Each Defendant's Products are also marketed and advertised to minors and young adults in Florida and throughout the United States.

466.  Each Defendant knew or, by the exercise of reasonable care, should have known, that its Products were dangerous, harmful, and injurious when used by youth, young adults, and neurodivergent individuals in a reasonably foreseeable manner.

467.  Each Defendant knew or, by the exercise of reasonable care, should have known that its Products posed risks of harm to youth, young adults, and neurodivergent individuals. These risks were known and knowable in light of each Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to O.A.

468.  Each **DEFENDANT** knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the **DEFENDANTS**' Products. Those risks include brain damage, abuse, addiction, and compulsive use in youth, young adults, and neurodivergent individuals, and which can lead to a cascade of negative effects including but not limited to

dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

469. Each Defendant knew that minors, young adults, and neurodivergent individuals would use its Products.

470. Despite this knowledge, each Defendant designed its Products to create addictive engagement and compulsive use, including spending, in foreseeable users, including Plaintiffs.

471. Each Defendant, as video gaming product designer, manufacturer, publisher, importer, distributor, and/or supplier, had a duty to design, manufacture, and supply a product that is reasonably safe for use.

472. Each Defendant had a non-delegable duty to use ordinary care in its design and to package the product in order to protect those who will use it and who are in the area of its use from unreasonable risk of harm while it is being used for its intended purpose or while it is being used for any purpose which should reasonably be expected by the manufacturer.

473. Each Defendant owed a duty to design, publish, supply, and sell reasonably safe products to foreseeable users, including O.A.

474. Each Defendant owed these duties to Plaintiffs, and particularly to O.A. as the foreseeable end-users.

475. Each Defendant breached the duties owed to Plaintiffs, and

particularly to O.A.  These breaches include, but are not limited to:

a.  Utilizing patented designs and technology for purposes of addicting users to the Defendant's Products;

b.  Failing to use ordinary care in the design of its products by negligently designing them with features and patented technology as described above that specifically are addictive and harmful to youth, who are particularly unable to appreciate the risks posed by the products;

c.  Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

d.  Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

e.  Failing to use ordinary care in the design of its products by negligently designing its products with features and patented technology as described above that created or increased the risk of brain damage, abuse and addiction in youth, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation,

negative consequences on cognitive processes, and other harmful effects;

f.     Failing to use ordinary care to use cost-effective, reasonably feasible alternative designs, including changes to feedback loops and the addictive features described above, and other safety measures, to minimize the harms described herein; and

g.     Otherwise failing to use ordinary care in the design of the products.

476. Alternative designs that would reduce the addictive features of **DEFENDANTS**' Products were available, would have effectively served the same purpose as each Defendant's defectively designed products, and would have reduced the gravity and severity of danger **DEFENDANTS**' Products posed minors, young adults, and neurodivergent individuals, including the danger and harm experienced by O.A.

477. A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

478. At the time each **DEFENDANTS** put its products into the market in Florida and throughout the United States, the products were defective as outlined herein, and at the time O.A. received and used each Defendant's products, the products remained defective.

479.  At all relevant times, O.A. used the **DEFENDANTS**' Products in the manner in which they were intended by **DEFENDANTS** to be used.

480.  As a direct and proximate result of each Defendant's breached duties, Plaintiffs were harmed.

481.  The **DEFENDANTS**' design of their Products was a substantial factor in causing the Plaintiffs' harm and injuries, as described herein.

482.  As a direct and proximate result of each Defendant's breached duties, O.A. have required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

483.  As a direct and proximate result of each Defendant's breached duties, Plaintiffs have suffered—and continue to suffer—economic loss and damages, as described herein.

484. **DEFENDANTS** negligently designed their Products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

## COUNT IV
## NEGLIGENCE – NEGLIGENT FAILURE TO WARN

485.  Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

486.  At all relevant times, each Defendant was engaged in the

business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the Products used by used by O.A..

487.  Each Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

488.  Each Defendant's Products are also marketed and advertised to minors and young adults in Florida and throughout the United States.

489.  Each Defendant knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth, young adults, and neurodivergent individuals.

490.  Each Defendant knew or, by the exercise of reasonable care, should have known that its Products posed risks of harm to youth. These risks were known and knowable in light of each Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to O.A.

491.  Each Defendant knew, or by the exercise of reasonable care,

should have known, that ordinary consumers such as O.A. would not have realized the potential risks and dangers of the **DEFENDANTS**' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

492. Each Defendant knew that minors, including O.A., would use its Products.

493. **DEFENDANTS** failed to give appropriate warnings about the risks of their products. None of **DEFENDANTS**' products, as identified herein, contain a warning—nor have **DEFENDANTS** ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors, young adults, and neurodivergent individuals.

494. None of **DEFENDANTS**' products, as identified herein, contain a warning—nor have **DEFENDANTS** ever warned the public—that their products pose a higher risk of addiction, worsening of an ability to control impulsivity, and brain damage in neurodivergent individuals, including individuals with a diagnosis of ADHD, autism, or ODD.

495. Had Plaintiffs received proper or adequate warnings about the risks of **DEFENDANTS**' Products, Plaintiffs would have heeded such

warnings.

496. Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product for a purpose and in a manner which the manufacturer should reasonably foresee.

497. Each Defendant had a duty to warn and/or instruct about particular risks of their Products, both before and after leaving a Defendant's possession.

498.  Each Defendant owed these duties to users including O.A.

499.  Each Defendant breached the duties owed to O.A., a foreseeable user. These breaches include, but are not limited to:

a.   Failing to warn users that **DEFENDANTS**' Products cause brain damage, addiction, compulsive use, and/or other simultaneous physical and mental injuries;

b.   Failing to otherwise provide reasonable and adequate warnings to Plaintiffs, as set forth above, about the dangers inherent or reasonably foreseeable posed by the use of each Defendant's product;

c.   Failing to adequately instruct Plaintiffs regarding the risks of each Defendant's Products and the need to alter O.A.'s game play

to avoid such risks; and

d.  Otherwise failing to warn and/or instruct product users, including Plaintiffs, of the risk and harm associated with normal, foreseeable, and intended use of **DEFENDANTS**' Products.

500.  A reasonable company under the same or similar circumstances as **DEFENDANTS** would have used reasonable care to provide adequate warnings to consumers, including the parents of minor users, as described herein.

501.  At all relevant times, each Defendant could have provided adequate warnings and/or instructions to prevent the harm and injuries described herein but failed to do so.

502.  Had Plaintiffs received proper or adequate instructions regarding the risks of **DEFENDANTS**' Products and the need to alter their game play to avoid such risks, Plaintiffs would have heeded such warnings.

503.  As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate warnings, Plaintiffs were harmed and sustained the injuries set forth herein. Each Defendant's failure to provide adequate and sufficient warnings was a substantial factor in causing harm to Plaintiffs.

504.  Each Defendant negligently failed to warn consumers, including

Plaintiffs, of the risks, dangers, and harm posed by their Products, as identified herein, and that negligence proximately caused harm to Plaintiffs; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

**COUNT V**
**NEGLIGENCE – ORDINARY**

505.  Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

506.  Each Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public in Florida and throughout the United States for the personal use of the end-user/consumer.

507.  Each Defendant's Products are also marketed and advertised to minors and young adults in Florida and throughout the United States.

508.  Each Defendant owed O.A. a duty to act as a reasonably careful company would under the circumstances.

509.  Each Defendant has breached the duties owed to O.A.

510.  A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or

other physical or mental injuries); yet each Defendant did just that.

511. A reasonably careful company would protect O.A. from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

512. A reasonably careful company would not invite, encourage, or facilitate youth, such as O.A., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

513. A reasonably careful company would disclose that it designed its video gaming product(s) with addictive properties to take advantage of the chemical reward system of a user's brain, to create addictive engagement, and would disclose the serious safety risks presented by its Products; yet each Defendant failed to do so while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects

514. O.A. was a foreseeable users of the **DEFENDANTS**' Products.

515. Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of O.A.'s use of

**DEFENDANTS**' Products.

516.  Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its Products (as developed, set up, managed, maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious when used by youth such as O.A.  in a reasonably foreseeable manner.

517.  Each Defendant knew this or should have known this because each designed their Products with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, physical damage to the brain, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

518.  At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its Products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth such as O.A., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

519.  Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its Products, such as O.A.,

would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

520.  Each Defendant's conduct was closely connected to O.A.'s injuries and Plaintiffs' damages, which were highly certain to occur.

521.  Each Defendant could have avoided Plaintiffs' injuries with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its Products which harmed O.A..

522.  Each Defendant's failure to act as a reasonable company would under similar circumstances harmed Plaintiffs.

523.  A reasonable company engaged in the manufacture, design, development, and supply of Products to minors would comply with federal and state laws designed to protect children in online spaces (e.g., 15 U.S.C. § 6501 *et seq*., and the corresponding federal regulations, 16 C.F.R. § 312 *et seq*., Fla. Stat. § 501.1735); yet the **DEFENDANTS** did not do that.

524.  Each Defendant has improperly and illegally collected or used

personal information from children younger than age 13 by, at least:

a.   Failing to provide through their video gaming websites and apps a clear, understandable, and complete direct notice to parents or guardians that described each Defendant's respective practices regarding the collection, use, or disclosure of children's personal information, in violation of 16 C.F.R. § 312.4(a) and (c);

b.   Failing to make reasonable efforts, and/or take into account available technology, to ensure parents or guardians received such notice on their websites and applications so that parents or guardians could provide informed consent, in violation of 16 C.F.R. § 312.4(b)-(c);

c.   Failing to obtain verifiable parental or guardian consent before any collection, use, or disclosure of personal information from children, in violation of 16 C.F.R. § 312.5(a)(1);

d.   Processing the personal information of minors, including O.A., with actual knowledge of and in willful disregard that the processing of that information may result in substantial harm or privacy risk to O.A.;

e.   Profiling minors, including O.A., without appropriate safeguards in place to protect children, and without such profiling of minors,

including O.A., being necessary for the function of the Products and/or without demonstrating that such profiling does not pose a threat to minors, including O.A.;

f.    Collecting, selling, sharing, and retaining personal information of minors, including O.A., that is not necessary to use **DEFENDANTS'** Products;

g.    Using the personal information of minors, including O.A., for reasons other than the purpose for which the personal information is collected, including but not limited to selling that information to third-parties and using such information for advertising, marketing, and design purposes;

h.    Collecting, selling, and sharing any precise geolocation data of children, including O.A., including but not limited to selling that information to third-parties and using such information for advertising, marketing, design, and matchmaking purposes;

i.    Collecting any precise geolocation data of children, including O.A., without providing an obvious sign to the child for the duration of the collection that the precise geolocation is being collected;

j.    Using dark patterns that lead or encourage children to provide

personal information beyond what personal information would otherwise be reasonable expected to be provided for the use of **DEFENDANTS**' Products, including but not limited to using dark patterns in matchmaking systems, marketing, microtransactions, and other product design features;

k.   Using any personal information collected from users, including O.A., to estimate their age or age range for purposes beyond age verification;

l.   Retaining personal information collected from users, including minors like O.A., longer than necessary to estimate the users age; and

m.   Otherwise acted in conflict with state and federal law regarding the protection of children in online spaces, which includes **DEFENDANTS**' Products.

525.   At all relevant times, each Defendant collected and/or used personal information from children—including O.A.,—using **DEFENDANTS**' Products in the ways described above; the **DEFENDANTS'** actions were negligent.

526.   Each Defendant has actual knowledge that it collects personal information, including but not limited to avatars generated from a child's

image, biometric and health information, and geolocations, directly from users of its respective websites or online services; the **DEFENDANTS**' collection of this information is negligence.

527. Each Defendant utilizes data collected users' personal information to design and develop new products and microtransactions, and also uses the collected personal information with algorithms and other patented technologies to target product users.

528. Each Defendant's negligent acts and omissions in violation of state and federal law harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minor into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

529. Each Defendant's actions with respect to their Products at issue fell below that which a reasonable company would do when knowingly designing and marketing toys for children; to wit, reasonable companies would not (as **DEFENDANTS** did here):

      a. Profile children in order to prey on the minors and trick minor into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal

dark patterns and/or to knowingly target minors to addict them to **DEFENDANTS**' products so **DEFENDANTS** can increase profits as much as possible;

b. Process children's information with a willful disregard for the harms outlined herein; and

c. Collect and retain information not necessary to provide an online service, product, or feature with which a child is actively and knowingly engaged posing an unnecessary and unreasonable risk of harm to children.

530.  Each Defendant owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the risk of using **DEFENDANTS**' Products that were known to each Defendant, or that each Defendant should have known through the exercise of reasonable care, and how to alter regular gameplay in order to avoid such risks; yet, no Defendant provided any such instruction.

531.  Each Defendant has breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of Defendants' Products.

Those breaches include:

    a.    Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including O.A.;

    b.    Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including O.A., including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    c.    Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including O.A.;

    d.    Including features and patented technology in their Products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of

the product by youth, including O.A.;

e. Including features and patented technology in their Products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including O.A., including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f. Including features and patented technology in their Products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including O.A.;

g. Developing, patenting, and licensing unreasonably dangerous features and algorithms for Products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of children, like O.A.;

h. Maintaining unreasonably dangerous features and algorithms in

their Products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of children, like O.A.; and

i.  Facilitating use of their Products by youth under the age of 13, including by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols.

j.  Failing to implement effective protocols to block users under the age of 13;

k.  Failing to implement effective parental controls;

l.  Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

m.  Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content, product upgrades, and/or microtransactions;

n.  Failing to implement reasonably available means to limit or deter

use of products by youth during ordinary times for school or sleep;

o.    Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users; and

p.    Otherwise failing to act as a reasonable company would under similar circumstances.

532.    Each Defendant further breached the duty owed to recognize the safety risks posed to such users from **DEFENDANTS**' interactive online Products.

533.    A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users like O.A.; yet **DEFENDANTS** did not do this. This was a breach of duties owed to Plaintiffs.

534.    As a direct and proximate result of each Defendant's breach of one or more of its duties, O.A. have been injured and harmed. Such injuries and harms include addiction to, or compulsive or excessive use of, **DEFENDANTS'** products, and a cascade of resulting negative effects,

including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

535.  As alleged herein, each Defendant's breach of one or more of its duties is a proximate cause of O.A.'s injuries and damages.

536.  As a direct and proximate result of each Defendant's breach of duties, each Orellana child has and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

537.  Each Defendant was negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VI
## GROSS NEGLIGENCE

538.  Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

539.  Each Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public in Florida and throughout the United States for the personal use of the end-user/consumer.

540. Each Defendant's Products are also marketed and advertised to young adults and minors, including O.A.

541. Each Defendant owed O.A. a duty to act as a reasonably careful company would under the circumstances.

542. A reasonably careful company would not create an imminent and/or clear and present danger from and in the use of its products (including an imminent risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

543. A reasonably careful company would protect O.A. from imminent and/or a clear and present danger from and in the use of its products; yet each Defendant failed to do that.

544. A reasonably careful company would not invite, encourage, or facilitate youth, including O.A., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

545. A reasonably careful company would disclose the serious safety risks presented by its Products; yet each Defendant failed to do that; to with, each Defendant failed to disclose that it designed its Products with addictive properties, including but not limited to using technologies, algorithms, and

psychological tricks within the game to keep users engaged and using Products, despite knowing that abuse, addiction, and compulsive use by foreseeable users, *e.g.*, minors and neurodivergent individuals, can lead to brain damage and injury and, as such, the products pose significant risk of harm.

546.   O.A. was a foreseeable users of each Defendant's Products.

547.   Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of O.A.'s use of each Defendant's Products.

548.   Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its Products (as developed, set up, managed, maintained, supervised, and operated by that Defendant) created an imminent risk and/or clear and present danger when used by youth, including O.A., in a reasonably foreseeable manner.

549.   At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its Products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed imminent and/or clear and present danger to youth, including O.A., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

550. Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its Products, including O.A., would not have realized the dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

551. Each Defendant owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the risk of using Defendants' Products that were known to each Defendant, or that each Defendant should have known through the exercise of reasonable care, and how to alter regular gameplay in order to avoid such risks.

552. Each Defendant designed, developed, managed, operated, tested, produced, manufactured, labeled, marketed, advertised, promoted, controlled, supplied, leased, sold, and/or otherwise distributed its products, which **DEFENDANTS** knew or should have known posed imminent and/or clear and present danger, throughout Florida and the United States with a conscious disregard of the consequences described herein.

553. Each Defendant's conduct was closely connected to Plaintiffs'

injuries and damages, which were highly certain to occur.

554.  Each Defendant could have avoided Plaintiffs' injuries and damages with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its Products which harmed O.A.

555.  Each Defendant failed to recognize safety risks posed to minors using interactive online products, such as **DEFENDANTS**' Products, and grossly breached the duty owed to O.A. to protect them from the dangers and risks of using online Products.

556.  Each Defendant failed to use even slight diligence in fulfilling the duties owed to Plaintiffs.

557.  Each Defendant has grossly breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its Products. Those breaches include:

    a.    Including features and patented technology in their Products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of

the product by youth, including O.A.;

b.    Including features and patented technology in their Products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including O.A., including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.    Including features and patented technology in their Products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including O.A.;

d.    Maintaining unreasonably dangerous features and algorithms in their Products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users, including O.A.; and

e.    Facilitating use of their Products by youth under the age of 13,

including by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols.

558. Each Defendant has grossly breached its duties of care owed to Plaintiffs through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its Products. Those breaches include:

a.   Failing to implement effective protocols to block users under the age of 13;

b.   Failing to implement effective parental controls;

c.   Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

d.   Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content and/or microtransactions;

e.   Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or

sleep; and

f.    Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

559.   A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and protective of youth users including O.A.; yet **DEFENDANTS** did not do this. This was a gross breach of duties owed to Plaintiffs.

560.   As a direct and proximate result of each Defendant's gross breach of one or more of its duties, O.A.  has been injured and Plaintiffs were harmed. Such injuries and harms include addiction to, or compulsive or excessive use of, **DEFENDANTS**' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

561.   Each Defendant's gross breach of one or more of its duties

proximately caused Plaintiffs' injuries and damages.

562.  Each Defendant's breach, or negligent act, as described and identified herein, was done with knowledge that **DEFENDANTS**' Products (including those identified herein and used by O.A.) posed imminent, clear, and real danger to foreseeable users of those Products (including O.A.).

563.  As a direct and proximate result of each Defendant's course of conduct and breach of duties, O.A. has been gravely injured, and have required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

564.  Each Defendant was grossly negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

565.  Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

566. The **DEFENDANTS** outrageous, extreme, and reckless conduct, as described herein, caused Shane Ayers and O.A. to experience extreme emotional distress; and that misconduct includes but is not limited to:

    a.    Each Defendant intentionally designed its Products to addict

minor, young adult, and neurodivergent users, the type of individuals who were particularly unable to appreciate the risks posed by **DEFENDANTS**' products and were particularly susceptible to harms from those products.

b. Each Defendant intentionally designed its Products to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harm;

c. Each Defendant designed its Products in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

d. **DEFENDANTS** intended for their products to be psychologically and neurologically addictive when used in their intended manner by their intended audience; and intended for minors, like O.A., to use each **DEFENDANTS**' video gaming product and intended for users, like O.A., to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of **DEFENDANTS**' conduct and immoral tactics;

e.  **DEFENDANTS** knew that extended use of video games, *i.e.,* their products, could likely cause addiction, yet each Defendant engaged in the course of conduct and reckless behavior surrounding their Products;

f.  Each Defendant intentionally failed to warn users, prospective users, or their parents/guardians of the addictive components of its Products and gaming products; and

g.  Each Defendant displayed flagrant disregard and an entire want of care to the consequences of their conduct, including to the health, safety, and welfare of their customers.

567. Each Defendant's conduct in designing and developing its products to knowingly and purposefully addict and harm users—especially minors, young adults, and neurodivergent individuals—was intentional, reckless, extreme, and outrageous, and was beyond all possible bounds of decency, and was to be regarded as atrocious and utterly intolerable in a civilized community.

568. Each Defendant knew users, like O.A., would likely become addicted to **DEFENDANTS**' Products because each Defendant designed and developed their Products to become more stimulative over time, to maximize young consumers' usage time, and to addict them so

**DEFENDANTS** can continue to profit off users, including O.A., after initial purchase or download.

569. Each Defendant knew that when users, like O.A., became addicted to **DEFENDANTS**' Products due to the addictive and defective qualities thereof, that parents and families, like Plaintiffs, would be forced to deal with an uncontrollable video game addiction in their child and the harmful effects of such addiction.

570. Each Defendant intended to inflict emotional distress (*e.g.*, causing addiction) on users, like O.A., and should have known product users and their families, like Plaintiffs, would suffer emotional distress as a result of **DEFENDANTS**' conduct.

571. Plaintiffs have sustained severe emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct.

572. Further, O.A.'s family has endured bouts of gamer's rage and emotional disturbances by O.A., which will require out-patient counseling, private tutoring and/or home-schooling.

573. **DEFENDANTS**' conduct—individually and collectively—including their decision to intentionally create and market products that addict and abuse children and cause them severe mental and physical harm

and distress—is extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

574.   No reasonable person would be expected to endure such severe emotional distress as each Defendant has caused Plaintiffs.

575.   As a direct and proximate result of each Defendant's outrageous conduct and infliction of emotional distress, O.A. has experienced extreme emotional distress and will require additional treatment for their mental health conditions proximately caused by **DEFENDANTS**' outrageous behavior.

576.   As a direct and proximate result of each Defendant's outrageous conduct and infliction of emotional distress, Shane Ayers has experienced severe emotional distress that has resulted in pain, suffering, and mental anguish, including having to witness O.A. suffer from addiction, pain, and mental distress caused by **DEFENDANTS**' outrageous conduct.

577.   As a direct and proximate result of each Defendant's outrage, Plaintiffs have been damaged. more specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

## COUNT VIII
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

578.  Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

579.  Each Defendant owed O.A. a duty to act as a reasonably careful company under the circumstances and not cause severe emotional distress to foreseeable users; yet each Defendant did just that.

580.  A reasonably careful company would not fail to disclose the serious safety risks presented by its Products; yet each Defendant defectively designed its Products to addict minors, young adults and neurodivergent individuals who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products.

581.  Each Defendant defectively designed its Products to take advantage of the chemical reward system of users' brains (especially young users including O.A.) to create addictive engagement, compulsive use, and additional mental and physical harm.

582.  Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of O.A.'s use of **DEFENDANTS**' Products.

583.  At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its Products (as developed, setup,

managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth, including O.A., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

584. Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users, including O.A., of its Products, including O.A., would not and could not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

585. A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users, including O.A.; yet **DEFENDANTS** did not do this and caused Plaintiffs to experience severe emotional distress and psychological trauma.

586. A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable

risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that and caused Plaintiffs to experience severe emotional distress and psychological trauma.

587. A reasonably careful company would protect O.A. from unreasonable risk of injury from and in the use of its products, and the emotional distress likely to result therefrom; yet each Defendant failed to do that and caused Plaintiffs to experience severe emotional distress and psychological trauma.

588. A reasonably careful company would not invite, encourage, or facilitate youth, young adults, and neurodivergent individuals, including O.A., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products, and that such foreseeable users would experience severe emotional distress as a result of that designed-addictive behavior; yet each Defendant did just that and caused Plaintiffs to experience severe emotional distress and psychological trauma..

589. A reasonably careful company would disclose the serious safety risks presented by its Products and that those safety risks included psychological trauma; yet each Defendant failed to disclose such risks and caused Plaintiffs to experience severe emotional distress and psychological

trauma.

590.   Each Defendant has breached the duties owed to O.A. and caused Plaintiffs to endure psychological trauma.

591. **DEFENDANTS'** Products are psychologically and neurologically addictive when used in their intended manner by their intended audience; and **DEFENDANTS** reasonably should have known that when used as intended by minors, young adults, and neurodivergent individuals, including O.A., to use each **DEFENDANTS'** video gaming product and for users, including O.A., to become addicted to the product, or should have known that users (particularly minors, young adults, and neurodivergent individuals) would become addicted and experience emotional and physical injuries, including severe emotional distress, as a result of **DEFENDANTS'** conduct and immoral tactics.

592. Each Defendant knew, or should have known, that users, including O.A., would become addicted to **DEFENDANTS'** Products because each Defendant designed and developed their Products to become more stimulative over time, to maximize young consumers' usage time, and made them addictive to these vulnerable consumers so **DEFENDANTS** can continue to profit off of users, including O.A., after initial purchase or download.

593.  Each Defendant knew, or should have known, that the harm caused to foreseeable users of **DEFENDANTS**' Products, including the harm caused to minors, young adults, and neurodivergent individuals and experienced by O.A., would cause severe emotional distress to those in close personal relationship to the harmed user, including parents like Shane Ayers.

594.  Each Defendant's conduct was closely connected to Plaintiffs' emotional distress, which was highly certain to occur.

595.  As a direct and proximate result of each Defendant's breach of one or more of its duties, Plaintiffs have sustained emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct.

596.  As a direct and proximate result of each Defendant's negligent conduct and infliction of emotional distress, O.A. has experienced extreme emotional distress, including diminished social interactions, loss of friends, poor hygiene, and withdrawal symptoms such as rage, anger, and physical outbursts.

597.  and is required (and will require) additional treatment for their mental health conditions proximately caused by **DEFENDANTS**' outrageous behavior.

598.  As a direct and proximate result of each Defendant's negligent conduct and infliction of emotional distress, Shane Ayers has experienced extreme emotional, including a fractured parent-child relationship, and loss of parenting role.

599.  As a direct and proximate result of each Defendant's negligent infliction of emotional distress, Plaintiffs have been damaged. more specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

600. Each Defendant negligently caused Plaintiffs to experience emotional distress and psychological trauma, such that Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

### COUNT IX
### FRAUD

601. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

602. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling,

suppling, leasing, selling, and otherwise distributing the Products used by O.A..

603.  As detailed herein, each Defendant knew about the defective conditions of its Products and that the products posed serious health risks to users, particularly minors, young adults, and neurodivergent individuals.

604.  Each Defendant knew their Products posed risk to minors, like O.A., based on internal research and external studies known in the industry and to each Defendant; yet each Defendant misrepresented the safety and value of their games for the purpose of inducing users, like O.A., to purchase/download the game and to continue using **DEFENDANTS**' products to the addiction knowingly caused by **DEFENDANTS**' products.

605.  Each Defendant could have disclosed the defective condition of their Products to the public and could have advised that the products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

606.  Each Defendant intentionally and knowingly did not disclose the serious safety risks presented by its Products.

607. Each Defendant intentionally omitted or knowingly did not disclose material facts about their Products, or their collective use of patents

designed to addict players to **DEFENDANTS**' products.

608. Each Defendant concealed the serious safety risks presented by its Products, including **DEFENDANTS**' concealment from the public, including Plaintiffs, that each Defendant designed its Products with addictive psychological features to take advantage of the chemical reward system of users' brains, to trick and induce users into purchasing addictive Products, and to keep users playing more often and for longer periods of time, despite **DEFENDANTS**' knowledge that abuse, addiction, and compulsive use of **DEFENDANTS**' Products by youth and neurodivergent people can lead to brain damage, addiction, and other injuries.

609. Each Defendant knew of the risks associated with use of their products based on internal research and external studies known within the industry and to each Defendant, and each Defendant intentionally concealed those findings in order to induce youth, including O.A., to continue using its Products and avoid losing users and revenue.

610. Each Defendant knew that its concealment was material.

611. Each Defendant intended its concealment to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game product transactions in each Defendant's product.

612. In addition to hiding and concealing the dangers of their Products, each Defendant made material misrepresentations (and others) about their Products while knowing or believing those representations to be false *and* with the intent that Plaintiffs (and the public) rely on those misrepresentations.

613. **DEFENDANTS**' false representations involve, but are not limited to, material misstatements about the safety of **DEFENDANTS**' Products, and other misstatements identified herein and made directly to consumers, including Plaintiffs.

614. Each Defendant also knowingly and recklessly misled the public—particularly product users, and their parents, including Plaintiffs, into believing these products were safe or even beneficial for children to use.

615. Each Defendant knew that its acts of concealment and omissions, nondisclosures, and misrepresentations involved material information.

616. **DEFENDANTS**' omission, nondisclosures, and misrepresentations were material because a reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of **DEFENDANTS**' products—to be important when deciding whether to use, or continue to use, those products.

617. If **DEFENDANTS** had not concealed, omitted, and misrepresented material facts regarding the safety of their products, Shane Ayers would not have allowed O.A. to use **DEFENDANTS**' Products and would not have purchased, downloaded, played, continued to use, and/or purchased downloadable game or content upgrades or in-game transactions in each Defendant's product.

618. As a direct and proximate result of each Defendant's material omissions and intentional nondisclosures, Plaintiffs had no reason to believe that each Defendant's products were unsafe for children to use.

619. As a direct and proximate result of each Defendant's concealment of material information, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

620. As a direct and proximate result of each Defendant's concealment, omission, nondisclosures, and misrepresentation of material information, O.A. have been injured and Plaintiffs have sustained damages, as described herein.

621. Each Defendant took affirmative steps to conceal the true nature and risk posed by their Products and each Defendant's fraudulent

concealment constitutes intentional, willful, wanton, and reckless conduct displaying an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers; therefore, an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the **DEFENDANTS** and deter others from like conduct is warranted.

622. The **DEFENDANTS**' fraudulent concealment tolls any applicable statute of limitations.

623. At all relevant times, within **DEFENDANTS**' Products, each Defendant included the ability for users, including Plaintiffs, to purchase in-game downloadable products or microtransactions; yet each Defendant hid the risk of harm posed by those products and that each Defendant used patented technologies and psychological features to target users based on their use of the product and other interactions with **DEFENDANTS**' products.

624. Users of **DEFENDANTS**' products, including minors, young adults, and neurodivergent individuals such as O.A., were deceived by each Defendant in connection with these microtransactions through false representations and material misstatements built into each Defendant's products.

625.  **DEFENDANTS**' methods of deceit include but are not limited to, using features and patented technology in each Defendant's product, including patented matchmaking technologies and algorithms to "put" players in certain game scenarios requiring additional purchases to advance, AI avatars or "friends" to encourage purchase, and disguised features of the **DEFENDANTS**' products, which misrepresent to users, like O.A., that game-selected purchases would help them advance in the game or complete necessary missions.

626.  **DEFENDANTS** made these false representations and material nondisclosures with intent that product users, like O.A., spend money on microtransactions.

627.  At the time each Defendant utilized these technologies to deceive O.A., and each Defendant knew that the representations made through the game were false and existed only to entice O.A. to continue spending.

628.  Each Defendant intended its fraudulent in-game microtransactions and psychological tactics to take advantage of users like O.A.

629.  At the same time, each Defendant knew that misrepresentations served only to increase users'—including O.A.'s—inherent risk of danger, specifically a risk of abuse, addiction, and compulsive use by youth which can

lead to a cascade of harms. Those harms include, but are not limited to, brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

630.  O.A. reasonably relied on **DEFENDANTS**' misrepresentations within each Defendant's product to make several in-game purchases that actually had little to no value to O.A. within the game.

631. Had Plaintiffs known that the representations in each Defendant's Products regarding in-game purchases were false and fraudulent, and the result of **DEFENDANTS**' use of patented technologies, O.A. never would have purchased **DEFENDANTS**' Products or spent money on additional in-game downloadable content or microtransactions built into the product design.

632.  Furthermore, as detailed herein, each Defendant knew about the defective conditions of its Products and that the products posed serious health risks to users.

633.  Even though each Defendant knew of the risks based on its internal information and external studies known to each Defendant, each Defendant intentionally and knowingly misrepresented those findings to avoid losing revenue so that product users, like O.A., would continue using each Defendant's Products.

634. Each Defendant knowingly and recklessly misled the public, users, and their parents and/or guardians, including Plaintiffs, into believing their Products were safe or even beneficial for children to use.

635. Each Defendant intended its misrepresentations, concealment, misstatements, and omissions to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

636. By intentionally making numerous material misrepresentations, downplaying any potential harm associated with its Products, and reassuring the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant did fraudulently induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product..

637. Each Defendant knew that its concealment, misstatements, and omissions were material, and that users, like O.A., would be induced into spending money that they would not spend on **DEFENDANTS**' products if they knew the truth.

638. A reasonable person, including Plaintiffs, would find information

that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of **DEFENDANTS**' products— to be important when deciding whether to use, or continue to use, those products. Thus, Plaintiffs justifiably relied on each Defendant's material misrepresentations that the products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content or in-game product transactions in each Defendant's product.

639.  As a direct and proximate result of each Defendant's fraudulent inducement, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably relied on Defendant's fraudulent conduct when purchasing, downloading, playing, and/or continuing to use each Defendant's Products, and/or purchasing downloadable game content or in-game product transactions in each Defendant's product.

640. As a direct and proximate result of each Defendant's concealment of material information, Plaintiffs have been financially and otherwise harmed through each Defendant's inducements to utilize their products, download and play their games, and/or continuously spend funds through its products.

641.  By intentionally making numerous material misrepresentation,

including, but not limited to, downplaying any potential harm associated with its Products, and affirmative representations to the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant intended to mislead the public, users, and their parents, including Plaintiffs, into believing its products were safe for children to use.

642. Each Defendant knew that its misstatements and false representations, as identified herein, were material.

643. The misrepresentations described herein were made to Plaintiffs—particularly to O.A. —prior to their purchase of each Defendant's product and to O.A. while O.A. was using **DEFENDANTS**' products as intended.

644. Each Defendant intended its material misstatements and false representations to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game product transactions in each Defendant's product.

645. Plaintiffs relied on **DEFENDANTS**' material misstatements and false representations in deciding whether to use, or continue to use, each of **DEFENDANTS**' products; specifically, Roblox and the Apple Store App.

646. Plaintiffs' reliance on each Defendant's material misrepresentations when purchasing, downloading, playing, continuing to

use, and/or downloadable game content upgrades or in-game transactions in each Defendant's product was justifiable and reasonable under the circumstances.

647.  As a direct and proximate result of each Defendant's material misrepresentations and false statements, *i.e.,* **DEFENDANTS**' deceit, Plaintiffs were not aware and could not have been aware of the material facts that each Defendant misrepresented or falsified, and therefore Plaintiffs justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

648.  As a direct and proximate result of each Defendant's material misrepresentations and false statements (*e.g.,* **DEFENDANTS**' deceit), Plaintiffs have been damaged. Such damage includes O.A.'s physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; O.A.'s inability to attend school; economic loss related to expenses incurred as a result of using **DEFENDANTS**' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to O.A.'s physical and mental injuries. O.A.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

649.  Each Defendant engaged in fraudulent misrepresentations and

deceit that is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial and in an amount a jury finds will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

650. In conjunction with **DEFENDANTS**' acts of concealment, omission, nondisclosure, and misrepresentation, each Defendant knowingly and recklessly misled the public, users, and their parents and/or guardians, including Plaintiffs, into believing these products were safe or even beneficial for children to use.

## COUNT X
## NEGLIGENT MISREPRESENTATION

651. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

652. Each Defendant had a pecuniary interest in the Products used by O.A.

653. Each Defendant—and all designers, developers, manufacturers, publishers, and suppliers of Products having a pecuniary interest in these Products—had a duty to communicate accurate information and to make truthful statements of material fact to the public about their Products. This duty includes but is not limited to telling Plaintiffs the truth about the addictive design and dangerous condition of **DEFENDANTS**' products

used by O.A. and that those products posed serious health risks to users, particularly youth, young adults, and neurodivergent individuals.

654. As detailed herein, each Defendant designed and developed their products to be addictive and knew, or should have known, its Products pose serious health risks to users, particularly minors, including O.A.; yet each Defendant made false statements of material fact relating to the educational and developmental value, along with the safety of daily, prolonged use and safety of use by minors due to age-based controls. More specifically, each Defendant made numerous partial material representations to the public, users, and their parents, including Plaintiffs, downplaying any potential harm associated with its products and reassuring the public, users, and Plaintiffs that its products were safe or even beneficial for children to use.

655. Each Defendant made false statements and misrepresentations with intent to induce Plaintiffs (and the general public) to purchase and use their Products believing them to be safe for use as intended, and to continue to use their product and make in-game purchases and microtransactions.

656. Each Defendant knew, or should have known, that their product was addictive and poses safety risks to users based on its internal research and industry-trade secrets known to each Defendant and, therefore, were careless and negligent in ascertaining the truth of their statements prior to

making them to Plaintiffs and the public.

657. **DEFENDANTS**' false statements and material misrepresentations downplaying any potential harm associated with its products did, in fact, induce Plaintiffs to purchase and use **DEFENDANTS**' products—and Shane Ayers relied upon **DEFENDANTS**' false statements and misrepresentations in allowing O.A. to use **DEFENDANTS**' games and gaming products, Likewise, O.A. relied on **DEFENDANTS**' false statements and misrepresentations in conjunction with in-game purchases and **DEFENDANTS**' deceptive microtransaction mechanisms, including the use of fake "friends" to induce O.A. into spending money.

658. Plaintiffs' reliance on **DEFENDANTS**' false statements was justifiable and reasonable since each Defendant concealed or misstated the truth about the addictive-design of their products.

659. Plaintiffs have been damaged because of the false statements of each Defendant and Plaintiffs' reliance on each Defendant's statements. This damage includes the injuries and harms to Plaintiffs, described above, including but not limited to O.A.'s addiction to, or compulsive or excessive use of, **DEFENDANTS**' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes,

and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life. Further, as a direct and proximate result of each Defendant's material misrepresentations, O.A. have required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

660.  Plaintiffs would not have incurred these damages, injuries, and economic losses but for the addictive and harmful propensities of **DEFENDANTS**' Products.

### COUNT XI
### CIVIL CONSPIRACY

661.  Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

662.  A civil conspiracy occurs when two or more persons with an unlawful objective, after a meeting of the minds, commit at least one act in furtherance of the conspiracy and thereby damage another. Such a conspiracy occurred here.

663.  The **DEFENDANTS** conspired to addict users, including O.A., to **DEFENDANTS**' Products.

664. As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like O.A., with

unfair and deceptive trade practices in order to maximize profits off of the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by O.A. and other users.

665.  Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each **DEFENDANTS** to utilize the same patents to keep users, including minors like O.A., addicted to **DEFENDANTS**' products.

666.  More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like O.A., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

667.  As described herein, Roblox Corp. knowingly conspired and otherwise acted in concert with Google to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Florida's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase **DEFENDANTS**' revenue at the expense of

consumers, including Plaintiffs.

668.  As described herein, Mojang knowingly conspired and otherwise acted in concert with each other, and with Microsoft, Nintendo and Google, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Florida's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase **DEFENDANTS**' revenue at the expense of consumers, including Plaintiffs.

669. As described herein, Epic Games knowingly conspired and otherwise acted in concert with Microsoft, Nintendo, and Google to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Florida's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase **DEFENDANTS**' revenue at the expense of consumers, including Plaintiffs.

670. As described herein, Microsoft knowingly conspired and otherwise acted in concert with Mojang, Epic Games, and Roblox to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Florida's products liability and common law, and to otherwise engage in the wrongful, deceitful, and

tortious acts, as identified herein, in an effort to increase **DEFENDANTS**' revenue at the expense of consumers, including Plaintiffs.

671.    As described herein, Nintendo knowingly conspired and otherwise acted in concert with Mojang/Microsoft and Epic Games to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Florida's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase **DEFENDANTS**' revenue at the expense of consumers, including Plaintiffs.

672.    As described herein, Google knowingly conspired and otherwise acted in concert with Roblox Corp., Epic Games, Mojang, and Microsoft to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Florida's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase **DEFENDANTS**' revenue at the expense of consumers, including Plaintiffs.

673.    The **DEFENDANTS** knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote,

control, sell, supply, lease, distribute, and benefit from their harmful Roblox video gaming product, and that addicted and harmed O.A.

674. As described herein, the **DEFENDANTS** conspired with and acted in concert with each other to distribute, market, supply, and/or sell Products and all in-game downloadable content and in-game purchases contained in an effort to increase' revenue at the expense of consumers, including Plaintiffs.

675. Each Defendant made a conscious commitment to participate in the selling, lease, or otherwise distribution of its video gaming product to users, including O.A., while knowing of the unreasonable risk of harms from their products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries).

676. Each Defendant shared a common purpose of fraudulently concealing the unreasonable risk of harm in its gaming product while continuing to market, sell, and otherwise distribute its product to users, including O.A.

677. These conspiracies allowed **DEFENDANTS** to maximize profits, all while causing significant harm to users, like Plaintiffs.

678. Plaintiffs sustained injuries and damages, as described herein, as

a direct and proximate result of the conspiracies described herein.

679.  Plaintiffs' injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

680.  The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using **DEFENDANTS**' products. As a proximate result of **DEFENDANTS**' conspiring to make their Products addicting, Plaintiffs continue to suffer injuries and damages as O.A. is unable to stop using **DEFENDANTS**' Products as a result of their addiction, **DEFENDANTS**' defective product designs, and **DEFENDANTS**' failure to warn consumers, like Plaintiffs, about the harmful and addictive qualities and components of those Products.

## COUNT XII
## AIDING AND ABETTING

681. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here,

682. Aiding and abetting arises where one party acts in concert with another tortfeasor; **DEFENDANTS** committed the tort of aiding and abetting in injuring and harming Plaintiffs.

683. As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like O.A., with

unfair and deceptive trade practices to maximize profits off the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by O.A. and other users.

684. Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each Defendant to utilize the same patents to keep users, including minors like O.A., addicted to **DEFENDANTS**' products.

685. More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like O.A., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

686. Each Defendant that licenses harmful patented technology from the creator, designer, and/or developer of said harmful technology is therefore liable for the harmful consequences arising from such technology.

687. Each Defendant knew of the risk of abuse, addiction, and compulsive use by youth, including O.A., arising from the harmful technologies and tactics contained in the patents, but continued to enter into licensing agreements, develop additional patents for license, and

encourage the other **DEFENDANTS** to do the same.

688. Additionally, the **DEFENDANTS** acted in concert with one another to place addictive games and technology in its Products and encourage the purchase and use of such products by minors, young adults, and neurodivergent individuals.

689. **DEFENDANTS** do not place any restrictions on game developers collecting and tracking game playing behavior, game stimulus to trigger purchasing microtransactions, or amount of time a player, who is a minor, including O.A., can spend playing games.

690. Each Defendant aided, abetted, and/or assisted in continuing to fraudulently conceal the unreasonable risk of harm in its own gaming product, and in all others.

691. Such concerted conduct allowed **DEFENDANTS** to maximize profits, all while causing significant harm to users, including Plaintiffs.

692. Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of the concerted conduct described herein.

693. Plaintiffs' injuries and damages cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

694. The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately

apparent from using **DEFENDANTS**' products.

695. As a proximate result of **DEFENDANTS**' conspiring to make their games addicting, O.A. continues to suffer injuries and is unable to stop using **DEFENDANTS**' Products as a result of O.A.'s addiction, **DEFENDANTS**' defective design and **DEFENDANTS**' failure to warn consumers, including Plaintiffs, about the addictive qualities and components of those products.

696. Each Defendant actively took part in the tortious, negligent, outrageous, fraudulent, deceptive, and malfeasance that proximately caused O.A.'s addiction and Plaintiffs' damages, as described herein.

697. For these reasons, **DEFENDANTS** have shared liability for Plaintiffs' injuries and damages.

## COUNT XIII
## SHANE AYERS'S LOSS OF CONSORTIUM

698. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

699. In Florida, a parent of an injured child may recover for the loss of companionship, society, love, affection, and solace as well as ordinary day-to-day services during the child's minority, expenses of treatment, and other damages based on a defendant's tortious conduct.

700. As described herein, each Defendant has designed its Products to

take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement, compulsive use, and additional mental and physical harm, engaged in intentional, deceptive, and unreasonable business practices in connection with **DEFENDANTS**' Products, which injured Shane Ayers's child, O.A.

701. As a direct and proximate result of the aforesaid careless, intentional, negligent, deceptive, fraudulent, reckless, willful, immoral, and unlawful acts on the part of each Defendant, and by reason of the personal injuries sustained by O.A., Shane Ayers has sustained damages—including great mental anguish and emotional distress—and may sustain such damages in the future by reason of O.A.'s injuries and a resulting loss of O.A.'s companionship, society, love, affection, and services.

## **PRAYER FOR RELIEF**

702. Plaintiffs Shane Ayers, individually and on behalf of O.A., a minor, respectfully request judgment in their favor and against each **DEFENDANTS** to the full extent of the law, as follows:

a. For an award of compensatory damages for O.A. in an amount to be determined at trial on the following elements of damage:

i. The nature, extent, duration, and permanency of O.A.'s injuries;

ii. The reasonable expense of all necessary medical care, treatment, and services received including transportation and board and lodging expenses necessarily incurred in securing such care, treatment, and services;

iii. The present value of all necessary medical care, treatment, and services including transportation and board and lodging expenses necessarily incurred in securing such care reasonably certain to be required in the future;

iv. The pain, suffering, and mental anguish experienced in the past;

v. The pain, suffering, and mental anguish reasonably certain to be experienced in the future;

vi. The present value of any loss of ability to earn in the future;

vii. Any scars, disfigurement, and visible results of O.A.'s injuries;

viii. The reasonable expense of any necessary help in O.A.'s home which has been required as a result of O.A.'s injuries;

ix. The present value of any necessary help in O.A.'s home reasonably certain to be required in the future;

x. O.A.'s inability to attend school;

xi.  Actual financial loss; and

xii.  Any other actual pecuniary loss or future financial loss proximately caused by **DEFENDANTS**.

b.  For an award of compensatory damages for Shane Ayers, in an amount to be determined at trial, to fairly compensate Shane Ayers for pain, suffering, mental anguish, emotional distress, actual financial loss, and the reasonable value of any loss of the services of his children resulting from the injuries to O.A. proximately caused by **DEFENDANTS**' tortious acts and misconduct described herein;

c.  For an award of actual damages, including economic and pecuniary loss, in an amount to be determined at trial;

d.  For an award of statutory damages in an amount to be determined at trial;

e.  For an award of costs and attorneys' fees, as allowable by law;

f.  For pre-judgment and post-judgment interest, as allowable by law; and

g.  For such other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted this 5th day of September, 2024.

**GOMEZ TRIAL ATTORNEYS**

<u>/s/ Joshua R. Harris</u>
Joshua R. Harris (FL 124124)
182 N. Palafox St., Suite 109
Pensacola, FL 32502
(619) 237-3490
(619) 237-3496 (facsimile)
josh@getgomez.com

**REICH & BINSTOCK, LLP**

Robert Binstock
4265 San Felipe, Suite 1000
Houston, Texas 77027
(713) 622-7271
(713) 623-8724 (facsimile)
bbinstock@reichandbinstock.com

*Admitted Pro Hac Vice*

**STERLINGTON LAW, PLLC**

Todd McClelland
One World Trade Center
85th Floor
New York, New York 10007
(404) 483-6976
todd.mcclelland@sterlingtonlaw.com

*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs Shane Ayers, individually and on behalf of O.A., a minor*

## CERTIFICATE OF SERVICE

I, certify that on September 5, 2024, I electronically filed the foregoing *Amended and Supplemental Complaint and Demand for Jury Trial* with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record for all Defendants.

Dated: September 5, 2024                    /s/ Joshua R. Harris